## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

In re:

Sixty Sixty Condominium Association, Inc.      Case No. 16-26187-RAM
      Debtor-in-Possession.             Chapter 11

_____/


In re:

Sixty Sixty Condominium Association, Inc.      Adv. Pro Case No.

      Plaintiff.

v.

Schecher Group, Inc. D/B/A
SG Shared Components

_____/


## COMPLAINT TO DETERMINE VALIDITY, PRIORITY AND EXTENT OF LIENS, SETOFF, OBJECTION TO CLAIM & REQUEST FOR DECLARATORY JUDGMENT

COMES NOW Sixty Sixty Condominium Association, Inc., the Chapter 11 debtor and debtor-in-possession herein (the "Plaintiff") and hereby brings this action against the Schecher Group, Inc. ("Schecher"), and alleges as follows:

### JURISDICTION

1.      On December 5, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code commencing the above captioned main bankruptcy case (the "Main Case" or "MC"). (MC ECF #1).

2.      This adversary proceeding is brought pursuant to 11 U.S.C. §§363(p)(2), 506, 544, 553, and 547 and Federal Rules of Bankruptcy Procedure 3007 and 7001.

3.      On April 14, 2017, this Court entered its *Order Setting Deadline For Debtor to File Adversary Proceeding* (MC ECF #204), requiring that "by April 27, 2017, the Debtor shall

file an adversary proceeding against the Schecher Group, Inc. to determine the amount of the Schecher Group's lien against the commercial units and residential unit owned by the Debtor."[1]

4.      This adversary proceeding is timely filed.

5.      This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§151, 157 and 1334(b). Venue is proper pursuant to 28 U.S.C. §1409.

6.      This adversary proceeding is a core proceeding as defined at 28 U.S.C. §157(b)(2)(B), (b)(2)(F) and (b)(2)(K) in that it is an action to determine the nature, extent and validity of a lien on property, to avoid a liens perfected during the preference period, improperly perfected liens, and the allowance or disallowance of a claim.

7.      The Plaintiff is a not-for-profit Florida corporation; a condominium association for a condominium located at 6060 Indian Creek Drive in Miami Beach, Florida (the "Condominium").

8.      The Plaintiff is a condominium association entitled to serve as the lawful representative of each and every unit owner of the Condominium pursuant to Florida Statutes §718.111(3).

9.      The Defendant, Schecher, is a for-profit Florida corporation with an address of 120 Piper Blvd., Port Orange, FL 32128.

10.     Richard J. Schecher, Sr. ("RJS") is the CEO of Schecher.

11.     Schecher does business in the State of Florida, in Miami-Dade County.

12.     Schecher now claims to be a creditor of the Plaintiff.

13.     Schecher is also a voting member of Plaintiff.

---

[1] Plaintiff holds other claims against Schecher Group, Inc. potentially sounding in contract, tort, statute and/or other basis not asserted herein and are hereby preserved in their entirety. MC ECF#25 at ¶74.

14.    "Presently, the Schecher Group takes the position that … it controls at least twenty-two (22%)(19 ÷ 87 = .218) … of all voting interest of the Unit Owners…" of the Plaintiff.[2] MC ECF #218 at p. 24.

15.    Accordingly, Schecher presently takes the position that it is an affiliate and insider of Plaintiff (the "Insider Allegation"). *See* 11 U.S.C. 101(1)(A), (B) & 101(31).

## GENERAL ALLEGATIONS

16.    On or about April 10, 2006, the Condominium was officially created by recording the *Declaration of Sixty Sixty Condominium* in the Official Records Book 24411, Page 1780 of the Public Records of Miami-Dade County, Florida (the "Declaration"). (MC ECF #138).

17.    The Condominium is composed of 87 "units", which includes: (i) 82 residential units (the "Residential Units") that are privately owned by the Residential Unit owners (the "RUOs");[3] (ii) four commercial units (the "Commercial Units")[4] presently owned by the Plaintiff (in this capacity, the "CUO"), and, (iii) generally speaking, all areas not within a Residential Unit or Commercial Unit are deemed to be a part of the hotel unit ("HU") owned and operated by Schecher.

18.    The Plaintiff owns the Commercial Units and Unit 505.

19.    Schecher acquired its interest in the HU by special warranty deed dated March 20, 2013.

20.    On March 20, 2013, Plaintiff entered into: (i) a *Condominium Management Agreement* with Schecher's affiliate, Condominium Hotel Management Corporation, Inc. ("CHMC") to manage Plaintiff.

21.    RJS is the Director of CHMC.

---

[2] Plaintiff disagrees with Schecher's computation of its percentage of voting interests.
[3] The Plaintiff owns Residential Unit 505 ("Unit 505").
[4] The Commercial Units are comprised of units "CU-1", "CU-2", "CU-3" and "CU-4").

22.     Also on March 2013, Plaintiff entered into an addendum to a certain *Operations Agreement*[5] with CHMC through which Schecher agreed to be bound by the Operations Agreement.

23.     According to CHMC, CHMC managed Plaintiff for approximately three years, "from March 20, 2013 through the end of 2015" (the "CHMC Management Period"). MC ECF #33 ¶1.

24.     According to CHMC, "CHMC's provision of management services to [Plaintiff] was ancillary to services provided to Schecher Group, as Hotel Unit Owner. Such ancillary services were provided at no charge to [Plaintiff]." MC ECF #33 ¶2.

25.     According to CHMC, "[b]illing and invoices related to [Plaintiff] are in the possession of Schecher Group." MC ECF #33 ¶2.

### *The Insurance Proceeds Issue*

26.     In June of 2014, while CHMC was managing the Plaintiff and Schecher, a Residential Unit on the 9th floor under CHMC's stewardship had a significant plumbing issue.

27.     The plumbing issue caused material water damage to Residential Units and Shared Components on floors 5-9 of the Condominium (the "Flood Event").

28.     As a result of the Flood Event and CHMC's and Schecher's failure to timely remedy same, the Fire Marshall issued a Cease & Desist Order on August 21, 2014.

29.     The Cease & Desist Order required evacuation of all Residential Units on floors 5, 6, 7, 8, and 9 through the end of October 2014. A 24 hour Fire Marshall watch was imposed by the City of Miami Beach.

30.     After October 2014, the majority of the units on the floors affected by the Flood Event re-opened.

---

[5] As defined in MC ECF #12.

31.     As of this Complaint, approximately ten units remain closed due to the damage.

32.     Upon information and belief, insurance has paid Schecher and/or its contractors, directly or indirectly, approximately **760,056** in connection with the Flood Event (the "Insurance Proceeds").

33.     To date, Plaintiff has not been provided a detailed explanation of the allocation of the Insurance Proceeds or any additional funds received on account of the Flood Event that would offset expenses related to same.

### *The Building Closure Issue*

34.     Upon information and belief, on or about April 6, 2015, A1 Fire & Security, LLC d/b/a MIRCOM Engineered Systems ("A-1") removed the custom smoke alarm panel from the Condominium and wrongfully discarded it.

35.     On April 13, 2015, the Condominium was again shut down and closed in its entirety by the City of Miami Beach Building Department as an Unsafe Building due to the following reasons:

> *Fire alarm panel was removed* and new panel still not in service Corridor walls and unit demising wall have been removed on units from 5th to the 9th floor Interior demo of all units from 5 to 9, smoke control system not functioning, exhaust vents from baths not protected and no damper shown from floor to floor, penetrations between floor not properly fire stopped, water lines from floor to floor corroded.

(emphasis added).[6]

36.     The Condominium was not reopened until late December 2016.

37.     The Condominium was not operational from April 2015 through late December 2016 (the "Lock-Out Period").

38.     On August 28, 2015, the Plaintiff commenced a lawsuit styled *Sixty Sixty*

---

[6] City of Miami Case Description, Case No. BV15000767.

*Condominium Association, Inc. v. Condominium Hotel Management Corporation, Inc., Schecher Group, Inc. and A1 Fire & Security LLC,* Case No. 2015-019981 CA 01 before the 11th judicial Circuit in and for Miami-Dade County, Florida (the "2015 Lawsuit").

39.    Among other things, the Plaintiff asserted claims against A-1 in the 2015 Lawsuit for negligence.

40.    As part of a mediated settlement agreement between Plaintiff, Schecher and CHMC, the 2015 Lawsuit was dismissed without prejudice and Schecher and CHMC agreed to prosecute the claim against A-1.

41.    On November 20, 2016, Schecher and Casablanca Rental Services, Inc. ("Casablanca")[7] filed a lawsuit against A-1 styled *Schecher Group, Inc. and Casablanca Rental Services, Inc., v. A1 Fire & Security LLC,* Case No. 2016-029937 CA 01 before the 11th judicial Circuit in and for Miami-Dade County, Florida  ("A-1 Lawsuit").

42.     The Plaintiff was not asked to join the lawsuit as a party plaintiff and the A-1 Lawsuit does not purport to seek damages that would benefit Plaintiff.

43.    The A-1 Lawsuit asserts claims of Schecher and Casablanca against A-1 for, among other things, negligence, conversion, trespass to chattles, breach of contract, slander of title, and to quite title.[8]

44.    Schecher's A-1 Lawsuit alleges that A-1 caused damages to Schecher in the form of, among other things, "costs necessary to purchase and install a new smoke control panel" (the "A-1 Damages"). A-1 Lawsuit, Complaint ¶41.

45.    However, upon information and belief, Schecher passed on 100% of the costs and expenses constituting the A-1 Damages to RUOs and CUOs, including Plaintiff.

---

[7] RJS is the CEO of Casablanca.
[8] Ironically, A-1 filed a proof of claim against the Plaintiff in the Main case asserting a secured claim in the amount of $57,001.87 ("POC #7"). MC Claim #7.

46.    To the extent Schecher makes a recovery on account of the A-1 Damages claim, such amounts ought to be applied to reduce charges made by Schecher against the RUOs and the CUO for same.

### *Schecher's Failure to Pay Plaintiff's Assessments/ Setoff*

47.    The Declaration empowers the Plaintiff to assess and specially assess the RUOs, the CUO, and the HU for the costs of Common Expenses[9] (the "Association Assessments"). Declaration §2.13.

48.    The Association Assessments are allocated across all unit owners pursuant to **Exhibit 3** of the Declaration (the "Common Expense Allocation").

49.    Under the Declaration, the Association holds a lien against all units for unpaid Common Expenses dating back to the date of the Declaration.

50.    Under the Common Expense Allocation, Schecher is responsible for paying at least 64.5962%, of the Common Expenses.

51.    On December 12, 2016, Plaintiff sought court approval of the engagement of Alessandra Stivelman and Eisinger, Brown, Lewis Frankely & Chait, P.A. ("Eisinger Law") to, among other things, represent Plaintiff in the collection of outstanding receivables ("Eisinger Employment Application"). MC ECF#10.

52.    On December 20, 2016, Schecher objected to the Eisinger Employment Application. MC ECF#30.

53.    On January 5, 2017, Plaintiff filed its supplement to the Eisinger Employment Application. MC ECF#53.

54.    On January 9, 2017, Plaintiff filed its application to employ Michael Marcusky

---

[9] All capitalized terms not otherwise defined herein shall have the same meaning as ascribed to them in the Declaration.

and Juda Eskew & Associates, PA ("JEA") in order to, among other things, assist the Plaintiff in collections of receivables including outstanding receivables (the "JEA Employment Application").

55.    On January 12, 2017, the Bankruptcy Court held a hearing on the Eisinger Employment Application and JEA Employment Application.

56.    On January 23, 2017, the Bankruptcy Court authorized the retention of Eisinger Law and JEA over Schecher's objections. MC ECF ##88 and 89.

57.    As of March 1, 2017, based on the records available to the Plaintiff, Schecher owes the Plaintiff approximately $889,921.29 in unpaid Association Assessments (the "$889k Obligation").

58.    On March 10, 2017, Eisinger Law sent its *Notice of Intent to Record a Claim of Lien* to Schecher on behalf of Plaintiff providing notice and disclosing the amount of the outstanding debt owed by Schecher to Plaintiff in the amount of $889,921.29 due through March 1, 2017 (the "Demand Letter").

59.    To date, Schecher has failed and refused to pay the $889k Obligation or any part thereof.

60.    On April 3, 2017, counsel for Schecher responded to the Demand Letter, disputing the amount of the $889k Obligation and demanding written verification of the debt (the "Schecher Response").

61.    The Schecher Response also states, "the Association also owes hotel unit fees for assessments, late fees, and interest which it has not paid and for which you apparently have not credited to the transaction detail you provided" (the "Offset Claim"). The Offset Claim of the

8

Schecher Response implicates the automatic stay under Section 362(a)(7) and the prohibitions against certain setoffs in Section 553 of the Bankruptcy Code.

62.     Eisinger Law and Plaintiff are taking all appropriate legal actions to prepare a reply to the Schecher Response.

### *Objection to Schecher's Proof of Claim #40*

63.     On or about April 11, 2017, Schecher filed a Proof of Claim in the Main Case ("POC 40"), asserting a claim in the sum of $1,075,516 (the "Claim Amount"), and further asserting that such claim is secured by liens against real property belonging to Plaintiff; the Commercial Units and Unit 505.

64.     Attached as Exhibit "B" to POC 40 appears to be a summary purporting to reflect the allocation of Schecher's total Claim Amount as against each Commercial Unit and Unit 505 (the "Summary Chart").

65.     The Summary Chart purports to be based on "Unit Ledgers".

66.     The "Unit Ledgers" themselves are not attached to POC 40.

67.     Other than the Summary Chart created by Schecher, POC 40 includes no documents purporting to support the calculation of the Claim Amount.

68.     Attached as Exhibit "A" to POC 40 is Schecher's *Statement of Claim* (the "Statement of Claim").

69.     The Statement of Claim asserts that Schecher owns the Shared Components (as defined in the Declaration). Statement of Claim at ¶4.

70.     The Statement of Claim asserts that as owner of the HU, Schecher is vested with certain rights under Sections 12.1, 12.3 and 12.4 of the Declaration. Statement of Claim at ¶7.

71.      The Declaration provides, among other things, that Schecher may impose charges against RUOs and the CUOs ("HU Assessments") for "the costs incurred by the Hotel Unit Owner in … the repair, replacement, improvement, maintenance, management, operation ad valorem tax obligations and insurance of the Shared Components … and any assessments payable by the Hotel Unit Owner to the Association" (the "Scope of HU Assessments"). Declaration §12.1.

72.      The Scope of HU Assessments does not include a profit component for Schecher.

73.      Schecher is not authorized to issue HU Assessments against RUOs or CUOs for any costs incurred by Schecher outside of the Scope of the HU Assessments.

74.      Schecher is not authorized to issue HU Assessments against RUOs or CUOs for any costs that would conceivably fall within the Scope of the HU Assessments but were not actually incurred by Schecher.[10]

75.      In sum, the Declaration provides that Schecher can only charge HU Assessments for costs actually incurred by Schecher that are properly within the Scope of HU Assessments.

76.      The Declaration further provides that such appropriate HU Assessments are chargeable against RUOs and the CUO pursuant to an allocation of such expenses pursuant to Exhibit 7 of the Declaration.

77.      Accordingly the total costs actually incurred by Schecher and properly within the Scope of HU Assessments constitutes the baseline of all HU Assessments against all RUOs and CUOs (the "Baseline").

78.      Once determined, the Baseline would provide a starting point to determine the appropriate HU Assessment against each and every RUO and CUO.

---

[10] As opposed to costs that were incurred by the Association for which Schecher is not liable.

79.     To determine any individual RUO or CUO's obligations for HU Assessments, the Declaration provides that the Baseline figure be multiplied by the allocation percentage attributable to the particular unit in Exhibit 7 of the Declaration (the "Allocable Share").

80.     Then, any payments (or other credits) made to Schecher by the RUO or CUO would be subtracted from the Allocable Share to determine the particular RUO or CUO's outstanding HU Assessment due.

81.     The Declaration provides that Schecher's right to impose the HU Assessments is in consideration for the easements provided under Sections 3.4(e) and 7.3 of the Declaration (the "Easement") and Schecher's agreement to repair replace, improve, maintain, manage, operate and insure the HU (the "HU Obligations"). Statement of Claim ¶12(4)(C); Declaration §§ 3.4(e); 7.3; 12.1.

82.     The Easement provided in Section 3.4(e) of the Declaration includes:

Ingress and Egress. A non-exclusive easement in favor of each Unit Owner and resident, their guests and invitees, for each member of the Association (and its and their guests, tenants and invitees) shall exist for (i) pedestrian traffic over, through and across such portions of the Hotel Unit as are designated by the Hotel Unit Owner and intended to provide direct pedestrian access to and from the applicable Residential Unit and/or Commercial Unit and the public right-of-way adjacent to the Condominium Property, and (ii) use and enjoyment of the Shared Components, subject to regulation as may be established from time to time by the Hotel Unit Owner and subject to the other provisions of this Declaration, specifically Section 3.3 above. **Notwithstanding the foregoing, the aforesaid easement over the Hotel Unit is limited and solely for use of the named beneficiaries' obtaining access to and from their Unit and shall not be used for the provision of any services, including, without limitation, any hotel related services including, but not limited to, solicitation and/or provision of housekeeping, personal services (i.e., massage, personal training, dry cleaning, etc.) and/or food and beverage service, it being understood and agreed by all Unit Owners that any such services may only be provided by the Owner(s) of the Hotel Unit.** The provisions of this section 3.4(e) may not be amended without an affirmative vote of not less than 4/5ths of all voting interests of all Unit Owners.

Declaration §3.4(e) (emphasis in original).

83.    "In consideration of the reservation and grant of easement over the Hotel Unit, as provided in Section 3.4(e) above, each Residential Unit Owner and each Commercial Unit Owner shall be obligated for payment of the expenses incurred by the Hotel Unit Owner(s) in connection with such maintenance, repair, replacement, improvement, management, operation, and insurance, all as more particularly provided in Section 12 below." Declaration §7.3.

84.    Of the HU Assessments, a certain portion is for those "assessments payable by the Hotel Unit Owner to the Association" (the "Association's Portion"). Declaration §12.1.

85.    Of any monies collected from RUOs and CUOs on account of HU Assessments, a portion of said payments are the Association's Portion.

86.    To date, Schecher withheld substantially all of the Association's Portion of the payments received from RUOs and CUOs from Plaintiff.

87.    Additionally, upon information and belief, an affiliate of Schecher has acquired four Residential Units.[11]

88.    To date, Schecher or Schecher's affiliated owner of the Residential Units has failed and refused to pay the Association Assessments for said units.

### Specific Nonexclusive Challenges to the Validity of the Amount of Schecher's POC 40

89.    In violation of the Declaration, Schecher charged HU Assessments to RUOs and CUOs, including the Plaintiff, that include costs incurred by Schecher that are outside the Scope of HU Assessments.

90.    In violation of the Declaration, Schecher charged HU Assessments to RUOs and CUOs, including the Plaintiff, that include costs that were not incurred by Schecher.

---

[11] *See* MC ECF#218 at p. 24. (the "Schecher Group takes the position that the Hotel Unit, along with the ownership of four (4) additional Residential Units through an affiliate…").

91.     Among other things, Schecher has charged HU Assessments to RUOs and CUOs, including Plaintiff, in the approximate amount of $203,023 for certain legal fees and costs associated with the 2015 Lawsuit that are not within the Scope of HU Assessments (the "2015 Legal Fees").[12]

92.     Among other things, Schecher charged HU Assessments to RUOs and CUOs, including Plaintiff, in the approximate amount of $160,195 for other legal fees and costs that are not within the Scope of HU Assessments.

93.     Among other things, Schecher charged hundreds-of-thousands of dollars in HU Assessments to RUOs and CUOs, including Plaintiff, for the costs of goods and services provided by Florida Building and Supply, Inc. ("FB&S") that, according to FB&S, were not incurred by Schecher (the "FB&S Expenses").

94.     On March 31, 2017, FB&S filed Proof of Claim #6 asserting a secured claim against Plaintiff in the amount of $1,032,413 and secured by the Commercial Units and Unit 505 for payment of the FB&S Expenses. MC POC #6.

95.     Among other things, Schecher charged significant sums in HU Assessments to RUOs and CUOs, including Plaintiff, to remove the individual locks to the doors of the RUOs' Residential Units and replaced same without permission or authority and without providing a key to said RUOs.

96.     Among other things, Schecher charged of hundreds-of-thousands of dollars in HU Assessments to RUOs and CUOs, including Plaintiff, for unsubstantiated services purportedly provided by affiliates including, among others, Casablanca and CHMC.

---

[12] Pursuant to a certain settlement agreement in the 2015 Lawsuit, each side agreed to bear its own fees related thereto. Schecher's 2015 Legal Fees do not fall within the Scope of HU Assessments and ought to be paid out of Schecher's non-unit owner revenues. Schecher is not a single purpose entity and derives revenue from many sources. Among other things, Schecher receives revenues on account of its rental of an antenna on top of the Condominium, rental revenues from Casablanca, and from its other business operations.

97. Schecher's Vendor Report[13] includes charges from Casablanca and CHMC for which no Supporting Invoice[14] was produced.

98. Among other things, Schecher charged tens-of-thousands of dollars in HU Assessments to RUOs and CUOs, including Plaintiff, for services purportedly provided for the management and operations of the Condominium while it was closed during the Lock-Out Period.

99. For example, during the Lock-Out Period the Vendor Report reflects that Casablanca was paid, among other payments, $21,915.56 on November 1, 2015; $17,190.99[15] on April 7, 2016; $15,524 on July 6, 2016; $17,732[16] on July 13, 2016.

100. During the Lock-Out Period, the Vendor Report reflects that CHMC was paid, among other payments, approximately $8,000 on June 10, 2015; $2,009 on June 10, 2015; approximately $8,000 on September 1, 2015; and approximately $8,000 on September 10, 2015. There are many other examples.

101. During the Lock-Out Period, the Easements were not provided to the RUOs or the CUO, including the Plaintiff.

---

[13] Schecher's report of charges by vendor produced pursuant to the Bankruptcy Court's *Order Granting Extension of Time and Setting Production Deadlines* (MC ECF #72) (the "Discovery Order") purports to reflect all charges incurred by Schecher related to the Condominium from all vendors from May 22, 2013 through January 12, 2017 (the "Vendor Report").

[14] On February 9, 2017, Schecher filed its *Schecher Group Inc.'s Second Notice of Compliance with Order [D.E. 72]* claiming that incompliance with the Discovery Order, "Schecher Group has already notified Debtor's counsel that all invoices in possession of Schecher Group are available for inspection and copying at the Schecher Group Office at the 6060. Alternatively, Debtor may have the invoices picked up by a reputable copy service for copying and return same to Schecher Group office at the 6060." Ultimately, a reputable copy service picked up all of the invoices made available by Schecher (the "Supporting Invoices" and each, a "Supporting Invoice") and made copies of same.

[15] Listed as being for "Insurance Coverage".

[16] Listed as being for real estate taxes, but no Supporting Invoice from Casablanca evidences the bill.

102.    Among other things, Schecher charged approximately $213,815 in HU Assessments to RUOs and CUOs, including Plaintiff, for services that Schecher alleges were negligently provided by A-1, which services caused considerable damages to Schecher, Casablanca, the Plaintiff and the RUOs and CUO, and which acts form the basis of the A-1 Lawsuit.

103.    Among other things, potentially in violation of the automatic stay under 11 U.S.C. 362, POC 40 contains amounts for interest and other charges that were only assessed post-petition ("Interest Charges").

104.    Upon information and belief, Schecher did not actually impose Interest Charges against the Plaintiff pre-petition.

105.    Schecher's POC 40 appears to include amounts that Schecher could theoretically have assessed as of the Petition Date, rather than the amount that Schecher actually assessed and was actually due on the Petition Date.

106.     Schecher is prohibited from recalculating Interest Charges that, in theory, may have been charged prepetition, but, in actuality, were only charged after the Petition Date.

107.    Schecher also impermissibly passed on interest charges at 18% on account of a loan from an affiliated entity, APO Annuity Manager, LLC ("APO").

108.    RJS is the Manager/Director of APO.

109.    Schecher also passed on charges of HU Assessments to RUOs and CUOs, including Plaintiff, that were not consistent with the allocations provided in Exhibit 7 of the Declaration.

## *Challenges to the Validity and Priority of the Schecher Liens*

*Challenges to Schecher's Lien against Unit 505 and Commercial Units as Preferences*

110.     Schecher's *Claim of Lien for Assessments* as to Unit 505 was filed seven days before the Petition Date, on November 28, 2016 (the "505 Lien").

111.     Schecher's *Claim of Lien for Assessments* as to the Commercial Units was filed one hundred and eighty-five (185) days before the Petition Date, on June 3, 2016.

112.     Schecher's Purported Commercial Liens (defined herein), based on the 4/21/2016 Letters (defined herein), were sent two hundred and twenty-eight dates before the Petition Date, on April 21, 2016.

113.     The 505 Lien purports to perfect a security interest on account of an antecedent debt owed by the Plaintiff to Schecher.

114.     The Commercial Liens purport to perfect security interests on account of antecedent debts owed by the Plaintiff to Schecher.

115.     During the 90 day period immediately preceding the Petition Date, the Debtor was insolvent.

116.     During the one year period immediately preceding the Petition Date, the Debtor was insolvent.

117.     The 505 Lien would entitle Schecher to receive more than Schecher would receive in a case under chapter 7, had the transfer not been made, and Schecher received payment of such debt to the extent provided under Chapter 7 of the Bankruptcy Code.

118.     The Purported Commercial Liens would entitle Schecher to receive more than Schecher would receive in a case under chapter 7, had the transfer not been made, and Schecher received payment of such debt to the extent provided under Chapter 7 of the Bankruptcy Code.

*Challenges to Schecher's Liens against Unit 505 and the Commercial Units as Legally Unenforceable*

119.    On April 21, 2016, Schecher sent to Plaintiff certain letters titled *Notice of Intent to Record a Claim of Lien* (the "4/21/2016 Letters") against the Plaintiff's Commercial Units (the "Purported Commercial Liens").

120.    The 4/21/2016 Letters fail as legally enforceable notice to claim a lien as they are not in substantially the same form as required by Florida Statute Section 718.112.

121.    Accordingly, the Purported Commercial Liens relying on the 4/21/2016 Letters are ineffective because they too are in violation of Chapter 718, Florida Statutes.

122.    On May 13, 2016, the Plaintiff responded to the 4/21/2016 Letters in writing (the "Dispute Letter") disputing the validity of the debts claimed therein and demanded supporting documentation, including proof of the alleged debt, pursuant to 15 U.S.C.A. Section 1692g of the Federal Fair Debt Collection Practices Act ("FDCPA").

123.    Schecher did not respond to the Dispute Letter and did not provide verification of the debt, in violation of the FDCPA.

124.    Instead, on June 3, 2016, Schecher continued with his collection efforts by filing the Purported Commercial Liens against each of Plaintiff's Commercial Units. *See* POC 40.

125.    The Claims of Lien recorded are deficient in that they do not meet the requirements of Florida Statute Section 718.116(5)(b) by among other things, failing to include the due dates (the beginning and ending dates from which the purportedly unpaid assessments accrued).

126.    Then, on August 29, 2016 Schecher sent to Plaintiff certain letters titled *Notice of Intent to Foreclose and Service of Lien* (the "8/29/2016 Letters") for each Commercial Unit.

127.    The 8/29/2016 Letters fail to comply with the requirements of Florida Statute Section 718.116(6) by, among other things, failing to use the proscribed form of 'Delinquent Assessment' notice.

128.    Moreover, the 8/29/2016 Letters did not attach the corresponding Purported Commercial Lien.

129.    With respect to the 505 Lien, Schecher failed to provide Plaintiff the requisite notice of intent to record a lien pursuant to Florida Statute Section 718.112 and Fair Debt Collection Practices Act. *See* 15 U.S.C. *§§* 1692 *et seq.*

130.    Accordingly, the liens filed by Schecher are in violation of Chapter 718, Florida Statutes, and the Fair Debt Collection Practices Act. *See* 15 U.S.C. *§§* 1692 *et seq.*

131.    All conditions precedent to the filing of the instant lawsuit have been performed, satisfied, excused or waived.

## COUNT 1: FOR DECLARATORY RELIEF TO DETERMINE THE VALIDITY EXTENT AND PRIORITY OF LIENS, CLAIMS AND ENCUMBRANCES IN PLAINTIFF'S REAL PROPERTY

132.    Plaintiff incorporates and realleges the allegations contained in Paragraphs 1 through 131 above as if fully set forth herein.

133.    This is an action for equitable and declaratory relief brought pursuant to 7001(2), Fed. R. Civ. P. and 11 U.S.C. §363(p)(2) to determine the validity, extent, and priority of the liens, claims, encumbrances, and interests of Schecher in the Commercial Units and Unit 505 including anyone laying claim to the estate's rights and interests in such properties.

134.    This Court should determine whether and to what extent Schecher has proven the validity, extent and priority of its respective liens, claims, encumbrances, and interests, including disputed ownership interests, pursuant to 11 U.S.C. §363(p)(2) in order to determine the amount

of the distribution they are entitled to receive from the net proceeds from the sale, if any, of the Commercial Units and Unit 505, if any, after costs and expenses of such sale, including all administrative expenses incurred in the sale.

**WHEREFORE**, Plaintiff requests this Court enter a declaratory judgment that determines the validity, extent, priority, and amount of Schecher's claims, liens and interest in the Commercial Units and Unit 505, if any, and awarding Plaintiff its attorneys fees and costs expended to prosecute this adversary proceeding, and granting such other, further and different relief as the Court deems just and proper.

## COUNT 2: OBJECTION TO CLAIM

135.    Plaintiff incorporates and realleges the allegations contained in Paragraphs 1 through 131 above as if fully set forth herein.

136.    This is an objection to claim pursuant to Pursuant to 11 U.S.C. §502 and Bankruptcy Rule 3007.

137.    In addition to the infirmities incorporated and realleged herein, POC 40 does not comply with Rule 3001 as it fails to provide sufficient documentation to support the alleged amount of the claim.

138.    POC 40 also appears to be duplicative of, among other claims, the POC #6 asserted by FB&S, POC #7 filed by A-1, and proof of claim #1 filed by Taw Power Systems, Inc.

139.    Finally, POC 40 fails to take into consideration the impact of the $889k Obligation.

Wherefore, Debtor respectfully requests an Order denying Schecher's POC #40 in the amount over which Schecher ought to be entitled to an allowed claim against Plaintiff, awarding

Plaintiff its attorneys fees and costs expended to prosecute this adversary proceeding, and for such further relief as this Court deems just and proper.

## COUNT 3: IMPROPER SETOFF

140.    Plaintiff incorporates and realleges the allegations contained in Paragraphs 1 through 131 above as if fully set forth herein.

141.    This is an objection to certain setoffs applied by Schecher in its POC 40.

142.    According to POC 40, it appears that Schecher setoff approximately $399,278.34 in claims held by Plaintiff against Schecher.[17]

143.    Upon information and belief, such setoffs were made within the 90 days prior to the Petition Date in violation of Section 547 and 553 or post-petition in violation of Sections 362 and 549 of the Bankruptcy Code.

144.    During the 90 day period preceding the Petition Date Plaintiff was insolvent.

145.    Upon information and belief, on account of such setoff, the amount of the insufficiency is less than the amount of the insufficiency either 90 days prior to the Petition Date or at some time during the 90-day period.

146.    Upon information and belief, such setoffs were made within the 1-year period prior to the Petition Date in violation of Section 547 or post-petition in violation of Sections 362 and 549 of the Bankruptcy Code.

147.    During the 1-year period preceding the Petition Date Plaintiff was insolvent.

148.    Upon information and belief, on account of such setoff, the amount Shecher would receive in this case is greater than it would be entitled under a chapter 7 case had the setoff not occurred.

---

[17] Schecher's Summary Chart reflects "Credits" in the total amount of $399,278.34. It is unclear whether such "Credits" reflect setoffs, payments, or other reductions to the "Charges" imposed by Schecher against Plaintiff. POC 40 provides no other information as to the "Credits" identified in the Summary Chart.

Wherefore, Debtor respectfully requests an Order denying the setoff to the extent that it was either post-petition or effected during the 90 day period preceding the Petition Date or the 1-year period prepetition and reduced the insufficiency, awarding Plaintiff its attorneys fees and costs expended to prosecute this adversary proceeding, and for such further relief as this Court deems just and proper.

## COUNT 4: TO AVOID PREFERENTIAL LIENS AGAINST UNIT 505 AND COMMERCIAL UNITS

149.    Plaintiff incorporates and realleges the allegations contained in Paragraphs 1 through 131 above as if fully set forth herein.

150.    This is an action to avoid a lien purportedly perfected during the 90 day and one year preference periods immediately preceding the Petition Date pursuant to Section 547 of the Bankruptcy Code.

151.    "Presently, the Schecher Group takes the position that … it controls at least twenty-two (22%)(19 ÷ 87 = .218) … of all voting interest of the Unit Owners…" of the Plaintiff.[18] MC ECF #218 at p. 24.

152.    Accordingly, Schecher presently takes the position that it is an affiliate and insider of Plaintiff. *See* 11 U.S.C. 101(1)(A), (B) & 101(31).

153.     The 505 Lien is a lien purportedly secured by Plaintiff's Unit 505.

154.    The 505 Lien was recorded during the 90 day period and one year period immediately preceding the Petition Date.

155.    The 505 Lien purports to perfect an antecedent debt owed by Plaintiff to Schecher, a creditor.

---

[18] Plaintiff disagrees with Schecher's computation of its percentage of voting interests.

156.    During the 90 day period and one year period immediately preceding the Petition Date, the Debtor was insolvent.

157.    The 505 Lien would entitle Schecher to receive more than Schecher would receive in a case under chapter 7, had the transfer not been made, and Schecher received payment of such debt to the extent provided under Chapter 7 of the Bankruptcy Code.

158.    The Purported Commercial Liens are purportedly secured by Plaintiff's Commercial Units.

159.    The Purported Commercial Liens were recorded during the 1 year period immediately preceding the Petition Date.

160.    The Purported Commercial Liens purport to perfect an antecedent debt owed by Plaintiff to Schecher, a creditor.

161.    During the one year period immediately preceding the Petition Date, the Debtor was insolvent.

162.    The Purported Commercial Liens would entitle Schecher to receive more than Schecher would receive in a case under chapter 7, had the transfer not been made, and Schecher received payment of such debt to the extent provided under Chapter 7 of the Bankruptcy Code.

Wherefore, Debtor respectfully requests an Order setting aside the 505 Lien and the Purported Commercial Liens, awarding Plaintiff its attorneys fees and costs expended to prosecute this adversary proceeding, and for such further relief as this Court deems just and proper.

### COUNT 5: TO AVOID IMPROPERLY PERFECTED LIENS AGAINST COMMERCIAL UNITS AND UNIT 505

163.    Plaintiff incorporates and realleges the allegations contained in Paragraphs 1 through 131 above as if fully set forth herein.

164.    This is an action to avoid the improperly perfected liens of Schecher pursuant to Section 544 of the Bankruptcy Code.

165.    In a Chapter 11 case such as the instant case, the Plaintiff (the debtor-in-possession) has the power of avoidance of a hypothetical lien creditor and bone fide purchaser as of the Petition Date. *See* 11 U.S.C. §§ 544 and 1107.

166.    As stated in more detail herein, as of the Petition Date Schecher failed to properly perfect the 505 Lien and the Purported Commercial Liens.

167.    Accordingly, the 505 Lien and the Purported Commercial Liens ought to be avoided.

Wherefore, Debtor respectfully requests an Order avoiding the 505 Lien and the Purported Commercial Liens pursuant to 11 U.S.C. 544, awarding Plaintiff its attorneys fees and costs expended to prosecute this adversary proceeding, and for such further relief as this Court deems just and proper.

Dated: April 27, 2017.                     Respectfully Submitted,

                                            MESSANA, P.A.
                                            *Counsel for Plaintiff*
                                            401 East Las Olas Boulevard, Suite 1400
                                            Fort Lauderdale, Florida 33301
                                            Telephone:  (954) 712-7400
                                            Facsimile:   (954) 712-7401
                                            Email:  blieberman@messana-law.com

                                            /s/ Brett D. Lieberman
                                            Thomas M. Messana, Esq.
                                            Florida Bar No. 991422
                                            Brett Lieberman, Esq.
                                            Florida Bar No. 0069583