**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov**

IN RE:

**SIXTY SIXTY CONDOMINIUM**                    **CASE NO.: 16-26187-RAM**
**ASSOCIATION, INC.,**                         **Chapter 11**

  **Debtor-in-Possession.**
_____/

**SIXTY SIXTY CONDOMINIUM**                    **Adv. Case No. 17-01171-RAM-BKC**
**ASSOCIATION, INC.,**

   **Plaintiff,**

**v.**

**SCHECHER GROUP, INC. D/B/A
SG SHARED COMPONENTS**

   **Defendant.**
_____/

**MOTION BY DEFENDANT, SCHECHER GROUP, INC., FOR PARTIAL SUMMARY
JUDGMENT ON COUNTS I AND II OF THE COMPLAINT TO DETERMINE
VALIDITY, PRIORITY AND EXTENT OF LIENS, SETOFF, OBJECTION TO
CLAIM & REQUEST FOR DECLARATORY JUDGMENT AND
INCORPORATED MEMORANDUM OF LAW**

  Defendant, Schecher Group, Inc. ("Defendant" or "Schecher Group"), by and through

counsel, and pursuant to Rule 56(c), Fed. R. Civ. P., as made applicable to this proceeding under

Rule 7056, Fed. R. Bankr. P., and Scheduling Order Setting Trial and Pretrial Deadlines and

Order Denying Motion to Compel Mediation (the "Scheduling Order")[Adv. D.E. #111], files

this Motion by Defendant, Schecher Group, Inc. For Partial Summary Judgment on Counts I and

II of the Complaint To Determine Validity, Priority And Extent Of Liens, Setoff, Objection To

Claim & Request For Declaratory Judgment And Incorporated Memorandum of Law (the

"Motion for Partial Summary Judgment") and states, as follows:

**I.**  **INTRODUCTION.**

  By this Motion for Partial Summary Judgment, the Schecher Group seeks the entry of

partial summary judgment on Counts 1 and 2 of the Complaint To Determine Validity, Priority And Extent Of Liens, Setoff, Objection To Claim & Request For Declaratory Judgment (the "Complaint") filed by the Plaintiff, Sixty Sixty Condominium Association, Inc. ("Plaintiff" or "Debtor") predicated upon the grounds set forth in Defendant, Schecher Group, Inc.'s Answer and Affirmative Defenses To Complaint To Determine Validity, Priority And Extent Of Liens, Setoff, Objection To Claim & Request For Declaratory Judgment (the "Answer") being litigated in the Shared Cost Adversary.[1] In the Answer, the Schecher Group asserted numerous affirmative defenses to the Complaint relating to, among other things, the validity, priority and extent of the Schecher Liens, as well as, the correctness of the budgeted annual charges and special charges for the HU Assessments disputed by the Debtor.

One of the primary issues, presented on summary judgment is the methodology employed by the Schecher Group, as the Hotel Unit Owner (HUO), for assessing Shared Costs under Section 12 of the Declaration in establishing the "Baseline" to determine the obligations of the Plaintiff to pay Defendant for delinquent HU Assessments. According to the Schecher Group, the HU Assessments attributable to the Shared Components are derived from the formulation of annual budgets and imposition of special charges (assessments) from time to time, including attorney's fees and costs, interest and late charges, which are also reflected in the corresponding Unit Ledgers and/or Statement of Accounts for the Debtor Units[2], which charges are expressly permitted by the Declaration (the "HU Budget Methodology").

Notably, for years prior to the Petition Date, the HU Budget Methodology and proposed budgets were approved by the Debtor as a valid means for charging HU Assessments, which stands in stark contrast to the more draconian and unworkable theory of a "dollar-for-dollar" reimbursement of Shared Costs actually incurred by the Defendant for the "repair, replacement, improvement, maintenance, management, operation, ad valorem tax obligations and insurance of the Shared Components" now being argued by the Plaintiff. More importantly, the Complaint does not directly challenge the HU Budget Methodology, but instead, seeks to deconstruct the HU Assessments by unilaterally excluding selected budget items and special assessments it

---

[1] For ease of reference, and unless specified otherwise, all capitalized terms shall have the same use and meaning as set forth in the pleadings [Adv. D.E. #1 & #58] and other motions filed by the parties in the Shared Cost Adversary.

[2] The "Debtor Units" consist of (i) Commercial Units - CU#1, CU #2, CU#3 & CU #4 and (ii) RU #505 owned by the Plaintiff as of the Petition Date.

deems as falling outside the Scope of HU Assessments. Yet, many of these disputed allegations are largely unsupported by the record, and based upon mere conjecture and speculation that the Schecher Group has engaged in impermissible budgeting and billing practices to somehow profit from the HU Assessments, which remain disputed material issues of fact precluding summary judgment in favor of the Plaintiff.

However, the undisputed material facts show that under Florida law, the obligations of the Plaintiff to pay its Allocable Share of HU Assessments is supported by the unambiguous language of the Declaration, along with other summary judgment evidence as presented herein, necessary for the Schecher Group to meet its burden with respect to the validity, priority and extent of the Schecher Liens by applying the HU Budget Methodology in reaching the Baseline. For the reasons explained below, there are no genuine issues of material facts to preclude the entry of a partial summary final judgment in favor of the Defendant as to the application of the HU Budget Methodology and each of the Affirmative Defenses raised in the Answer Liens in this Shared Cost Adversary.

## II.    UNDISPUTED MATERIAL FACTS.

1.    The procedural background and facts leading up to the filing of the Shared Cost Adversary are well known to the Bankruptcy Court. For purposes of brevity, and in addition to the undisputed facts set forth below, the Schecher Group incorporates by reference the stipulation of facts set forth in the Preliminary Pretrial Stipulation [Adv. D.E. #60].

### Procedural Background

2.    The genesis of the 6060 Building dates back to 1992, when the property was originally built as a Holiday Inn in Miami Beach. In 2006, the developer, Indian Creek Hotel Investors, Ltd. (the "Developer"), converted the 6060 Building into the hotel/condominium form of ownership that exists today.

3.    On December 18, 2008, the Developer executed and delivered a Special Warranty Deed (the "CUO Warranty Deed") to the Association for the Commercial Units, which was recorded on October 13, 2009, in the Official Records in and for Miami-Dade County, Florida, OR BK 27046, Pgs. 0261-263.

4.    On March 20, 2013, the Schecher Group acquired the Hotel Unit pursuant to that certain Special Warranty Deed by and between Optima Hospitality Associates, LLC, Grantor

("Optima")(predecessor of the Developer) and Schecher Group, Inc., Grantee, which was recorded on March 28, 2013 in the Official Records in and for Miami-Dade County, Florida, OR BK 28552, Pgs. 3802-3804 (the "HUO Deed").

5.      On March 1, 2017, the Defendant filed Schecher Group's Notice of Filing Governing Documents of The Sixty Sixty Condominium Association, Inc. ("Notice of Declaration")[D.E. #138], consisting of the (i) Declaration of Sixty Sixty Condominium ("Declaration"), (ii) Articles of Incorporation for Sixty Sixty Condominium Association, Inc. ("Articles"), and (iii) By-Laws of Sixty Sixty Condominium Association, Inc. ("By-Laws")(collectively, the "Condominium Documents").[3] The Bankruptcy Court has previously ruled that the Condominium Documents are covenants running with the land that defines the property rights and obligations of the Debtor, Schecher Group and RUOs.[4]

6.      At all times material, the Schecher Group was the fee simple owner of the Hotel Unit (the "Hotel Unit Owner") and, therefore, the Shared Components as defined in Sec. 2.32 of the Declaration, having stepped into the shoes of Optima for purposes of taking over its debt and liabilities. Afterwards, the 6060 Building continued to operate as a hotel for transient occupants, offering short term rentals, maintaining a front desk, and other common hotel amenities such as housekeeping services, etc., consistent with the Declaration.

7.      Accordingly, under the Declaration, the Schecher Group is vested with certain rights, duties and powers under Sections 12.1, 12.3 & 12.4 of the Declaration, to collect, charge, lien, impose, and foreclose the Debtor, along with the RUOs, for payment of Shared Costs defined in Section 2.33 of the Declaration relating to "the repair, replacement, improvement, maintenance, management, operation, ad valorem tax obligations and insurance of the Shared Components". See, Excerpt of Section 12 of Declaration for Sixty Sixty Condominium (the "Declaration Excerpts") attached hereto as **Exhibit "A"**.

---

[3] The Declaration, Articles and By-Laws were recorded in the public records of Miami-Dade County on April 10, 2006, at Official Records Book 24411, Pgs. 1780-1883.

[4] See, Order Setting Deadlines [D.E. # 230], ¶1(b)("…the Declaration and By-Laws are covenants that run with the land and define the property rights between the Debtor, Unit Owners, and the Schecher Group. *Woodside Vill. Condo. Ass'n v. Jahren*, 806 So. 2d 452, 456 (Fla. 2002)("A declaration of a condominium is more than a mere contract spelling out mutual rights and obligations of the parties thereto-it assumes some of the attributes of a covenant running with the land, circumscribing the extent and limits of the enjoyment and use of real property.").

8.      Further, pursuant to Section 12.3(a) - Charges to Unit Owners; Liens - of the Declaration "each Owner of any Residential Unit and/or Commercial Unit….shall be deemed to covenant and agree, to pay to the Hotel Unit Owner **annual charges** for the operation and insurance of, and for payment of 100% of the Shared Costs (the "Non-Hotel Units Allocated Share"), the establishment of reasonable reserves for the replacement of the Shared Components and the furnishing and finishing thereof, capital improvement charges, special charges and all other charges hereinafter referred to or lawfully imposed by the Hotel Unit Owner in connection with the repair, replacement, improvement, maintenance, management, operation, and insurance of the Shared Components, all such charges to be fixed, established and collected from time to time as herein provided." (Emphasis added).

9.      By virtue of the CUO Warranty Deed, and ownership of and RU #505, the Debtor became obligated and responsible under Exhibit "7"- *Allocation of Hotel Shared Costs* (the "Allocable Shared Cost Exhibit") of the Declaration to pay 16.6401% of Shared Costs to Defendant. Conversely, the Allocable Shared Cost Exhibit expressly provides that the Schecher Group shall pay nothing for Shared Costs, even for Common Expenses assessed by the Debtor. [D.E. #138, pg. 104 & #445, pg. 10].

10.      On April 11, 2017, the Schecher Group filed its secured Proof of Claim, Claim No. 40 ("POC 40") in amount of $1,075,516.08 containing, among other things, a Statement of Claim attached thereto as Exhibit "A", along with a Pre-Petition Shared Costs Assessments Due from Debtor (Exhibit 1), summarizing the HU Assessments from March 31, 2013 to the Petition Date given the account activity reflected on the Unit Ledgers for the Debtor Units, plus accrued interest, attorneys' fees and costs and late charges (the "Claim Amount").

11.      On November 10, 2017, the Plaintiff filed the Debtor's Motion For Entry Of Order Authorizing Sale Of Debtor's Real Property Located At 6060 Indian Creek Drive, Miami, Fl 33140 To Kingsfisher Island, Inc. And Payment Of Costs Associated Therewith and proposed contracts (the "Sale Motion") [D.E. #432]. Pursuant to the Bid Process Order [D.E. #427], the Court conducted an evidentiary hearing on the Sale Motion over the period of November 28, 2017 to December 8, 2017 (the "Sale Motion Hearing").

12.      On November 22, 2017, the Defendant filed Schecher Group, Inc.'s (I) Objection To Debtor's Motion For Entry Of Order Authorizing Sale Of Debtor's Real Property Located At

5

6060 Indian Creek Drive, Miami, FL 33140 To Kingsfisher Island, Inc. And Payment Of Costs Associated Therewith And (II) Motion For Authority And Option To Credit Bid Under 11 U.S.C. §363(k) (the "Objection to Sale Motion") [D.E. #457]. In the Objection to Sale Motion, the Schecher Group advised the Bankruptcy Court regarding the status of Trials which proceeded on November 14th through 20th, 2017 in the Foreclosures.

13.    On November 20, 2017, the foreclosure defendants (many of whom are part of the Collective Unit Owners that intervened in the Shared Cost Adversary), called Mark R. Gerstle ("Mr. Gerstle") of the accounting firm Gerstle, Rosen & Goldenberg, P.A. ("Gerstle, P.A.") to provide expert testimony in defense of the Foreclosures. As detailed below, Mr. Gerstle essentially agreed with counsel for the Schecher Group, as plaintiff in the Foreclosures, that the HU Budget Methodology was appropriate with respect to the HU Assessments.

14.    On December 6, 2017, during the Sale Motion Hearing, the corporate representative of the Schecher Group, Mr. Richard Schecher ("Mr. Schecher") testified on several topic areas concerning various issues raised in the Sale Motion and Objection to Sale Motion. See, Transcript of Testimony for Richard Schecher (the "Schecher Transcript") attached hereto as **Exhibit "B"** and referenced herein as "Schecher Trans."

15.    More significantly, on direct examination, Mr. Schecher provided testimony detailing the HU Budget Methodology and mechanics of the budgeting process for Shared Costs, including the reasons for special assessment charges, which become part of the HU Assessments. Furthermore, Mr. Schecher explained to the Court the rationale behind budgeting for the HU Assessments as evidenced in the following colloquy:

> THE COURT: You said "they don't have the money," who are you referring ---
>
> THE WITNESS: "They" meaning the HU owner, the shared component owner. Their --  they have no funds other than what is collected from the unit owners, and the only funds  they're  supposed  to be collecting from the unit owners is to pay the building expenses or any extra services they may have been provided at a unit -- unit owner's request.
>
> So that's why it all starts with a budget, and the budget is nothing more than the estimated expenses of the building. The budget worksheet, which is what you were just showing me a minute ago, breaks it down in

minute detail as to everything that is required to operate that. So I -- I guess the simple way to say it is a budget is your best guess or your best estimate as to what the cost will be.

When we -- we send out the coupons to the owners. In the perfect world they're supposed to be paying that coupon every month, and every month the hotel unit owner will have funds to pay those bills, that's how it works in the -- in the perfect world.

And in the real world, and if you think about it for a minute, every single entity in the world, even our U.S. Government, every business, every condo association, everybody follows that same procedure. You come up with a budget, and when a budget isn't -- when you don't have a budget available, they're talking about closing down the -- the government even, and how many times has our own government been closed down because our legislatures couldn't get the budget passed in time.

THE COURT: All right.

THE WITNESS: So that's all I can say, is that it starts with the budget and it ends with people paying or not paying.

See, Schecher Trans., pgs. 34, lns. 15-25; pg.-35, ln. 1-25.

## The Shared Cost Adversary

16.     On April 27, 2017, the Debtor filed its Complaint [Adv. Doc. No. 1] asserting claims for (i) Count 1: For Declaratory Relief To Determine The Validity Extent And Priority Of Liens, Claims And Encumbrances In Plaintiff's Real Property; (ii) Count 2: Objection To Claim Count; (iii) 3: Improper Setoff; (iv) Count 4: To Avoid Preferential Liens Against Unit 505 And Commercial Units; and (v) Count 5: To Avoid Improperly Perfected Liens Against Commercial Units And Unit 505 (the "Avoidance Claims").[5]

17.     Significantly, the focus of the Avoidance Claims were limited to the following issues: (i) "Insurance Proceeds Issue"; (ii) "Building Closure Issue"; (iii) "Schecher's Failure to Pay Plaintiff's Assessments/Setoffs"; (iv) "Objection to Schecher's Proof of Claim #40"; and (v) "Specific Nonexclusive Challenges to the Validity of the Amount of Schecher's POC 40" (the

---

[5] It should be noted that the Plaintiff's Complaint never alleged 'usury' as grounds for objecting to POC 40 and the Schecher Liens. Because 'usury' is generally an affirmative defense to a loan transaction the HU Assessments are not subject to collateral attack by the Debtor since no lending relationship exists between the parties under the Declaration. *Valliappan v. Cruz,* 917 So.2d 257 (Fla. 4th DCA 2005); *See also, Dixon v. Sharp,* 276 So.2d at 819; *see also Jersey Palm-Gross, Inc.,* 639 So.2d at 664, 666, *app'd,* 658 So.2d 531 (Fla.1995).

"Avoidance Claim Issues"). The Avoidance Claims Issues also involve the $889k Obligation and rights of setoff under 11 U.S.C. §553, which the Court reserved for consideration at a later date.

18.    On June 9, 2017, the Schecher Group filed Defendant, Schecher Group, Inc.'s Motion to Dismiss Complaint To Determine Validity, Priority And Extent Of Liens, Setoff, Objection To Claim & Request For Declaratory Judgment And/Or For More Definite Statement (the "Motion to Dismiss")[Adv. D.E.#11].

19.    On August 7, 2017, the Court entered its Order (1) Granting In Part and Denying In Part Motion to Dismiss; and (2) Setting Deadlines and Filing Requirements; and (3) Setting Status Conference (the "Dismissal Order")[Adv. D.E. #43]. Pursuant to the Dismissal Order, only Counts 1 and 2 of the Complaint presently remain at issue in the Shared Cost Adversary. Further, the Court found that POC 40 "that is the subject of Count 1 was timely filed and is technically sufficient and not subject to challenge based upon lack of sufficient documentation." See, Dismissal Order, pg. 2, ¶2(a)&(b).

20.    On July 13, 2017, the Collective Unit Owners filed their Motion to Intervene, seeking intervention in the Shared Costs Adversary [Adv. D.E. #26]. On August 7, 2017, the Court entered its Order Granting Motion to Intervene With Limitations (the "Intervention Order")[Adv. D.E. #42].

21.    On August 23, 2017, the Schecher Group filed its Answer and pleaded a total of fifteen (15) Affirmative Defenses to Counts I and II of the Complaint based upon the following defenses: (i) First Affirmative Defense (Failure to State a Claim - Enforcement of Declaration); (ii) Second Affirmative Defense (Estoppel); (iii) Third Affirmative Defense (Res Judicata and Collateral Estoppel); (iv) Fourth Affirmative Defense (Right of Setoff Under 11 U.S.C. §553); (v) Fifth Affirmative Defense (Unclean Hands); (vi) Sixth Affirmative Defense (Failure of Consideration); (vii) Seventh Affirmative Defense (Excuse of Performance); (viii) Eighth Affirmative Defense (Waiver and Laches); (ix) Ninth Affirmative Defense (Allowance of POC 40 Under 11 U.S.C. §506(a)); (x) Tenth Affirmative Defense (Statute of Limitations); (xi) Eleventh Affirmative Defense (Failure to State a Cause of Action – FDCPA/Chapter 718, Fla. Stats.); (xii) Twelfth Affirmative Defense (Lack of Standing); (xiii) Thirteenth Affirmative Defense (Failure to Mitigate Damages); (xiv) Fourteenth Affirmative Defense

(Settlement/Release); and (xv) Fifteenth Affirmative Defense (Failure to Comply With Statutory Conditions Precedent) (hereinafter, the "Affirmative Defenses") [Adv. D.E. #58].

22. Substantively, the Defendant's First, Second, Third, Fourth, Fifth, Sixth and Seventh Affirmative Defenses contained within the Answer, sets forth numerous undisputed factual matters and legal issues, which negate many material facts of the Complaint thus precluding summary judgment on the Avoidance Claims. At the same time, however, these Affirmative Defenses support the Motion for Partial Summary Judgment insofar as barring and estopping Plaintiff from prosecuting Counts 1 and 2 of the Complaint to the extent that the Schecher Group is entitlement to enforce the Declaration according to the HU Assessment Methodology and collect the Claim Amount due for HU Assessments evidenced by POC 40.

23. Moreover, as alleged in the Third Affirmative Defense, the Plaintiff was involved in two (2) state court actions against the Schecher Group and its processor, Optima, in the matters (i) *Sixty Sixty Condominium Association, Inc. v. Optima Hospitality, LLC, et. al.*, Case No. 11-21320 CA 13, in the Circuit Court for Miami-Dade County, Florida (the "Optima State Court Action") and (ii) *Sixty Sixty Condominium Association, Inc. v. Condominium Hotel Management Corporation, Inc., et. al.*, Case No. 2015-019981 CA O1, in the Circuit Court for Miami-Dade County, Florida ("2015 Lawsuit")(collectively, the "State Court Actions"). As a result, the doctrines res judicata, collateral estoppel and/or Rocker-Feldman rule, and other statutory rules of construction, apply with respect to determining the Baseline, particularly, with respect to validating the Special and/or Emergency Assessments.

24. On August 28, 2017, the parties filed their joint Preliminary Pretrial Stipulation (the "Stipulation") identifying a preliminary set of undisputed facts, disputed legal issues, and witnesses known at the time and subject to further amendment. [Adv. D.E. #60].

25. On December 11, 2017, the Court entered its Order (1) Denying Motion to Abstain; (2) Clarifying Scope of Proceedings; (3) Reserving Ruling on Motion to Reset Trial; and (4) Setting Filing Deadline (the "Abstention Order")[Adv. D.E. #111] clarifying the scope of the Shared Cost Adversary, as follows:

> "As the Court noted at the hearing, this adversary proceeding will only determine the Debtor's prepetition debt to the Defendant, the Schecher Group, Inc. (the "Schecher Group") as it may be affected by the Debtor's prepetition claims against the Schecher Group. Non-debtor individual unit owners were allowed to

9

intervene "solely for the limited purpose of litigating the Baseline amount of shared costs due to the Defendant." Order Granting Motion to Intervene with Limitations (the "Intervention Order")[DE# 42]. As stated further in the Intervention Order, "[t]he Court will not be determining any issues in the state court foreclosure cases against the Intervenors other than the Baseline amount."

26.      On December 22, 2017, in the Bankruptcy Case, the Plaintiff filed Debtor's Exigent Application To Employ Mark R. Gerstle And Gerstle, Rosen & Goldenberg, P.A. As Debtor's Expert Nunc Pro Tunc Court (the "Gerstle Application")[D.E. #478]. On January 10, 2018, the Court entered its Order granting the Gerstle Application [Adv. D.E. #484], employing Mr. Gerstle as Plaintiff's accounting expert in connection with the Shared Cost Adversary.

27.      Although the Schecher Group has not had an opportunity to conduct expert discovery in the Shared Cost Adversary, nevertheless, the testimony of Mr. Gerstle in the Trials supports the Affirmative Defenses that Defendant correctly charged HU Assessments based upon the HU Budget Methodology in determining the Baseline amount for the Shared Costs. See, Transcript Excerpts of Trial Testimony for Mark R. Gerstle (the "Gerstle Transcript") attached hereto as **Exhibit "C"** and referenced herein as "Gerstle Trans."

28.      By way of example, but not limitation, on November 20, 217, on cross-examination by Defendant's counsel, Steven Davis, Esq. during the Trials in the Foreclosures, Mr. Gerstle testified, as follows:

Q.      You agree with me that assessing is done according to the budgets?

A.      Yes.

Q.      Right. And in fact, every business assesses based on a budget? They don't get the bill first and then assess?

A.      Yes.

Q.      It wouldn't make any sense. Okay. So you looked at the budgets, correct?

A.      Yes.

Q.      What specifically – you didn't mention anything you saw specifically that was out of whack in the budget, like an expense for labor, an expense for taxes, an expense for insurance. None of those are out of whack, are they?

A.    No. What I mentioned was the loan payment and the deficit, two separate line items.

Q.    But you don't know what that loan payment was for, if it was for a prior deficit or if it was for future operations, do you?

A.    It's my understanding when owners didn't pay, he had to put money in for them to continue to operate.

Q.    Okay. So then if it's a loan that was taken out to fund future operations, then there's nothing - -

A.    To pay past due bills.

Q.    But you don't know one way or the other, do you?

A.    I don't know for a fact, no.

See, Gerstle Trans., pgs. 392, lns. 22-25; 393, lns. 1-25; 394, lns. 1-3.

29.    While the testimony of Mr. Gerstle also ran the gambit of certain matters related to the Avoidance Claim Issues, the question on summary judgment as to whether HU Assessments are determined by analyzing the HU Budgets was put to rest by this expert in favor of the Defendant as opposed to the "actual" expenses methodology portrayed by the Plaintiff in the Shared Cost Adversary.

30.    Undoubtedly, the precise calculation of HU Assessments remains a disputed issue of material fact precluding summary judgement for either party, but the amount of Shared Costs far exceeds $4.1Million under either computation especially after months of unpaid Utilities and other HU Assessments that continued to accrue to this date.

31.    For the reasons stated herein, the Answer and Affirmative Defenses filed by the Schecher Group raise no genuine issues of material fact and, therefore, the Court should grant the Motion for Partial Summary on Counts 1 and 2 of the Complaint.

### III.    **STANDARD FOR MOTION FOR SUMMARY JUDGMENT.**

Federal Rule of Civil Procedure 56, as incorporated by Federal Rule of Bankruptcy Procedure 7056, provides that a party may move for summary judgment, identifying each claim or defense– or the part of each claims or defense– on which summary judgment is sought. It's

well established that summary judgment shall only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has reaffirmed the vitality of summary judgment as a method for the just, speedy and inexpensive disposition of cases. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

Summary judgment may be entered only where there are no genuine issues of material fact. *See Twiss v. Kury*, 25 F.3d 1551, 1554 (11th Cir. 1994). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. The material fact and legal element of certain of the Plaintiff's claims at issue in this adversary proceeding is the Debtor's intent. The Plaintiff has the burden of meeting Rule 56's standard. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The nature of the movant's initial burden "varies, however, depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant bears the burden of proof at trial." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991). However, this does not mean that a court must accept all of the non-movant's factual characterizations and legal arguments as true. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir. 1994). Once the moving party identifies those portions of the record that demonstrate the absence of a genuine issue of material fact, any party opposing summary judgment must set forth specific facts showing a genuine issue for trial, and may not rely on mere allegations or denials. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 256-57. If the record as a whole could not lead a rational finder of fact to find for the non-moving party, then there is no genuine issue of fact precluding summary judgment. *Matsushita*, 475 U.S. at 586-87.

## IV.    MEMORANDUM OF LAW.

The clarifying of scope of the Abstention Order simplifies the material issues of fact and law relevant to the entry of partial summary judgment on the Affirmative Defenses as to Counts I

and II of the Complaint. The undisputed record evidence dictates that the HU Budget Methodology must be accepted as the proper means of determining the Baseline predicated upon the Allocable Share of Shared Costs owed by the Plaintiff for the HU Assessments. While the precise calculation the Claim Amount necessary to reach the Baseline number remain disputed issues of material fact for trial in the Shared Cost Adversary, granting the Motion for Partial Summary Judgment as to undisputed portions of the HU Assessments is warranted. Indeed, not all charges for the HU Assessments can be disputed by the Debtor and for good reason.[6]

The power of the Schecher Group to budget for HU Assessments is found within Section 12 of the Declaration. Specifically, pursuant to Sections 12.1, 12.3 & 12.4 thereof, the Schecher Group is authorized to collect, charge, lien, impose, and foreclose on the Debtor and RUOs for "the costs incurred by the Hotel Unit Owner in…the repair, replacement, improvement, maintenance, management, operation, ad valorem tax obligations and insurance of the Shared Components." In analyzing the language of the Declaration Excerpts, several key concepts emerge under the HU Budget Methodology. First, the liabilities for Shared Costs are not limited to the actual costs 'incurred' by the Hotel Unit Owner. In fact, the word "incurred" only appears once in Section 12.1, while the word "annual" appears at least seven (7) times in Sections 12.1 and 12.3, in the context of assessing and collecting Shared Costs. Second, the Schecher Group has no obligation to fund and/or advance any deficits or shortfalls that are responsibility of the Debtor and RUOs for maintenance, repair and/or replacement obligations for the Shared Components since the HUO is never liable for Shared Costs (the "Non-Hotel Units Allocated Share"). Third, the Schecher Group has the right to establish reasonable reserves and assess special charges or assessments for Shared Costs as HU Assessments. Fourth, the Schecher Group has the right to impose late charges on unpaid installments for monthly HU Assessments, which shall accrue interest at eighteen percent (18%) per annum. See, Section 12.4 of the Declaration. Lastly, by "acceptance of a deed or other conveyance of the applicable Unit," the Debtor and RUOs are deemed to have agreed to the Shared Costs and may not escape liability for HU Assessments by non-use of the Hotel Unit, whether voluntary or involuntary.

In evaluating the Motion for Partial Summary Judgment, the Bankruptcy Court should view the Declaration as a whole and not rewrite its contractual terms to achieve a result not

---

[6] The Court previously determined the Debtor's liability for its Allocable Shared of Utilities [D.E.#284 & #475].

envisioned by the parties. When reviewing a document, a court must consider the document as a whole, rather than attempting to isolate certain portions of it. *See U.S.B. Acquisition Co. v. Stamm,* 660 So.2d 1075 (Fla. 4th DCA 1995); *Royal Oak Landing Homeowner's Ass'n v. Pelletier,* 620 So.2d 786 (Fla. 4th DCA); *J.C. Penney Co. v. Koff,* 345 So.2d 732 (Fla. 4th DCA 1977). Further, courts are not authorized to rewrite clear and unambiguous contracts. *E.g., Hill v. Deering Bay Marina Ass'n,* 985 So.2d 1162, 1166 (Fla. 3d DCA 2008). Rather, "where a contract is clear and unambiguous, it must be enforced as written." *Andersen Windows, Inc. v. Hochberg*, 997 So.2d 1212, 1214 (Fla. 3d DCA 2008). Indeed, under Florida law, a clear and unambiguous contract is not subject to the judicial rules of construction, nor is it proper to consider outside evidence in its interpretation. *See Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1548-49 (Fla. 11th Cir. 1996); *see also McGhee Interests, Inc. v. Alexander Nat'l Bank,* 102 Fla. 140, 135 So. 545, 547 (1931); *Koplowitz v. Imperial Towers Condominium, Inc.*, 478 So.2d 504 (Fla. 4th DCA 1985)("Whether they appear in a statute or in a declaration of condominium, words of common usage should be construed in their plain and ordinary sense"). Here, the Complaint alleges no set of facts that raises any genuine issues of material fact concerning any ambiguity with respect to the terms of the Declaration nor the Debtor's lack of knowledge regarding any of its provisions. To the contrary, the allegations of the Complaint are limited to a critic of the HU Assessments as falling outside of the 'Scope of HU Assessments,' which is an unsubstantiated, novel phrase coined by the Debtor to create a claim where none exits.

In this instance, the Declaration is clear and unambiguous in its terms that costs incurred by the Hotel Unit Owner in the repair, improvement and/or maintenance of the Shared Components (the "Shared Costs") were/are to be paid out of charges imposed against the RUOs and CUOs in accordance with the terms of the Declaration. Indeed, the Declaration *excuses* and *relieves* the Hotel Unit Owner from the obligation to conduct any and all maintenance, repair and/or replacement obligations to the extent that funds necessary to perform such maintenance, repairs and/or replacements "*are not available through the charges imposed and actually collected*." These provisions make crystal clear that any costs incurred by the Hotel Unit Owner for the repair, improvement and/or maintenance of the Shared Components are to be paid through Shared Costs collected *beforehand*, and that the Hotel Unit Owner is under no obligation to "front" the Shared Costs and then seek reimbursement for "actual costs" from the RUOs and

CUOs *after the fact*. The Plaintiff's flawed and tortured interpretation of the Declaration would force the Hotel Unit Owner to either pay the Shared Costs necessary to perform needed repairs, improvements and/or maintenance, with the hope that all RUOs and CUOs would pay their HU Assessments for his/her Unit, or forego the necessary repairs, improvements and/or maintenance altogether, allowing the Shared Components to fall into disrepair. Such an interpretation is not only contradicted by the clear language of the Declaration, it is, in fact, nonsensical.

To further illustrate the HU Budget Methodology to be adopted by the Bankruptcy Court, attached hereto as **Exhibit "D"** is the HU Budget And Assessment Analysis ("HU Budget Analysis"), which includes Exhibits "1" through "7" containing the 2013 Budget, Allocable Share chart, and sample Unit Ledgers/Statements of Account. In this example, the budgeting process is applicable to the Debtor Units for the year 2013. However, not only does the HU Budget Analysis comport with the terms of the Declaration, but is supported by the testimony of Mr. Schecher [Schecher Trans., pgs. 31 – 89] as the HU Budget Methodology generally applies to the 2017 HU Budget and 2018 HU Budget attached hereto as **Exhibit "E"** and **Exhibit "F"**, respectively, and accepted into evidence during the Sale Motion Hearing as Exhibits #35 and #36 of the Schecher Group, Inc.'s Exhibit Register [D.E. #486].

Moreover, it's undisputed that the Debtor acquired the Debtor Units subject to the provisions of the Declaration which it cannot disavow now. The declaration, which some courts have referred to as the condominium's 'constitution,' strictly governs the relationships among the condominium unit owners and the condominium association." *Woodside Vill. Condo. Ass'n v. Jahren,* 806 So.2d 452, 456 (Fla.2002); See also, *In re Bayshore Yacht & Tennis Club Condo. Ass'n., Inc.*, 336 B.R. 866 (S.D. Fla. 2006)("[t]he declaration of condominium, is the condominium's constitution" which creates the condominium and "strictly governs the relationships among the condominium unit owners and the condominium association." 336 B.R. 866, 874 (Bankr. S.D. Fla. 2006) (quoting *Woodside Vill. Condo. Ass'n v. Jahren,* 806 So. 2d 452, 456 (Fla. 2002)). Moreover, restrictions which may be found in a declaration of condominium are clothed with a very strong presumption of validity when challenged. *Woodside Vill. Condo. Ass'n,* 806 So.2d at 457. This presumption arises from the fact that each individual unit owner purchases his unit knowing of and accepting the restrictions to be imposed. *Id.* "Such restrictions are very much in the nature of covenants running with the land and they will not be

invalidated absent a showing that they are wholly arbitrary in their application, in violation of public policy, or that they abrogate some fundamental constitutional right." *Id.* at 457 (quoting *Hidden Harbour Estates, Inc. v. Basso,* 393 So.2d 637, 639–40 (Fla. 4th DCA 1981)).

Moreover, as set forth in the Affirmative Defenses, the Plaintiff is barred and estopped from objecting to POC 40 and seeking a declaration as to the validity, priority and extent of the Schecher Liens in Counts 1 and 2 of the Complaint, and waived its right to challenge the HU Assessments on the basis that portions of these are not within the Scope of HU Assessments. Under Florida law, the party invoking estoppel must prove all facts and elements essential to that estoppel. *United States Life Ins. Co. in the City of New York v. Logus Manufacturing Corp*., 845 F.Supp.2d 1303 (S. D. Fla. 2012)**.** Equitable estoppel requires proof of three elements:

> (1) a representation by the party estopped to the party claiming the estoppel as to some material fact, which representation is contrary to the condition of affairs later asserted by the estopped party; (2) a reliance upon this representation by the party claiming the estoppel; and (3) a change in the position of the party claiming the estoppel to his detriment, caused by the representation and his reliance thereon.

*Travelers Indem. Co. v. Swanson,* 662 F.2d 1098, 1102 (5th Cir.1981) (citing Florida law).

Throughout the Bankruptcy Case and Shared Cost Adversary, the Bankruptcy Court has taken judicial notice of the fact that the Debtor and RUOs went on a so-called "payment strike" sometime in mid-2015 refusing to pay even undisputed HU Assessments to the Schecher Group. Estoppel by silence or inaction may arise where the party to be estopped has a duty to speak or act and fails to do so. *See id.* (*citing Pasco County v. Tampa Development Corp.,* 364 So.2d 850, 853 (Fla.Dist.Ct.App.1978)). Meanwhile, in reliance on the past HU Budgets, the Schecher Group continued to impose HU Assessments utilizing the HU Budget Methodology and mailed payment coupons to the Unit owners on an annual basis. [See, Schecher Transcript]. Until the filing of the Petition Date and Shared Cost Adversary, the Schecher Group detrimentally relied on the HU Budgets for the HU Assessments.

Further, it has consistently been held that waiver encompasses not only the intentional or voluntary relinquishment of a known right, but also conduct that warrants an inference of the relinquishment of a known right. *Singer v. Singer,* 442 So.2d 1020, 1022 (Fla. 3d DCA 1984); *Miami Dolphins, Ltd. v. Genden & Bach, P.A.,* 545 So.2d 294 (Fla. 3d DCA 1989). Clearly, the

Debtor had knowledge that 6060 Building was hotel/condominium catering to transient guests, and by definition, the Hotel Unit Owner would conduct essential activities for the "repair, replacement, improvement, maintenance, management and operation" of the Shared Components by way of the Easements to conduct such hotel business. This contemplates having, among other important security measures and life safety equipment, Shared Costs for a front desk (check-in procedures) irrespective of whether a Unit Owner was in the hotel rental program to "allow Owners and hotel guests to be well integrated into a unified structure and operation." [See, Section 16 of the Declaration].

The entry of partial summary judgment in favor of the Schecher Group is also warranted on the grounds articulated in the Third Affirmative Defense as the Plaintiff is further barred and precluded from prosecuting Counts 1 and 2 of the Complaint, in whole or in part, under the doctrines of Res Judicata, Collateral Estoppel and/or *Rooker-Feldman*. "Under the doctrine of res judicata, a claim is barred by prior litigation if: (1) there is a final judgment on the merits; (2) the decision was rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, are identical in both suits; and (4) the same cause of action is involved in both cases." *Griswold v. Cnty. of Hillsborough*, 598 F.3d 1289, 1292 (11th Cir. 2010) (quoting *Ragsdale v. Rubbermaid, Inc.,* 193 F.3d 1235, 1238 (11th Cir. 1999)). "If even one of these elements is missing, res judicata is inapplicable." *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1296 (11th Cir. 2001) (citing *Hart v. Yamaha–Parts Distrib., Inc.,* 787 F.2d 1468, 1473 (11th Cir. 1986)). "At all times the burden is on the party asserting res judicata … to show that the later-filed suit is barred." *Id.* (citing *Thorsteinsson v. M/V Drangur,* 891 F.2d 1547, 1551 (11th Cir. 1990)).

Similarly, collateral estoppel (or, issue preclusion) bars litigation of a previously decided issue when the parties are the same or in privity, and if the party against whom the issue was decided had the opportunity to litigate the issue in the earlier proceeding. *Brandt v. Bassett et al (In re Southeast Banking Corp.)*, 69 F.3d 1539, 1552 (11th Cir. 1995). For collateral estoppel to apply under Florida law, it is required that "the parties and issues be identical, and that the particular matter be fully litigated and determined in a contest which results in a final decision of a court of competent jurisdiction." *In re Letterese*, 397 B.R. 507, 514 (Bankr. S.D. Fla. 2008)(citing *Department of Health & Rehab Services v. B.J.M.*, 656 So.2d 906, 910 (Fla. 1995)).

Prior to the Petition Date, the Debtor instituted the Optima State Court Action against

Optima asserting various causes of action and claims for relief. Importantly, the Debtor challenged the validity of the Declaration and litigated issues such as the purported aberrational ownership and cost structures of the 6060 Building, which it lost, resulting in the issuance of the Order On Plaintiff/Counter Defendant, Sixty Sixty Condominium Association's, Amended Motion For Partial Summary Judgment As To Counts I, II, & V Of Its Complaint And On Defendant/Counter-Plaintiff, Optima's, Cross-Motion For Summary Judgment On Counts I & II Of Sixty Sixty's Complaint dated May 30, 2012 in favor of Optima (the "<u>MSJ Order</u>"). The MSJ Order attached hereto as **Exhibit "G"** provided, in pertinent part, as follows:

> 1.      The Court finds that the Sixty Sixty Condominium is a commercial condominium and not a mixed-use condominium pursuant to F.S. §718.103(23) and *Daytona Beach Club Condo Ass'n, Inc. v. Miller,* Arb. Case No. 2007-03-6407, Final Order of Dismissal (September 19, 2007). This finding is made with full knowledge of the pleadings by Optima.
>
> ***
>
> 4.       OPTIMA's Cross-MSJ on Count II of Plaintiff ASSOCIATION's Complaint is Granted in favor of OPTIMA as to the following issues:
>
> a) The ASSOCIATION's claim that the Condominium Declaration improperly shifts the obligation for payment of Common Expenses; and
>
> c) The ASSOCIATION's claim that the Condominium Declaration improperly grants OPTIMA the right and authority to charge "Shared Costs" as consideration for the easement provided under Section 3.4(e) of the Condominium Declaration.

After the Optima State Court Action concluded, on August 28, 2015, the Debtor commenced the 2015 Lawsuit alleging various causes of action against the Schecher Group, CHMC and A-1. During the pendency of the 2015 Lawsuit, the Debtor was already aware of the Flood Event and status of the Insurance Proceeds. The Plaintiff asserted claims against Defendant for breach of the Declaration and Operations Agreement, as well as for declaratory relief regarding the (i) $375,000 emergency special assessment from 2015 ("<u>ESA I</u>") and (ii) $975,000 emergency special assessment from 2016 ("<u>ESA II</u>") totaling $1,350,860.40 ("<u>Emergency Assessments</u>")[Adv. D.E. #58]. Undisputedly, the Emergency Assessments were imposed by the Defendant for Shared Costs associated with the Lock-Out Period necessary to fund repairs for damages to the 6060 Building caused by A-1 to the smoke alarm, including other costs and expenses to reopen the building. In fact, pursuant to court order entered in

connection with the 2015 Lawsuit, the Schecher Group provided audited Financial Statements for the Debtor for the years ended 2013 and 2014 (the "Audits"), which included an analysis for actual versus budgeted expenses for the Shared Components of the HU and the passage of the Emergency Assessments and other special assessments passed in 2014.

Later, on March 8, 2016, the parties entered into a Mediation Settlement Agreement (the "Settlement") attached hereto as **Exhibit "H"** providing whereby the Plaintiff and Defendant stipulated and agreed to the following Emergency Special Assessments:

> 5.    Upon dismissal of SGI and CHMC from the pending lawsuit, as set forth in Paragraph1 above, and with regard to the Emergency Special Assessments in the amount of $375,000.00 from 2015 and $975,860.46 from 2016, as previously imposed, SGI agrees to provide an option for a payment plan with each unit owner who is current with their monthly maintenance fees and the 2014 special assessment. Such payment plan will be based upon the unit owner's prior payment history, ability to pay, and the amount in arrears. SGI and CHMC agree to utilize the funds that are obtained, and to utilize their best efforts to reopen the building which is the subject of this lawsuit as soon as possible, which will include the payment of City of Miami Beach fines and costs for obtaining an occupational license. (emphasis added).

Following the execution of the Settlement, the Schecher Group complied with the agreement by, among other things, providing RUOs with an optional payment plan in accordance with the above terms, paying fines to the City of Miami Beach, and offering delinquent ROUs an opportunity to avoid incurring additional default rate interest and late charges by remitting monthly payments equal to twenty (25%) percent of allocable Share Costs for HU Assessments. However, the Defendants efforts to cure the Unit Owners' defaults were largely ignored. Accordingly, under *Rooker-Feldman* the Court should not look behind the MSJ Order and Settlement since "[i]t is well-settled that a federal district court lacks jurisdiction to review, reverse, or invalidate a final state court decision." *Harper v. Chase Manhattan Bank*, 138 Fed. Appx. 130, 132 (11th Cir. 2005) (citing *Dale v. Moore*, 121 F.3d 624, 626 (11th Cir. 1997).

Additionally, as set forth in ¶1 thereof, the "Association agrees to file a voluntary dismissal of the pending lawsuit, without prejudice, as CHMC and SGI [Defendant], with each side to bear its respective attorney's fees and costs." As a result, the 2015 Legal Fees charged as Shared Costs by the Schecher Group were within the Scope of HU Assessments given that the litigation over Shared Costs, Emergency Assessments and other issues concerning the 6060

Building (Condominium) was considered part of the HU's operation and management of the Shared Components, which may be assessed to the RUOs under the Declaration.  On this issue, *Wellpoint, Inc., v. C.I.R*, 599 F.3d 641 (7th Cir.  2010) is instructive as to what litigation expenses would be considered ordinary business expenses. "[B]usiness expenses incurred in day-to-day operations are deemed ordinary business expenses. *Commissioner v. Heininger,* 320 U.S. 467, 471, 64 S.Ct. 249, 88 L.Ed. 171 (1943); *Welch v. Helvering,* 290 U.S. 111, 113–14, 54 S.Ct. 8, 78 L.Ed. 212 (1933). By way of analogy, a business that is sued for unpaid taxes, or unpaid rent, is allowed to deduct its expenses in defending the suit as 'ordinary' business expenses. *Trust Under the Will of Binham v. Commissioner,* 325 U.S. 365, 376, 65 S.Ct. 1232, 89 L.Ed. 1670 (1945); see also *Commissioner v. Tellier,* 383 U.S. 687, 689–90, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966). Given that the 2015 Legal Fees are the sort of expense that is incurred to preserve the operation and maintenance of the Hotel Unit these Shared Costs are well within the Scope of HU Assessments as "'ordinary and necessary' even though such costs are not as regular and predictable as costs of labor and materials." *Wellpoint, supra*. at 646–647. Furthermore, the Defendant requests that this Court take judicial notice of the pursuant to Rule 201 of the Federal Rules of Evidence of the docket, all pleadings and all papers filed in the underlying State Court Actions. *See, e.g., Universal Foam v. Kohr* (*In re Kohr*), 399 B.R. 284, 287 (Bankr. M.D. Fla. 2008) (Court may take judicial notice of the docket and documents filed in litigation related to the debtor) *citing* Fed. R. Evid. 201(b).

Finally, for the reasons stated herein, and given the record before the Bankruptcy Court, the Schecher Group contends that no genuine issues of material fact remain as to the Affirmative Defenses raised in the Answer. Therefore, the entry of an order granting the Motion for Partial Summary Judgment is appropriate at this stage of the Shared Cost Adversary.

## V.    RELIEF REQUESTED.

**WHEREFORE**, the Defendant, Schecher Group, Inc., respectfully request that the Court enter an Order (i) granting the Motion for Partial Summary Judgment as to Counts I and 2 of the Complaint; (ii) awarding the Schecher Group its attorney's fees and costs in defending the Shared Cost Adversary; and (iii) granting such other and further relief as the Court deems just and appropriate.

Respectfully submitted this  **16**th day of January, 2018.

GENOVESE, JOBLOVE & BATTISTA, P.A.
*Attorneys for Defendant, Schecher Group, Inc.*
100 S.E. 2nd Street, Suite 4400
Miami, FL 33131
Tel: (305) 349-2300
Fax: (305) 349-2310


By:   /s/ Barry P. Gruher
         Barry P. Gruher, Esq.
         Fla. Bar No. 960993
         Email: bgruher@gjb-law.com

BECKER & POLIAKOFF, P.A.
*Attorneys for Defendant, Schecher Group, Inc.*
121 Alhambra Plaza, 10th Floor
Coral Gables, FL  33134
(305) 262-4433 Telephone
E-mail: Sdavis@bplegal.com


By: _____
Steven M. Davis
Florida Bar # 894249

## CERTIFICATE OF SERVICE

   **I HEREBY CERTIFY** that true and correct copy of the foregoing Motion for Partial Summary Judgment was served on January 16th, 2018 by electronic mail via CM/ECF Notification and/or via U.S. Mail, postage prepaid, as indicated, to those listed on the attached Service List.

                              By:  /s/ Barry P. Gruher
                                      Barry P. Gruher, Esq.

## SERVICE LIST

**Served Via CM/ECF Notification**

David Marshall Brown on behalf of Creditor Collective Unit Owners
DavidBrownfll@gmail.com

Steven M Davis on behalf of Defendant Schecher Group, Inc.
sdavis@bplegal.com

Steven M Davis on behalf of Respondent CASABLANCA RENTAL SERVICES, INC.
sdavis@bplegal.com

Inger M. Garcia on behalf of Creditor Collective Unit Owners
attorney@ingergarcia.com

Barry P Gruher on behalf of Defendant Schecher Group, Inc.
bgruher@gjb-law.com, vlambdin@gjb-law.com;gjbecf@gjb-law.com;cesser@gjb-law.com;chopkins@gjb-law.com

Brett D Lieberman on behalf of Plaintiff Sixty Sixty Condominium Association, Inc.
blieberman@messana-law.com, emair@messana-law.com;nbarrus@messana-law.com;tmessana@messana-law.com;thurley@messana-law.com;mwslawfirm@gmail.com

Thomas M. Messana, Esq. on behalf of Plaintiff Sixty Sixty Condominium Association, Inc.
tmessana@messana-law.com, emair@messana-law.com;blieberman@messana-law.com;thurley@messana-law.com;tmessana@bellsouth.net;nbarrus@messana-law.com;mwslawfirm@gmail.com;cbroussard@messana-law.com

# EXHIBIT "A"

## EXCERPTS OF DECLARATION FOR SIXTY SIXTY CONDOMINIUM

### Excerpt of Section 12

12.    <u>Obligation for Expenses Relating to the Hotel Unit.</u>

12.1    **<u>Maintenance.</u> As provided in Sections 3.4(d) and 7.3 above, the Hotel Unit owner has granted easements with respect to certain portions of the Hotel Unit and agreed to repair, replace, improve, maintain, manage, operate, and insure the Hotel Unit, all to be done as determined and ordered by the Hotel Unit Owner, or otherwise as provided in Section 7.3. In consideration of the foregoing each Residential Unit Owner, and each Commercial Unit Owner, by acceptance of a deed or other conveyance of the applicable Unit, and whether or not expressly stated, shall be deemed to agree that the costs incurred by the Hotel Unit Owner in (or reasonably allocated to) the repair, replacement, improvement, maintenance, management, operation, ad valorem tax obligations and insurance of the Shared Components (including reasonable reserves if established by the Hotel Unit Owner and any assessment payable by the Hotel Unit Owner to the Association, the "Shared Costs") shall be paid for in part through charges (either general or special) imposed against the Residential Units and the Commercial Units in accordance with the terms hereof. No Owner may waive or otherwise escape liability for charges for the Shared Costs by non-use (whether voluntary or involuntary) of the Hotel Unit or abandonment of the right to use same. Notwithstanding anything herein contained to the contrary, the Hotel Unit Owner shall be excused and relieved from any and all maintenance, repair and/or replacement obligations with respect to the Hotel Unit to the extent that the funds necessary to perform same, to the extent the obligation of the Residential Unit Owners and/or the Commercial Unit Owners, are not available through the charges imposed and actually collected. The Hotel Unit Owner shall have no obligation to fund and/or advance any deficit or shortfall in funds which were the obligation of the Residential Unit Owners and/or the Commercial Unit Owners in order to properly perform the maintenance, repair and/or replacement obligations described herein.**

    **\*\*\***

12.3    **<u>Charges to Unit Owners: Lien.</u>**

    (a)    **Developer, for all Units now or hereafter located within the Condominium Property, hereby covenants and agrees, and each Owner of any Residential Unit and//or Commercial Unit, by acceptance of a deed thereof or other conveyance thereof, whether or not it shall be so expressed in such deed or other conveyance, shall be deemed to covenant and agree, to pay the Hotel Unit Owner annual charges for the operation and insurance of, and for payment of 100% of the Shared Costs (the "Non-Hotel Units Allocated Share"), the**

**establishment of reasonable reserves for the replacement of the Shared Components and the furnishing and finishing thereof, capital improvement charges, special charges and all other charges hereinafter referred to or lawfully imposed by the Hotel Unit Owner in connection with the repair, replacement, improvement, maintenance, management, operation, and insurance of the Shared Components, all such charges to be fixed, established and collected from time to time as herein provided. The annual charge, capital improvement charge and special charge, together with such interest theron and costs of collection thereof as hereinafter provided, shall be a charge on the Residential Units and Commercial Units and shall be continuing lien upon the Residential Units and Commercial Units against which each such charge is made upon all improvements thereon, from time to time existing.** Each such charge, together with such interest thereon and costs of collection thereof as herein after provided, shall also be the personal obligation of the person who is the Owner of such Residential Units and/or Commercial Obligation of the person who is the Owner of such Residential Units and/or Commercial Units at the time when the charge fell due and all subsequent Owners of the Unit until paid, except as provided in Section 12.5 below. Reference herein to charges shall be understood to include reference to any and all said charges whether or not specifically mentioned. Each Residential and Commercial Unit shall be charged a "proportionate share" of the Hotel Shared Costs. **The proportionate share for each Residential and Commercial Unit is set forth on Exhibit "7" attached hereto (with the aggregate of the proportionate shares attributable to the Residential and Commercial Units equal to the Non-Hotel Units Allocated Share).**

(b)      **In addition to the regular and capital improvement charges which are or may be levied hereunder, the Hotel Unit owner shall have the right to collect reasonable reserves for the replacement of the Shared Components and the furnishing and finishing thereof and to levy special charges against an Owner(s) to the exclusion of other Owners for the repair or replacement of damage to any portion of the Hotel Unit (including, without limitation, improvements, furnishing and finishing therein) caused by the misuse, negligence or other action or inaction of an Owner or his guests, tenants or invitees**. Any such special charge shall be subject to all the applicable provisions of the Section including, without limitation, lien filing and foreclosure procedures and late charges and interest. Any special charge levied hereunder shall be due within the time specified by the Hotel Unit Owner in the action imposing such charge. The annual regular charges provided for in this Section shall commence on the first day of the month next following the recordation of this Declaration and shall be applicable through December 31 of such year. Each subsequent annual charge shall be imposed for the year beginning January 1 and ending December 31. The annual charges shall be payable in advance in monthly installments,

2

or in annual, semi- or quarter-annual installments if so determined by the Hotel Unit Owner (absent which determination they shall be payable monthly). The charge amount (and applicable installments) may be changed at any time by the Hotel Unit Owner from that originally stipulated or from any other charge that is in the future adopted by the Hotel Unit Owner. The original charge for any year shall be levied for the calendar year (to be reconsidered and amended, if necessary, at any appropriate time during the year), but the amount of any revised charge to be levied during any period shorter than a full calendar year shall be in proportion to the number of months (or other appropriate installments) remaining in such calendar year. The Hotel Unit Owner shall fix the date of commencements and the amount of the charge against the Residential Units and/or Commercial Units, as applicable, for each charge period, to the extent practicable, at least thirty (30) days in advance of such date or period, and shall, at that time, prepare a roster of the Residential Units, and Commercial Units and charges applicable thereto which shall be kept in the office of the Hotel Unit Owner and shall be open to inspection by any Owner. Written notice of the charge shall thereupon be sent to every Unit Owner subject thereto twenty (20) days prior to payment of the first installment thereof, except as to special charges. In the event no such notice of the charges for a new charge period is given, the amount payable shall continue to be the same as the amount payable for the previous period, until changed in the manner provided for herein.

12.4    Effect of Non-Payment of Charge; the Personal Obligation; the Lien; Remedies of the Hotel Unit Owners. If the charges (or installments) provided for herein are not paid on the date(s) when due (being the date(s) specified herein or pursuant hereto), then such charges (or installments) shall become delinquent and shall, together with late charges, interest and the cost of collection thereof as hereinafter provided, thereupon become a continuing lien on the Unit and all improvements thereon which shall bind such Unit in the hands of the then Owner, and such Owner's heirs, personal representatives, successors and assigns. Except as provided in Section 12.5 to the contrary, the personal obligation of an Owner to pay such charge shall pass to such Owner's successors in title and recourse may be had against either or both. **If any installment of a charge is not paid within fifteen (15) days after the due date, at the option of the Hotel Unit Owner, a late charge not greater than the amount of such unpaid installment may be imposed (provided that only one late charge may be imposed on any one unpaid installment and if such installment is not paid thereafter, it and the late charge shall accrue interest at eighteen percent (18%) per annum or as provided herein but shall not be subject to additional late charges; provided further, however, that each other installment thereafter coming due shall be subject to one late charge each as aforesaid) and the Hotel Unit Owner may bring an action at law against the Owner(s) personally obligated to pay the same, may record a claim of lien (as evidence of its lien rights as hereinabove provided for ) against the Unit on which the charges and late charges are unpaid and all improvements thereon, may foreclose the lien against the**

3

**applicable Unit and all improvements thereon on which the charges and late charges are unpaid, or may pursue one or more of such remedies at the same time or successively, and attorneys' fees and costs actually incurred in preparing and filing the claim of lien and the complaint, if any, and prosecuting same, in such action shall be added to the amount of such charges, late charges and interest secured by the lien, and in the event a judgment is obtained, such judgment shall include all such sums as above provided and attorneys' fees actually incurred together with the costs of the action, through all applicable appellate levels.** Failure of the Hotel Unit Owner (or any collecting entity) to send or deliver bills or notices of charges shall not relieve Owners from their obligation s hereunder. The Hotel Unit Owner shall have such remedies for collection and enforcement of charges as may be permitted by applicable law. All remedies are intended to be, and shall be, cumulative.

# EXHIBIT "B"

Page 1

1                  UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                         MIAMI DIVISION

3

4

5    IN RE:                    CASE NO. 16-26187-RAM
                               CHAPTER 11
6    SIXTY SIXTY CONDOMINIUM
     ASSOCIATION, INC.,
7
                    Debtor.
8    _____/

9

10

11                            ECF #432

12

13                        December 6, 2017

14

15          The above-entitled cause came on for hearing

16   before the Honorable ROBERT A. MARK, one of the Judges in

17   the  UNITED  STATES  BANKRUPTCY COURT,  in  and  for  the

18   SOUTHERN DISTRICT OF  FLORIDA, at 301 North Miami Avenue,

19   Miami,  Miami-Dade County,  Florida on, December 6, 2017,

20   commencing  at or  about  9:05 a.m.,  and  the  following

21   proceedings were had:

22

23

24       Transcribed from a Digital Audio Recording by:
                Margaret Franzen, Court Reporter
25

Page 2

1                      APPEARANCES:

2

3

                   MESSANA LAW FIRM, by
4                  BRETT LIEBERMAN, ESQUIRE
                   On behalf of the Debtor

5

6

7            DAVID MARSHALL BROWN, P.A., by
              DAVID MARSHALL BROWN, ESQUIRE
8                         and
             LAW OFFICES OF INGER M. GARCIA, by
9              INGER M. GARCIA, ATTORNEY-AT-LAW
           On behalf of 49 Collective Unit Owners

10

11

12           GENOVESE JOBLOVE & BATTISTA, by
                  BARRY GRUHER, ESQUIRE
13                        and
                 STEVEN M. DAVIS, ESQUIRE
14         On behalf of Schecher Group, Inc.

15

16

             PROFESSIONAL PARTNERS GROUP, by
17            ADAM T. KENT, ESQUIRE (CourtCall)
              On behalf of King Fisher Island

18

19

20                   ALSO PRESENT:

21

22        CORINNE AFTIMOS, Judge Mark's Law Clerk
          ECRO - Electronic Court Reporting Operator

23

24

                   - - - - - - -

25

Page 3

1                         I-N-D-E-X

2   WITNESS              DIRECT   CROSS    REDIRECT    RECROSS

3   RICHARD SCHECHER
      By Mr. Davis        4                175
4     By Mr. Lieberman            137                    --

5

6

                  EXHIBITS ADMITTED INTO EVIDENCE
7

8     Exhibit Number 35                               74
      Exhibit Number 36                               91
9     Exhibit Number 32                              126
      Exhibit B                                      149
10

11

12                     - - - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    THE COURT:  Good morning.
 2                    THE MARSHAL:  Good morning, Judge.
 3                    THE COURT:  I've got the sun in my eyes.
 4     All right.  Have a seat.
 5                    Let's get appearances starting on the
 6     debtor's side.
 7                    MR. LIEBERMAN:  Good morning, Your Honor.
 8                    Brett Lieberman, L-i-e-b-e-r-m-a-n, for the
 9     debtor, Sixty Sixty Condominium Association, Inc.
10                    MR. BROWN:  Good morning, Your Honor.
11                    David Marshall Brown appearing on behalf of
12     49 collective unit owners and with me in the courtroom is
13     lead counsel, Ms. Inger Garcia.
14                    MS. GARCIA:  Good morning, Your Honor.
15                    Inger Garcia.
16                    THE COURT:  Okay.  Good morning.  All right.
17                    MR. GRUHER:  Good morning, Your Honor.
18                    Barry Gruher, Genovese Joblove & Battista,
19     on behalf of the Schecher Group, Inc.
20                    MR. DAVIS:  Good morning, Your Honor.
21                    Steve Davis also on behalf of Schecher
22     Group, and Mr. Schecher is here with us.
23                    THE COURT:  Okay.  So I think -- I think
24     where we left off we had -- we had finished with
25     Ms. Valez.
```

Page 5

1                    The debtor rested, correct, Mr. Lieberman?

2                    MR. LIEBERMAN:  That's correct, Your Honor.

3                    THE COURT:  So, Mr. Gruher, it's your case.

4                    MR. GRUHER:  Yes, Your Honor.  Mr. Davis

5     will be handling the direct examination of

6     Mr. Richard Schecher --

7                    THE COURT:  Okay.

8                    MR. GRUHER:  -- on behalf of Schecher Group.

9                    THE COURT:  Okay.  All right.  So you're

10    calling Mr. Schecher?

11                   MR. GRUHER:  Yes, sir.

12                   THE COURT:  All right.  Let's -- what's the

13    matter?

14                   (Inaudible.)

15                   THE COURT:  What, the scan thing, I mean the

16    overhead?

17                   THE MARSHAL:  No, the computer, Judge.  They

18    wanted to put the computer onto the screen (inaudible.)

19                   THE COURT:  Do you have electronic exhibits

20    that you want to do through your computer or you just want

21    to put stuff in the overhead, I'm not clear?

22                   MR. LIEBERMAN:  I may want to use that, I

23    don't want to interrupt their direct, though.

24                   THE COURT:  Okay.  You -- you don't need any

25    electronics, Mr. Davis?

1              MR. DAVIS:  Just the overhead, Your Honor.

2              THE MARSHAL:  That's easy, I can switch it

3    here.

4              THE LAW CLERK:  Hi, Julio.  This is Corinne,

5    we're in Judge Mark's courtroom and we're having some

6    trouble with the evidence display.

7              UNIDENTIFIED SPEAKER:  Doc cam?

8              THE LAW CLERK:  Can you come up here or send

9    somebody up here?

10             Thank you.

11             MR. DAVIS:  Your Honor, may I approach the

12   witness to provide him with an exhibit book?

13             THE COURT:  Yes.  Corinne, is the doc cam

14   not working either?

15             THE LAW CLERK:  Yeah, the doc cam --

16             MR. DAVIS:  No, the doc cam is fine.

17             THE LAW CLERK:  -- is working fine.

18             THE COURT:  Okay.

19             MR. DAVIS:  I just want to turn it off while

20   I'm not using it.

21             MR. GRUHER:  Make sure the Judge knows we

22   added two exhibits and give them to his Honor, 35 and 36.

23             THE LAW CLERK:  Good morning.

24             MR. DAVIS:  Hello.

25             THE LAW CLERK:  Let's see, we already did

1    that.  No.

2                    MR. DAVIS:  That's off.

3                    THE COURT:  While we're doing that,

4    Mr. Kent, are you on the line?  I understand you wanted to

5    call in for listen only?

6                    THE LAW CLERK:  It might be that your

7    computer is just not (inaudible) ---

8                    MR. KENT:  Good morning, Your Honor.

9                    Adam Kent for King Fisher Island.

10                   MR. DAVIS:  We're not using the computer.

11                   THE LAW CLERK:  Right, but -- they're not

12   yours?  That's not yours?  They're not using it.

13                   THE COURT:  I don't know if that came

14   through the sound --

15                   UNIDENTIFIED SPEAKER:  That will work.

16                   MR. DAVIS:  Yeah, that's on.

17                   THE LAW CLERK:  Yeah, we're good.  So we're

18   good.

19                   MR. DAVIS:  Yeah.

20                   THE LAW CLERK:  Okay.  Thank you.

21                   THE COURT:  -- but it's Adam Kent for King

22   Fisher.  All right.  So we're just trying to get set up

23   here.  Where is ---

24                   UNIDENTIFIED SPEAKER:  It's pretty early

25   over there in California.  Maybe they're not up yet.

Page 8

```
 1                  THE COURT:  I need to get my capture --
 2   what -- what am I doing wrong?
 3                  THE LAW CLERK:  (Inaudible).
 4                  THE COURT:  Corinne, what am I doing wrong
 5   to see this?
 6                  THE LAW CLERK:  Oh, I'm sorry.
 7                  THE COURT:  I thought I had doc cam.  Okay.
 8   All right.  The icon was hidden.
 9                  All right.  So, I'm sorry, can -- did you
10   swear Mr. Schecher in, if not, let's do that please?
11                  ECRO:  Good morning.  Please raise your
12   right hand.
13                  Do you solemnly swear to testify you are
14   about to give in this case now before the Court will be
15   the truth, the whole truth, and nothing but the truth, so
16   help you ---
17                  MR. SCHECHER:  I do.
18                  THE COURT:  Okay.  Proceed.
19                  MR. DAVIS:  Thank you, Your Honor.  It's
20   hard -- it's a little hard to see with the bright light
21   behind you, but I'll try to do my best.
22                  My -- my goal today of questioning
23   Mr. Schecher is to show the Court just how usury this
24   contract is --
25                  THE COURT:  Okay.
```

1          MR. DAVIS:  -- this proposed deal, that it's

2    financially impossible and these guys, we think they did

3    no homework and that's -- that's what I intend to show

4    through Mr. Schecher.

5          This is no different than the Mark Realty

6    Deal that got washed out.  We think this is going to be

7    the same thing.

8    Thereupon,

9          RICHARD SCHECHER,

10   having been first duly sworn, was examined and testified

11   as follows:

12          DIRECT EXAMINATION

13   BY MR. DAVIS:

14        Q.    Mr. Schecher, you heard testimony at the

15   last hearing about a meeting between KFI and yourself in

16   Daytona Beach.

17          Did -- did that meeting take place?

18        A.    Yes, it -- it did.

19        Q.    All right, and what happened at that meeting

20   with regards to the hotel unit?

21        A.    The gentlemen flew in -- I live in a flying

22   community, they flew in on their own private jet.  They

23   came into the meeting, and we were going to discuss the

24   possibility of a joint venture deal or of them buying me

25   out.

1          THE COURT:  When was this?

2          THE WITNESS:  It was early summer, I don't

3    know the exact date.

4    BY MR. DAVIS:

5          Q.    Of 2006 or -- 2016 --

6          A.    Of this year --

7          Q.    -- or 2017?

8          A.    -- 2017.

9          Q.    All right.  So it was like May or June,

10   somewhere around in there?

11         A.    Somewhere like that.  I -- I flew in from

12   Atlantic City.  I live in Atlantic City --

13         Q.    Was it --

14         A.    -- in the summer.

15         Q.    -- was it clear to you what the folks from

16   KFI were looking for?

17         A.    Crystal clear.

18         Q.    And what was it that they were looking for?

19         A.    They were looking to acquire my hotel unit.

20         Q.    Anything else?

21         A.    Basically their end game was no different

22   than anyone else who I was actually under contract with,

23   was to -- to acquire the building, and then to convert it

24   into a single ownership building, and to sell it at a huge

25   profit.

1          Q.    And are you interested in doing such a deal?

2          A.    No, I'm not.

3          Q.    How many different proposed buyers or

4    investors over the past couple of years have come to you

5    with similar types of deals?

6          A.    I've been approached and I continue to be

7    approached by numerous people monthly, if not weekly.  I

8    was actually under contract with three, what I considered

9    to be serious, buyers at one time.

10          Q.    It was represented ---

11          THE COURT:  I'm not -- I'm sorry, I didn't

12    understand the testimony.  When you say three different --

13    three buyers, in one deal or three different deals?

14          THE WITNESS:  Three separate deals,

15    Your Honor, each one was structured in a way that made

16    sense, as opposed to this one, where they would buy the

17    hotel unit owner, secure the building, and then acquire --

18    all of the subsequent units followed once they tied up the

19    hotel unit.

20    BY MR. DAVIS:

21          Q.    So is it your ---

22          THE COURT:  You had three different

23    contracts that you -- you signed and none -- none of them

24    went forward?

25          THE WITNESS:  I -- I signed three separate

1    contracts, each one had a sizeable deposit, each one went

2    into a due diligence period, and at the 11th hour, I would

3    almost say on two out of the three waited until the 11th

4    hour to back out of the deal for one legitimate reason or

5    another, and one person I -- I quickly put an end to the

6    deal because I -- he kept trying to renegotiate everything

7    once the deal was signed.  I didn't consider him to be a

8    real buyer.

9    BY MR. DAVIS:

10           Q.    When you say sizeable deposit, what do you

11   mean by sizeable deposit?

12           A.    I'm a real estate investor.  I have a

13   sizeable global portfolio of real estate.  I buy and sell

14   real estate all the time, and when I reference that

15   deposit, in the industry I would consider a ten percent or

16   after tough negotiations, maybe a five percent of the

17   purchase price an acceptable deposit that would show me

18   that the buyer is real, however you want to define real,

19   but at least that he's committed to -- to the sale.

20           Q.    What are your thoughts about the deposit in

21   this case, in this proposed sale?

22           A.    I -- I think this is a deposit, what I would

23   refer to as somebody who's a tire kicker.  They --

24   generally the profile of somebody is they have a contract

25   made out to the name of a company and/or assigns, and

Page 13

```
 1    there's a -- a number of various escape clauses in the
 2    contract as opposed to, in my opinion, the due diligence
 3    period is a period of time where the buyer is -- through
 4    his due diligence determines that everything represented
 5    by the seller is true, void of any crazy escape clause.
 6              Q.    All right.  We'll get back to the contract
 7    here in a moment.
 8                    It was represented that you were willing to
 9    sell to KFI for 3.1 million for the hotel unit plus -- for
10    the shared components, plus six million for your hotel
11    unit, is that -- was that correct?
12              A.    That's absolutely not correct.
13              Q.    All right.  What was the proposed deal back
14    then?
15              A.    Well, first off, there was no deal.  We were
16    only discussing.
17              Q.    Okay.
18              A.    The price of six point million -- six
19    million, I had published a video at one time and I sent it
20    to all of the people who had contacted me that I
21    considered to be good prospects to buy my unit.  At that
22    time I did want to sell the hotel unit.
23                    So the six -- the $6 million number came
24    from that video, and I was throwing out there as a
25    starting point to negotiate with me.
```

Page 14

1                    The three million that -- I forget the

2        gentleman's name, Todd --

3               Q.    Michaels.

4               A.    -- Michaels represented, absolutely did not

5        have anything to do with the shared components because

6        what I tried to explain to him, is that he -- I -- I

7        believe he was being misled by the seller.

8                    The 3.1 in question was the accounts payable

9        of the Schecher Group at that time, and we went into great

10       discussion where I -- they had even asked me and sent me

11       an e-mail asking if I would forward them, and I believe at

12       that point in time in early summer, the balance due from

13       the unit owners were a little bit over six million.

14                    So they wanted to understand the 3.1 was my

15       accounts payable, and they wanted to understand the

16       balance due from the various unit owners, being the 6.1.

17       They requested backup for their own due diligence at that

18       time.

19               Q.    In this ---

20                    THE COURT:  Wait, wait, I'm not clear on

21       what -- what you were -- what you were proposing in terms

22       of selling what you owned and settling the liens for

23       shared costs.

24                    THE WITNESS:  At that point in time,

25       Your Honor?

Page 15

1          THE COURT:  Yeah.

2          THE WITNESS:  Okay.  The best way to

3    describe it is this way, all of the contracts that I had

4    prior to my discussions here with King Fisher Island, was

5    basically what I called a step into my shoes contract, and

6    that's how I bought it from the prior owner.  I stepped

7    into the shoes of the owner and I assumed all of his

8    liabilities, and I also assumed all of his receivables.

9               So what I was discussing at the time was

10   the -- the 3.1 million was the payables that my company

11   was legally on the hook for that could actually have

12   adverse reaction on my credit ratings.

13               So what I was talking about at that point

14   was you can step into my shoes, you pay the 3.1, which

15   wipes out the payables that I'm concerned about; you pay

16   me the six million for the hotel unit, and then in my

17   shoes you have the -- now the responsibility to pay all of

18   the bills of the building, but you also have the asset of

19   being able to collect what you have to pay from the unit

20   owners of their outstanding balance, which was 6.1 or

21   6.5 million at that time.

22               And that's why they wanted to verify that

23   what was due, because if they were going to step into my

24   shoes, I'm certain they didn't want to come out of pocket

25   any more than I would, and they wanted to make sure that

1   the receivables from the owners would cover what -- what

2   they actually have to be liable for.

3              THE COURT:  Okay.  So that was the structure

4   of the deals that were under contract earlier that -- that

5   didn't get past due diligence, and that was the same

6   structure you were proposing that King Fisher take -- take

7   the receivables and you -- you collect the shared costs,

8   and just pay me what I'm -- the Schecher Group is

9   presently obligated for, which was 3.1 million?

10             THE WITNESS:  That's correct, Your Honor.

11             THE COURT:  Okay.

12  BY MR. DAVIS:

13        Q.    The receivables now have been filed --

14  the -- the summary of shared costs due for the hotel unit

15  assessments have been filed in this Court and now approach

16  12 and a half million dollars.

17             Can you explain where that 12 and a half

18  million dollars owed by the unit owners, the residential

19  unit owners and commercial unit owners, comes from?

20        A.    Yes.  The 12.5 million is an accumulation of

21  debt that started before I actually owned the hotel unit.

22             When I stepped into the shoes of the prior

23  owner, as I said, I -- I -- I took over his liabilities,

24  which were his payables, and I also took over the

25  receivables from the owners for me to pay those bills.

Page 17

1          I believe at the time in 2013 when my

2     company took over, there was about $600,000 that was

3     actually owed at that time by the unit owners.  It

4     graduated to the present day of 12 point some million, but

5     what makes that up is -- is basically the annual budget

6     every year generates payment coupons, which on the ledger

7     is listed as the HU shared component.

8               So every unit owner shares the same one

9     entry, but a different amount.  Based upon the -- the --

10    the condo declarations, they'll have the shared component

11    cost.  In 2015, and even back in 2013, when the special

12    assessments were -- were passed, they also appear on the

13    ledger.  So those are the common things that would be on

14    everybody's ledger.

15              Individual ledgers would have individual

16    charges generated by that particular unit.  So, again, no

17    two unit ledgers would actually be the same dollar-wise,

18    but they would -- they would contain the same line item of

19    charges, being the shared component costs being one of

20    them, the special assessment for the FBS Construction,

21    that was originally listed on the ledger spread out over

22    eight years.

23              So, for example, there was a charge

24    everybody would have based upon their percentage, and I'll

25    pick a number, $214 a month.  So every ledger from the day

Page 18

```
 1    the condo association approved the FBS loan, they had a

 2    special assessment charge of $214, and that covered the

 3    FBS.

 4                    THE COURT:  What's SBS.

 5                    THE LAW CLERK:  FBS.

 6                    THE WITNESS:  Florida Building Supply.

 7                    THE COURT:  Oh, FBS, okay.

 8                    MR. DAVIS:  FBS.

 9    BY MR. DAVIS:

10          Q.    Let's -- let me just stop you for a second

11    and have you turn to Exhibit Number 25 in the book in

12    front of you, which is the ledger for Unit 505.

13                    UNIDENTIFIED SPEAKER:  24.

14                    THE WITNESS:  I'm sorry, Tab 25?

15    BY MR. DAVIS:

16          Q.    Tab -- it looks like it's Tab 25.  It should

17    be the ledger for Unit 505.

18          A.    Yes.

19          Q.    Is that the ledger for Unit 505?

20          A.    Yes.

21          Q.    There's some others in there, too, for the

22    commercial units, but let's just take a look at 505 for

23    the time being.

24                    I'd like to move these ledgers into

25    evidence, if we could, Your Honor.  I'll lay the
```

1   foundation if I need to.

2                  THE COURT:  Where did the document come

3   from?

4                  You can identify this, Mr. Schecher, as --

5                  THE WITNESS:  Yes, this is ---

6                  THE COURT:  -- ledgers from your records --

7                  THE WITNESS:  Yes, sir.  This is a --

8                  THE COURT:  -- or Schecher Group?

9                  THE WITNESS:  -- a ledger from -- from

10  the -- my computer.

11                 THE COURT:  Okay.  So when I say "you," I'm

12  really referring to Schecher Group, just so we don't ---

13                 THE WITNESS:  Yes, Your Honor.

14                 THE COURT:  Okay.

15                 THE WITNESS:  When I say "I," I'm also

16  referring to my company, not me, personally.

17                 THE COURT:  Okay.  All right.  Any

18  objection, Mr. Lieberman?

19                 MR. LIEBERMAN:  No -- no objection, just to

20  note the date of the ledger, November 17, 2017.

21                 THE COURT:  Okay.  Well, it -- yeah, well

22  let's -- let's see if that's right.

23                 Is this date at the bottom, 11/17, is that

24  when this was printed out?  I mean, so that -- or I should

25  say does this represent your ledger balance as of that

Page 20

1    date, 11/17?

2                    THE WITNESS:  As of that date and that time,

3    Your Honor.

4                    THE COURT:  Okay.

5    BY MR. DAVIS:

6         Q.    I'd just like to go through some of the

7    entries that you were talking about earlier, if we could.

8                    Starting off with HU -- the June 1, 2013

9    entry.  What exactly is that, for 929?

10        A.    That line item is -- is the computer code,

11   it's HU shared component cost, and if you -- if you travel

12   across, it shows the amount of 929.41.

13                   So for Unit 505 based upon the condominium

14   documents, he -- they pay a percentage of the annual

15   budget, and their percentage applied to the annual budget

16   worked out to be $929.41.

17                   So they would have received, just like in a

18   normal condo association, a coupon booklet from the bank,

19   I believe it's BB&T Bank, where they tear off a coupon and

20   they mail it in monthly with -- with their payment or they

21   go onto electronic payment.

22        Q.    All right, and I'm going slide this up so

23   you can see ---

24                   MR. LIEBERMAN:  Your Honor, I have an

25   objection to this line of questioning.

Page 21

1             I had thought that we were going to narrow

2    the scope of this hearing to the reasonableness of the

3    contract and not have a mini trial on the shared

4    components.  I think that this goes beyond the scope of

5    whether the debtor exercised a reasonable business --

6    business judgment or whether the buyers acted in good

7    faith, and I think this goes directly to the issues that

8    Your Honor suggested that we would not be trying.

9             THE COURT:  Okay.  Response.

10            MR. DAVIS:  Yes, Your Honor.  The purpose of

11   my questioning is, first of all, some background

12   information on how the assessing is done because I know

13   that's going to be an issue for later, but more

14   importantly, to show what these amounts are and to show

15   the absurdity of this proposed contract where they think

16   there's some very low number that somehow magically

17   appears that they can use to buy -- to pay off

18   Mr. Schecher's debt, and by showing this particular

19   ledger, Your Honor can see how the assessing is done, and

20   we're going to show you as far as the declaration

21   provision on how this stuff works and how it relates to

22   the complete absurdity of what it is that this proposed

23   buyer is looking to do.

24            So I'll -- I'll be very brief with this.

25            THE COURT:  Okay.

1          MR. DAVIS:  I'm not going to go through

2    every entry --

3          THE COURT:  Okay.  I agree --

4          MR. DAVIS:  -- but it's certainly relevant.

5          THE COURT:  -- I agree in part with

6    Mr. Lieberman, in that I'm not going to make a finding or

7    even an estimate of what the shared cost amounts will --

8    will be, but it -- it's relevant to your objection and

9    helpful since we've talked -- and helpful generally in the

10   case since you've talked about the Schecher Group's

11   methodology.  So let's -- so I'll allow it.

12         MR. DAVIS:  Thank you, Your Honor, and

13   that's my goal, just to show the methodology, not to come

14   up with a precise calculation of --

15         THE COURT:  So --

16         MR. DAVIS:  -- of the numbers.

17         THE COURT:  -- the line item we were looking

18   at 6/1/2013, 929.41, which presumably is a recurring --

19   will be a monthly recurring charge, is the -- that unit's

20   percentage share under the declaration of the previous

21   year's budget or that year's --

22         THE WITNESS:  Of the present year's --

23         THE COURT:  -- budget?

24         THE WITNESS:  -- budget, Your Honor.

25         THE COURT:  Present year's budget.  The

Page 23

```
 1    budget is January 1 through December 31st or is there a
 2    fiscal year or what?
 3                  THE WITNESS:  Well, it was -- it was -- it
 4    was changed last year, and I'll -- I can explain why, but
 5    normally, it was January until December 31st, with a new
 6    budget starting in January.
 7                  THE COURT:  Okay.  As long as I interrupted,
 8    let me just, for further background, it's come up I think
 9    in the past, so Schecher Group determines the budget and
10    just advises everybody or is there some input or right of
11    input from the unit owners in what the budget number is?
12                  THE WITNESS:  I'll start at the end and work
13    backwards.
14                  There is -- under the declarations, there's
15    no right for anybody other than the hotel unit owner to
16    actually come up with a budget.  There is a fiduciary
17    obligation to make it an accurate budget that addresses
18    the needs of the building.
19                  Going back in -- in time, from 2013 up until
20    2015, until the board of directors changed, when the
21    current present -- president became the president, the
22    board of directors always participated and we voluntarily
23    allowed them as part of the process.
24                  So basically every single annual budget from
25    2013 until 2000, and I believe, 15, was basically approved
```

Page 24

1    in combination by both the board of directors, the

2    association, and the hotel shared component owner, my

3    company.

4              This changed in 2015, but I guess it's

5    important for Your Honor to know why we -- we allowed them

6    to participate and why we welcomed their participation.

7    The association budget depends upon -- because they own

8    the commercial space and they acquired a residential unit

9    under foreclosure, the only way they can properly prepare

10   a budget is to know what the shared component costs are

11   because the same formula in the condo declarations applies

12   a financial obligation, which is much higher than the 929

13   that we see here to the commercial units.  So the

14   association needed to know our budget upfront so they can

15   prepare their budget.

16             Now, this changed in 2015.  I was in --

17   actually came out of retirement, came in, and we -- we

18   made the change because we were adversaries it seemed

19   constantly with the current president and the current

20   board, but to respect their -- the process they have to

21   follow, I changed the budget.

22             Their budget is due in January.  So I made

23   our budget effective December 1st until December of the

24   following year, this way I would have our budget, which

25   was actually out, published and the coupons have already

Page 25

1    been mailed to -- to all the owners for 2018, this gives

2    the association a month to prepare their budget with

3    whatever factors they use to get their budget out to the

4    same unit owners for the association.

5                    THE COURT:  Okay.  I think I understand the

6    concept that the association has to have a budget that

7    collects enough from the residential unit owners to cover

8    the association owned units' obligations for shared costs,

9    that's what you're saying; right?

10                   THE WITNESS:  That's correct, Your Honor.

11                   THE COURT:  Okay.  So that ---

12                   THE WITNESS:  Just like we have to have the

13   same process to -- to collect to -- to maintain our

14   building.

15                   THE COURT:  Okay.  I understood everything

16   you said except I wasn't clear on the dates.

17                   When -- what was the first -- for what

18   calendar year did you first start the December 1st

19   publication of your budget, was that December 1, '15 for

20   2016 or December 1st ---

21                   THE WITNESS:  It was December 1st of 2016,

22   Your Honor.

23                   THE COURT:  Okay.  Okay.

24                   THE WITNESS:  There was another reason, but

25   that -- that reason is -- is no longer valid.  We were --

1   we were pushing to have the building opened by New Year's,

2   and I needed the budget out, I needed to -- to have funds

3   starting to roll in so we could afford to have the

4   building, not only opened, but operational.

5                THE COURT:  Okay.  It's an issue of law that

6   the attorneys can argue if they disagree, and there was no

7   objection in terms of a legal opinion, but in any event

8   your -- your understanding of the declaration is that

9   there is no specific provision for any unit owner to

10  challenge the budget?

11               THE WITNESS:  That -- that's my -- my

12  understanding.  I read the document several times and

13  there's no place in there that I can find any reference to

14  anyone coming in to assist with the budget.

15               THE COURT:  Okay.  I'm not ---

16               MR. DAVIS:  And we'll get the declaration.

17               THE COURT:  I'm shifting over so I don't

18  have the sun glaring at me.  All right.

19               MR. DAVIS:  That is really bothersome up

20  there, it must be bothersome for Your Honor.

21               THE COURT:  I knew there was a reason I

22  don't start this early generally.

23               Okay.  Keep going.  So I think we were

24  starting to go through examples of the line items.

25               MR. DAVIS:  Yeah, I wanted to follow up ---

Page 27

1          THE COURT:  We clarified and I understand
2  the recurring monthly charge.  So what other line items
3  did you want to point out?
4          MR. DAVIS:  I just -- I just wanted to
5  follow up on -- on what Your Honor asked --
6          THE COURT:  Okay.  Go ahead.
7          MR. DAVIS:  -- about the budgeting process
8  with the association's budget and your budget.
9  BY MR. DAVIS:
10      Q.    Part of the association's budget is to
11  assess the hotel unit for a percentage of its budget;
12  isn't that right?
13      A.    That's correct.
14      Q.    And then so when you -- the hotel unit is
15  assessed for a part of that association budget, how is
16  that amount paid?
17          For example, let's say the association has a
18  budget of a thousand dollars and assesses the hotel unit
19  600 of that thousand dollars.  How is that $600 assessed
20  and paid?
21      A.    Well, if I -- if I do my -- the budget is
22  only an estimate of the -- the charges that are going to
23  be taking place for that year.
24          If I -- if I consider that in the very
25  beginning, which normally we would do, my budget stands

1   pretty accurate, and there's no need for a special

2   assessment or -- which is referenced in the documents as

3   special charges.

4            So if -- if I do the job right or my company

5   does the job right, we'll have a budget and it should

6   remain -- you just pay your coupons every month and

7   everything is fine.  If ---

8        Q.    Let me just back you up a second because I

9   think you might have missed my question.

10       A.    No, I was getting to the end, that part.

11       Q.    Okay.  Let me -- okay.  All right.  Well, go

12  ahead then.

13       A.    So my point is we either did it right and

14  it's in the budget or the association comes back and they

15  assess me for this amount that was not anticipated, then

16  that -- because the condo documents say the hotel unit

17  owner pays no assessments, it gets put back to the unit

18  owners.  So those -- that would be a special charge which

19  is authorized.

20            So if I did it right, there's no special

21  charge.  If I did it wrong, there would be a special

22  one-time charge to cover that to the unit owners.

23       Q.    So is -- is what you're saying that when the

24  association assesses the hotel unit some percentage of its

25  budget, that assessment gets passed on to the unit owners?

Page 29

1          A.    That's passed on to the unit owners.

2          Q.    So that gets added into your budget, is that

3    what you're saying?

4          A.    Yes.

5          Q.    So if you have a -- I didn't mean to lead

6    him, Your Honor --

7                THE COURT:  Yeah, no, keep going --

8                MR. DAVIS:  -- but I just wanted to clarify.

9                THE COURT:  -- keep going and then I may

10   have a question, but ---

11   BY MR. DAVIS:

12         Q.    Okay.  So let's say that you have a budget

13   of a million dollars.

14               THE COURT:  Well, why don't we use something

15   that approximates --

16               MR. DAVIS:  We can use the real numbers.

17               THE COURT:  -- what the actual budgets

18   were --

19               MR. DAVIS:  Okay.

20               THE COURT:  -- for a year just because I

21   don't really have a sense.

22   BY MR. DAVIS:

23         Q.    All right.  So let's say that your

24   budget ---

25         A.    If it's helpful, I can give a real life

1    example.

2              THE COURT:  Yeah, that's what I --

3    BY MR. DAVIS:

4         Q.    Well -- all right.

5              THE COURT:  -- I'd rather, than throwing out

6    a million, I'd --

7              MR. DAVIS:  Yeah.

8              THE COURT: -- throw out what a number was

9    for one of the years.

10   BY MR. DAVIS:

11        Q.    So let's go to the 2017 --

12             UNIDENTIFIED SPEAKER:  I think -- I think 36

13   would be the (inaudible).

14   BY MR. DAVIS:

15        Q.    -- operating budget that's at Tab 35.

16             THE COURT:  My book only goes up to 34.

17             MR. GRUHER:  Let the Judge -- I'm sorry,

18   Your Honor, I didn't mean to interrupt.  But I -- I had

19   the courtroom deputy provide two additional exhibits.

20   They should have been on your ---

21             THE COURT:  Oh, yeah.  Okay.

22             MR. GRUHER:  Sorry, Your Honor.  I didn't

23   mean to interrupt.

24             THE COURT:  I -- I see that.  I thought it

25   was -- I thought those were debtor exhibits.

Page 31

```
 1                    MR. GRUHER:  And they're hole punched if you
 2    want to put them ---
 3                    THE COURT:  Okay.  I've got it, 35.
 4                    MR. GRUHER:  And they're hole punched if you
 5    want to put them into your book.
 6                    THE COURT:  All right.
 7                    MR. GRUHER:  Thank you, Your Honor.
 8    BY MR. DAVIS:
 9        Q.    Okay.  So let's take a look at the 2017
10    Sixty Sixty operating budget.  We're talking about the
11    hotel units' share of the association's budget, do you
12    follow me so far?
13        A.    Yes, that -- that would be a line item.
14        Q.    So where is that reflected in the 2017
15    Sixty Sixty operating budget?
16        A.    If you go under the category of professional
17    fees, and if you look at legal expense, it says budgeted
18    and the line item is $650,000.
19                    THE COURT:  All right.  I'm not sure --
20                    THE WITNESS:  Okay.
21                    THE COURT:  -- I understood the answer in
22    reference to the question.
23                    THE WITNESS:  I'm mentally thinking of -- of
24    what the association passed onto us.  So you're -- you're
25    saying -- I'm confused.
```

Page 32

1                    THE COURT:  Well, why don't you ask your

2       question again.

3       BY MR. DAVIS:

4            Q.   Okay.  Let me show you -- I'll put the

5       exhibit up.  This is the 2017 Sixty Sixty operating

6       budget.

7                    And you recall -- you -- take a look at the

8       screen, you can see it up on the screen, okay.  I'm going

9       to flip to the third page of that, okay.

10                   Are you familiar with that document?

11           A.   Yes.

12           Q.   All right.  So I'm going to put up the third

13      page of that, and do you see where it says HU share of CE?

14           A.   Yes.

15           Q.   What exactly is that amount?

16           A.   That's what -- that's what we're talking

17      about now.  That's the share that gets passed back to the

18      unit owners, what the -- the association charges the hotel

19      unit owner, which is 60 some percent of their operating

20      budget, and because they actually own units, that -- that

21      amount is pretty high.

22           Q.   Okay.  We'll get -- we'll get back to that.

23      I just wanted to clarify that question, Your Honor, and

24      we'll get back to the budget in a little bit, and I'll

25      move that into evidence when we -- when we get to it.

Page 33

1               All right.  Let's get back to Unit 505, what

2       we were -- what we were talking about before, it's

3       been ---

4               THE COURT:  Can I go back to the question I

5       was going to ask?  It -- it came up or it's come up a few

6       times in hearings during -- during discussions about the

7       process.

8               Would -- would the hotel unit pay and

9       then -- the association and then collect or was it just an

10      accounting kind of debit and credit, or maybe we should

11      start out, if everything in a -- in a fantasy world I'll

12      use for my hypothetical, if everything was copacetic

13      between the Schecher Group and the unit owners, would the

14      hotel unit pay its share each month and it -- it would be

15      covered by, in turn, money coming in each month that was

16      part of the budget or would it be done by debits and

17      credits on an accounting basis, if you understand the

18      question?

19              THE WITNESS:  If -- if I understand the

20      question correctly, the answer is neither.

21              THE COURT:  Okay.

22              THE WITNESS:  The correct answer would be if

23      you just did any research on the internet with the Florida

24      State Department of Professional Regulation or the

25      condominium departments, they -- they publish and they

Page 34

```
 1   make it perfectly clear what a budget is, and the budget
 2   has to take -- it's an estimate of the annual charges.  It
 3   is absolutely impossible, and if you just use common sense
 4   for a minute, the answer is obvious, it's absolutely
 5   impossible in our particular case for the -- the -- the
 6   hotel shared component, we'll just call it the hotel unit
 7   owner, to pay and then collect.  It's impossible because,
 8   number one, they don't have the money available to do
 9   that, but number two the --
10            THE COURT:  Who -- who -- when you say "they
11   don't" ---
12            THE WITNESS:  -- the condo declaration --
13   sorry, Your Honor.
14            MR. DAVIS:  Schecher Group.
15            THE COURT:  You said "they don't have the
16   money," who are you referring ---
17            THE WITNESS:  "They" meaning the HU owner,
18   the shared component owner.  Their -- they have no funds
19   other than what is collected from the unit owners, and the
20   only funds they're supposed to be collecting from the unit
21   owners is to pay the building expenses or any extra
22   services they may have been provided at a unit -- unit
23   owner's request.
24            So that's why it all starts with a budget,
25   and the budget is nothing more than the estimated expenses
```

1   of the building.  The budget worksheet, which is what you

2   were just showing me a minute ago, breaks it down in

3   minute detail as to everything that is required to operate

4   that.  So I -- I guess the simple way to say it is a

5   budget is your best guess or your best estimate as to what

6   the cost will be.

7                When we -- we send out the coupons to the

8   owners.  In the perfect world they're supposed to be

9   paying that coupon every month, and every month the hotel

10  unit owner will have funds to pay those bills, that's how

11  it works in the -- in the perfect world.

12               And in the real world, and if you think

13  about it for a minute, every single entity in the world,

14  even our U.S. Government, every business, every condo

15  association, everybody follows that same procedure.  You

16  come up with a budget, the budget gets funded, and the

17  bills get paid by the budget, and when a budget isn't --

18  when you don't have a budget available, they're talking

19  about closing down the -- the government even, and how

20  many times has our own government been closed down because

21  our legislatures couldn't get the budget passed in time.

22               THE COURT:  All right.

23               THE WITNESS:  So that's all I can say, is

24  that it starts with the budget and it ends with people

25  paying or not paying.

1            THE COURT:  Okay.  Well, I don't --

2            MR. DAVIS:  To further answer ---

3            THE COURT:  -- I don't think you answered --

4            MR. DAVIS:  I might be able to clarify that,

5   Your Honor.

6            THE COURT:  -- my question.

7            You looked at a line item on Page 3 of

8   the -- of Exhibit 35, which had HU share of CE, 45,894 a

9   month, right, that's what Mr. Davis was -- that was the

10  line you were looking at?

11           MR. DAVIS:  Yes, Your Honor.

12           THE COURT:  Okay.

13           MR. DAVIS:  I can ---

14           THE COURT:  So -- so you're -- you're

15  budgeting for 2017, based on what either the association

16  has published or what you think the association's

17  budget -- association's budget is going to look like, your

18  share of 45,894 a month; right?

19           THE WITNESS:  That number is derived

20  primarily from the fact that CU 1 through 4 and 505 have

21  monthly maintenance fees to pay.

22           THE COURT:  Okay.

23           THE WITNESS:  So I would -- I would probably

24  tell you that 95 percent of that number are those items.

25           THE COURT:  Okay.

1              THE WITNESS:  The rest -- because the -- the

2    actual budget of the association is minimal.  They just

3    pay for a few things.  If they didn't own these units,

4    their monthly maintenance would be next to nothing.

5              THE COURT:  I understand that, that the main

6    cost --

7              THE WITNESS:  For that line item.

8              THE COURT:  -- other than -- other than

9    legal fees of the association, is paying the commercial

10   unit and the one residential unit's share of shared costs.

11             THE WITNESS:  Yes.

12             THE COURT:  So the -- but what I was asking

13   is -- is just a matter of cash versus accounting.

14             The 45,894, if you -- if that's the amount

15   that -- that you're including in your overall budget that

16   you're going to collect from the unit owners, if all the

17   unit owners paid, what I was asking is, would you and

18   the -- and the -- then be paying the hotel units' share to

19   the association, is it a cash/cash transaction?

20             You said neither, and you said common sense,

21   but the issue has come up, maybe Mr. Davis or

22   Mr. Lieberman could refresh my memory on -- if I'm --

23             MR. DAVIS:  Let me ---

24             THE COURT:  -- off the mark, but I think

25   it's come up whether in --

1                    MR. DAVIS:  Let me direct you to the ---

2                    THE COURT:  -- in a perfect setting --

3                    MR. DAVIS:  Yeah.

4                    THE COURT:  -- you would actually be

5        collecting the hotel units' share each month from the unit

6        owners and paying it over to the association.

7                    MR. DAVIS:  Let me direct you to the

8        declaration.

9                    THE COURT:  Well, maybe -- maybe he can

10       answer that --

11                   THE WITNESS:  I can, Your Honor.

12                   THE COURT:  -- if I restate it.  Okay.

13                   THE WITNESS:  This number here represents

14       what the hotel unit owner has to pay for gas, water, for

15       everything, including what they owed the condo

16       association.

17                   THE COURT:  Right, and I'm looking at -- so

18       if -- so my question is if the residential unit owners

19       paid the full amount each month that represented their

20       percentage share of your budget, would you, in turn, be

21       paying the association the HU share of its budget since

22       it's included in your budget?

23                   THE WITNESS:  Yes, Your Honor.

24                   THE COURT:  Okay.  That -- that --

25                   THE WITNESS:  Everybody would be paying.

1               THE COURT:  -- that's all I was asking.

2               THE WITNESS:  I'm sorry, I didn't

3    understand.

4               THE COURT:  But since there's been an

5    arrearage, which will have to be determined, what -- and

6    maybe this is a legal conclusion, let -- let me ask

7    Mr. Davis to proffer.

8               How do you propose that we -- this will be

9    handled if we get to a trial on the shared cost adversary,

10   will -- will it, because it's not a perfect world

11   obviously where you collect -- Schecher collected and

12   Mister -- Schecher Group paid.

13              Will it be an accounting offset that you'll

14   be arguing?

15              MR. DAVIS:  There will be some amount of an

16   offset, but to -- to -- just to get back to Your Honor's

17   original question that I don't -- I don't think we

18   completely clarified, and that's you -- you mentioned in

19   the perfect world, which would be a fantasy land, that

20   everybody is paying and the money flows right to the

21   association.  That's not happening because nobody is

22   paying.

23              And I wanted to direct the Court to

24   Article 12.1, the last sentence there that I put up on the

25   screen that says what happens in a case where the unit

Page 40

1    owners aren't paying.  The hotel unit owners ---

2                    THE COURT:  What are we looking at?

3                    MR. DAVIS:  The bottom of Article 12.1 of

4    the declaration.

5                    THE COURT:  Is this one of the exhibits or

6    this is just from the record?

7                    MR. DAVIS:  That's from the -- the

8    declaration has been filed with the Court.

9                    THE COURT:  Right, okay.

10                   MR. DAVIS:  So the -- the counter of being

11   in fantasy land, where everybody is paying, is a real

12   world where nobody is paying, and this specifically says

13   the hotel unit owner shall have no obligation to fund or

14   advance any deficit or shortfall that are the obligation

15   of the RUOs and commercial unit owners.

16                   So when the unit owners don't pay

17   Mr. Schecher's company, the Schecher Group, he has no

18   obligation to pay the association, that's our position

19   based upon the declaration.

20                   The money just doesn't fall out of the sky,

21   it needs to come from the RUOs and the commercial unit

22   owners.  So the association -- forgetting for a moment the

23   circular assessment theory ---

24                   THE COURT:  This provision broadly applies

25   to all expenses, right, in your view?

Page 41

1                    MR. DAVIS:  Yes, yes, of course --

2                    THE COURT:  Okay.  All right.  But --

3                    MR. DAVIS:  -- everything.

4                    THE COURT:  -- but all I'm asking, I think

5       it's a -- the answer should be obvious, you can't include

6       in the total shared costs, let's assume we wind up doing

7       it by the budget, the -- you can't include this line item

8       as what is -- is owed without also then including for

9       accounting purposes, what is owed to the association.

10                   Now, it may not be direct offset because

11      we're talking about total amounts owed by everybody and --

12      and -- but there has to be some kind of offset or setoff

13      when we do the accounting; right?

14                   MR. DAVIS:  Yes, yes, there is some amount

15      that the Schecher Group would be paying to the

16      association, that -- that shared component number that we

17      just talked about that's in the budget, so that would be

18      the amount that would be owed to the association, but that

19      money has to come from the unit owners and they're not

20      paying.

21                   So we can say, yes, this is money that's

22      owed to the association.  We get to the circular

23      assessment thing, that the association owes Schecher Group

24      money for Unit 505 on the commercial units, as well, but

25      that's -- you know, if we get to that point, would not be

Page 42

1    for today.

2                  THE COURT:  But in terms of process, you

3    would put on the budget and say, this is the total shared

4    cost.  Then when we look at what the association owes,

5    they would owe their percentage of the total shared costs

6    determination minus, if that amount had been paid, what

7    would have actually gone to the association, isn't this --

8    isn't that -- is that not right?

9                  MR. DAVIS:  No, I'm not -- I'm not sure I

10   followed your example, Your Honor.

11                 THE COURT:  Well, if the association is

12   going to have to pay based on a budget that includes the

13   HU share that's owed to the association, then either --

14                 MR. DAVIS:  But as -- because ---

15                 THE COURT:  -- if that's -- if that's

16   collected --

17                 MR. DAVIS:  Yeah.

18                 THE COURT:  -- it would have to go to the

19   association or would be some sort of offset; right?

20                 MR. DAVIS:  The association would owe -- I'm

21   not sure I follow your -- your scenario.

22                 THE COURT:  The association -- if -- if

23   you -- if you win a hundred percent on both methodology

24   and amount --

25                 MR. DAVIS:  Yes.

Page 43

1                  THE COURT:  -- then the association is going
2       to --
3                  MR. DAVIS:  They would owe what's ---
4                  THE COURT:  -- owe it's percentage share of
5       the total budget; right?
6                  That's what Mr. Schecher was explaining --
7                  MR. DAVIS:  Yeah.
8                  THE COURT:  -- you determine the total --
9                  MR. DAVIS:  If we win ---
10                 THE COURT:  -- the total amount owed,
11      whether it's for --
12                 MR. DAVIS:  Based upon these ledgers.
13                 THE COURT:  -- budgeted special assessments,
14      special charges, and then -- then it's just mathematical,
15      adjusted by payments in, payments out, late payments and
16      so forth.
17                 MR. DAVIS:  They -- they would owe --
18                 THE WITNESS:  No.
19                 THE COURT:  No, is that ---
20                 MR. DAVIS:  -- based on these ---
21                 THE WITNESS:  No.
22                 THE COURT:  Okay.
23                 THE WITNESS:  Could I --
24                 THE COURT:  All right.
25                 THE WITNESS:  -- could I maybe try to

Page 44

1    explain it better?

2                    THE COURT:  Yeah, go ahead.

3                    I know we -- we are, Mr. Lieberman,

4    departing from issues that may directly affect the sale

5    for a moment, but we've had lawyers proffering how this

6    works and I'd like to hear at least Mr. Schecher's

7    explanation of how he thinks it works.

8                    Mr. Lieberman.

9                    MR. LIEBERMAN:  No objection to this line of

10   inquiry, Your Honor.

11                   THE WITNESS:  Okay.

12                   THE COURT:  I didn't hear what you said.

13                   MR. LIEBERMAN:  I'm sorry, I have no

14   objection to this line of inquiry, Your Honor.

15                   THE COURT:  Okay.  All right.

16                   THE WITNESS:  Go?

17                   THE COURT:  Yeah, go ahead.

18                   THE WITNESS:  Okay.  If you -- if you look

19   at the line item, the line item is HU share of CE, that

20   means common expenses.  It isn't anything really to do

21   other than in -- in the declarations, the common expenses,

22   if -- if you remember, there were two -- there were two

23   exhibits, one where the HU paid zero, and one where the HU

24   paid 60 some percent.  One is the association side and one

25   is the hotel unit side.

Page 45

1              This CE is common area expense.  So when you

2    plug in the association's budget, 60 percent of that

3    budget gets assigned to the hotel unit owner.  That

4    number, that 60 percent is represented here because in

5    order for the hotel to pay the association, it has to

6    collect that money.

7              So this is strictly a line item that the

8    hotel collects from the unit owners to pay that 60 percent

9    per that exhibit, that association document of that

10   60 percent.

11             THE COURT:  Yeah, I ---

12             THE WITNESS:  There's no accounting offset,

13   it's a simple ---

14             THE COURT:  Well, I -- I understand that,

15   and I think maybe we're repeating, but if you actually

16   collected this -- this amount each month from all the unit

17   owners, then Schecher Group would in turn pay its share to

18   the association; right?

19             THE WITNESS:  Yes, Your Honor, that's a

20   hundred percent --

21             THE COURT:  Okay.

22             THE WITNESS:  -- correct.

23             THE COURT:  All right.  But you haven't been

24   collecting and you haven't been paying, so I was just

25   trying to preview if we go to trial how this would be

Page 46

1  handled in terms of offset.

2              I'm not saying how it's intended to work.  I

3  understand how it was intended to work, but Mister --

4  Mr. Davis has pointed out that the unit owners don't pay,

5  you're not obligated, Schecher Group is not obligated to

6  pay any of these costs, including the costs to the

7  association.

8              MR. DAVIS:  And therein lies the problem

9  with -- with the entire scenario, both here and -- and in

10  state court.  These owners aren't paying anything and they

11  never will pay anything, so it's just round and round.

12              THE COURT:  All right.  But let's not get

13  into good/bad and --

14              MR. DAVIS:  I'd like to --

15              THE COURT:  -- good and evil, but ---

16              MR. DAVIS:  -- defer for a moment to

17  Mr. Gruher.

18              THE COURT:  Pardon me?

19              MR. DAVIS:  I'd like to defer just for a

20  moment to Mr. Gruher.  He wanted to raise a bankruptcy

21  issue that's beyond my --

22              THE COURT:  Okay.

23              MR. DAVIS:  -- beyond my expertise.

24              THE COURT:  All right, and then at that

25  point, I'll withdraw my question about how we're going to

1    account for ---

2                    MR. GRUHER:  Yeah, Your Honor, I -- I think

3    where you're going, and it's maybe getting lost in the

4    translation here, because I think you're getting into the

5    issue of 553 and the issues that have been raised in

6    Mr. Lieberman's pleadings and our pleadings, and I think

7    you're looking for a more functional, more practical means

8    should we be going forward with the shared cost adversary,

9    how we deal with the Schecher Group's proof of claim

10   against the association, and the association's claim that

11   there is an eight -- $89,000 obligation owed, that's where

12   I think you're going, if I'm not mistaken.

13                   THE COURT:  All I'm -- I'm not even looking

14   at specifics of 553, I'm just looking conceptually.  If

15   all this worked well, Schecher Group would have collected

16   everything in its budget, including what it owed to the

17   association, and would be paying the association.

18                   It hasn't gone well, to say the least, but

19   you're going to try to put on proof that the debt that's

20   owed is the association's share of the -- of the budget,

21   and that would include the --

22                   MR. GRUHER:  Commercial ---

23                   THE COURT:  -- amounts in the budget

24   allocated to pay the association.

25                   So there has to be -- how that will work

Page 48

1    accounting-wise, I'll -- I'll withdraw my question.

2    We'll -- we'll deal with that down the road.

3                    MR. GRUHER:  Yes, sir.  I -- I do --

4                    THE COURT:  Because there may be --

5                    MR. GRUHER:  -- understand what you're

6    saying.

7                    THE COURT:  -- there may be other

8    complications to it.

9                    Okay.  So let -- let me send it back to

10   Mr. Davis to continue the direct.

11                   MR. DAVIS:  Thank you, Your Honor.  Can I

12   move onto -- I wanted to point out, so we've covered 12.1,

13   the bottom of 12.1 about the hotel unit owner's

14   obligation.

15                   MR. LIEBERMAN:  Objection, Your Honor.  The

16   sentence that Mr. Davis read for the record was incomplete

17   and I'd just ask that we read the entire sentence into the

18   record.

19                   THE COURT:  Okay.

20                   MR. DAVIS:  Well, 12 point ---

21                   THE COURT:  Well, we'll get that -- into

22   that in argument.

23                   MR. DAVIS:  All right.  12.1 is ---

24                   THE COURT:  But he was pointing it out just

25   by reference.  So I ---

Page 49

1          MR. DAVIS:  Yeah, it's the last sentence of

2    12.1 is what I referenced.  The entire 12.1 is -- is long

3    and has some things that are unrelated, so I didn't read

4    that into the record.

5    BY MR. DAVIS:

6          Q.    Can you -- so we were -- we were talking for

7    a moment before about the -- the ledger.  I want to get

8    back to the 505 ledger, and just talk about a couple of

9    the other entries that are on there.

10         And back on the first page of the 505

11   ledger, you'll see a special assessment that seems to be

12   recurring.

13         THE COURT:  We're back on 25, right, for the

14   record?

15         MR. DAVIS:  Yes, Your Honor.

16         THE COURT:  Okay.

17   BY MR. DAVIS:

18         Q.    And you'll see there's -- at the bottom

19   there's April 1, 2014 special assessment and May 1, 2014,

20   and it looks like that goes back a couple of months, as

21   well.

22         Do you know what that special assessment

23   represents?

24         A.    The one that's 248.04?

25         Q.    Yes.

1          A.     That is the FBS special assessment.  When

2     the contractor entered into the agreement, he -- he was

3     going to perform work and then basically finance it at

4     zero percent interest over eight years.

5                 And we created a special assessment account

6     and a separate coupon so owners would then be sending in

7     their coupon for the shared component along with a coupon

8     for this special assessment, and in this particular case

9     it's that number indicated on the ledger.

10          Q.     All right.  I'd like to switch over to the

11     final page of that same ledger, and I'll put that up on

12     the screen, as well, and going down to February 21, 2017,

13     there's something called HTLREVPYT, do you see that?

14          A.     No.

15          Q.     On February 21, 2017.

16                 THE COURT:  Well, maybe you're not on the --

17                 MR. DAVIS:  The last page.

18                 THE COURT:  -- because there's -- there's

19     several ledgers in this.

20                 THE WITNESS:  Okay.

21                 THE COURT:  You mean Page ---

22                 MR. DAVIS:  Page 4 of the 505 ledger.

23                 THE COURT:  The fourth page of the exhibit;

24     right?

25                 MR. DAVIS:  It's on the screen.  Yes, Your

Page 51

1    Honor.

2                    THE WITNESS:  It says payment received

3    HTLREV, that's the one you're referencing?

4    BY MR. DAVIS:

5            Q.    Yes.

6            A.    Yes, I see it.

7            Q.    What exactly is that?

8            A.    That is a ledger entry for this particular

9    unit owner.  He is under contract with the hotel owner.

10   At the end of the month, the hotel company, instead of

11   paying the owner directly, they pay the revenue share that

12   would have gone to the owner directly to the shared

13   component in this to offset the payment for this owner.

14           Q.    Now, this owner is the association, correct,

15   505?

16           A.    Yes.

17           Q.    All right.  So I see -- now, when the money

18   gets applied to the ledger, this $309.28, is that money

19   then -- does that money then go to the hotel unit owner to

20   use for some purpose?

21           A.    That goes into the bank account of the hotel

22   unit owner, and those funds, along with everybody else's,

23   are used to pay all bills.

24           Q.    What kind of bills?

25           A.    The bills -- the operating bills of the --

Page 52

1    of the building.

2          Q.     So on this particular ledger, then, the

3    payments seem to stop on February 1, 2017.  Why are there

4    no more hotel revenue payments after February 21st of 2017

5    for the association's unit?

6          A.     The association elected to pull it off the

7    hotel program.  They felt they could rent it better

8    themselves or they didn't need the money.

9          Q.     And -- and what's your understanding as to

10   what happened with that unit?

11               MR. LIEBERMAN:  Objection, Your Honor,

12   relevance.

13               MR. DAVIS:  Well, it is relevant,

14   Your Honor.

15               THE COURT:  Overruled.  I'll -- I'll -- I'll

16   hear it.  Go ahead.

17               THE WITNESS:  This particular unit is

18   sitting empty, and it's a waste of a total -- an asset

19   that can be generating income in my opinion.

20               THE COURT:  So as of February 2017, there

21   was still a contract in place with the association for the

22   rental of the unit or was it a contract with the prior

23   owner?  How -- how did that work?

24               THE WITNESS:  I honestly can't give an

25   accurate answer to that question because it could be one

Page 53

1    of two things, it could have been a -- more than likely it

2    was a contract with the prior owner.  When it was

3    foreclosed upon, at that particular time, the association

4    and the hotel unit owner were working hand in hand.  So

5    I -- I'm sure there is no written contract between the

6    association and the hotel unit owner, it was just mutual

7    agreement --

8                    THE COURT:  Okay.

9                    THE WITNESS:  -- which took -- was basically

10   the same with every unit that they foreclosed upon and

11   didn't sell, they kept it in the hotel program to earn

12   revenue until they could sell it and recapture their loss.

13                   THE COURT:  How many units are presently in

14   the hotel program?

15                   THE WITNESS:  I -- I believe there's 38 --

16   38 right now, maybe 40.

17                   THE COURT:  All right.  So just -- I believe

18   I understand it, but I've been wrong before, so correct

19   me.  So what you're saying is the -- the unit is rented

20   and let's say it's a hundred bucks, 50 under the documents

21   or the agreements goes to Casablanca, right, for its

22   share, and 50 would go to the unit owner if they were

23   current in their -- in their charges to -- in their shared

24   costs under that example; is that right?

25                   THE WITNESS:  Yeah, the -- the hotel

Page 54

1    company, Casablanca Rental Services, has a contract with

2    everybody.  Either the one you're describing, which is a

3    50/50 basis or they have what they call a guaranteed

4    contract, they will pay $1200 a month, I believe the

5    number is, or whatever was negotiated by the individual

6    owner regardless if the -- the unit gets rented or not.

7                    THE COURT:  Okay.  All right.  Let's say

8    it's just a split.  So let's say it's 50/50.

9                    So if the unit owner is current, Casablanca

10   would keep 50, and the unit owner would get 50.  If the

11   unit owner is not current, Casablanca pays Schecher Group

12   the unit owner's 50, and the ledger shows a credit against

13   the debt?

14                    THE WITNESS:  Yes, Your Honor.

15                    THE COURT:  Okay.

16   BY MR. DAVIS:

17        Q.    Is there any reason that you can think of

18   why the association's unit is not generating revenue?

19        A.    There's no effort by anybody to rent it,

20   that's the reason.

21        Q.    Is there any reason why this unit should not

22   be in the hotel rental program?

23        A.    None whatsoever.  We painted it and had it

24   all ready to go.  It was actually rented.

25                    THE COURT:  What are you charging per night

1    now, not, well, you, but Casablanca?

2             THE WITNESS:  Well, it depends, Your Honor.

3    There's several factors.  It's -- now it's reflecting in

4    my eyes.

5             THE COURT:  Yeah.

6             THE WITNESS:  It could be any -- anywhere

7    from $89 a night to a hundred and eighty-nine dollars a

8    night, depending upon the day, depending upon any events

9    that are taking place, and dependent upon what's known in

10   the industry as your competitive set, which in simple

11   terms it's basically your neighbors, and our neighbors are

12   the Hilton across the street, are the Casablanca across

13   the street, and the other hotels in the immediate area,

14   most of which are -- are charging right now about the

15   same, anywhere from 89 to maybe a hundred and eighty-nine

16   dollars.

17           THE COURT:  Okay.  Are you on any of the --

18   I know -- I know this is irrelevant, but I'm just curious,

19   we've had the case so long.  Are you on like Hotel.com or

20   any of those things for -- for bookings?

21           THE WITNESS:  Yes, Your Honor, and it's even

22   better than that.  We have contracts with, I believe it's

23   Hotel Beds and Expedia, that we have guaranteed revenue,

24   guaranteed room nights from these people.

25          We also have contracts with a number of

Page 56

1    different providers and -- and we actually -- if I had the

2    60 rooms that are on this contract, I'd have them rented

3    the very next day because every provider is pushing us to

4    get -- they want to buy more rooms from us.

5              So in other words, they might pay us $40,000

6    a month whether they fill the room or not, and that's good

7    fill in business, but as a hotel owner, you also need to

8    be -- I -- I think KFI's representative said rack rate,

9    our rack rate was $89.

10             Well, that's not accurate, that is not our

11   rack rate.  We -- we try to keep a certain number of rooms

12   available to get rack, is generally considered your

13   highest rate, and that's why we don't -- it sounds good,

14   gee-whiz, we could rent all the units tomorrow, be a

15   hundred percent occupied, but these people that give you

16   the guarantee, they -- they, of course, want a discount

17   for the room because they resell it.

18             So the perfect operation is where you have

19   the guarantee to get you through the slow season, which in

20   Florida is generally the summertime, yet you have the

21   availability of your rack rate rooms to capture the -- the

22   highest revenue during the highest season, which we're --

23   we're coming into right now.

24             As an example, and try to motivate owners to

25   put their unit, I -- I took one of the units that we got

Page 57

1    back from an owner, and I did a gut renovation, and I'll

2    admit under oath that I'm cheap, so I try to get away

3    with -- with doing the best for the least, and I conveyed

4    this to the MRC buyers.

5                    I was excited when they came into the

6    picture because I thought they were real players, I

7    thought they were interested, and they were saying the

8    same thing that KFI did on the stand, well, we're going to

9    improve -- we're going to build these units up to a --

10   we'll put in 300,000, hypothetically, to make this unit

11   perfect.

12                   We're going to get the $750 a night, and I

13   tried to educate the gentleman and say, well, there's

14   something called competitive set.  You can build a million

15   dollar room and you're never going to get more than 89 to

16   a hundred and eighty-nine dollars a night because that's

17   the sandbox that you're playing in, and worse than that,

18   because we're not on the beach, the ones that -- that are

19   on the beach are a more desired property to the public,

20   they're getting the same 89 to 189.

21                   What I did, was I -- I -- marketing our

22   Sixty Sixty as a sister property to Casablanca, where I

23   own assets at Casablanca, so I created what we would -- in

24   the industry we would call value added.

25                   So now we're just not Sixty Sixty, that

Page 58

1    building on the bay, we're Sixty Sixty with a cabana club,

2    we're Sixty Sixty with an oceanfront swimming pool, we're

3    Sixty Sixty with an oceanfront restaurant, we're

4    Sixty Sixty with the ocean.

5                    THE COURT:  So does the -- does the shared

6    cost budget include payments to the sister hotel for these

7    services?

8                    THE WITNESS:  Not one penny, Your Honor.

9                    THE COURT:  So Mr. Michaels' suspicions you

10   believe are inaccurate that any portion of your budget

11   is -- is covering expenses at the sister hotel, the

12   Casablanca?

13                    THE WITNESS:  I'd bet my wife's dog's life

14   on it, Your Honor.

15                    THE COURT:  A lot of people don't like their

16   wife's dog, so ---

17                    THE WITNESS:  I've been married for

18   50 years, I met her in 5th Grade.

19                    THE COURT:  Okay.

20                    THE WITNESS:  Trust me, I like her.

21                    MR. DAVIS:  The dog is cute, too.

22                    THE COURT:  No, I didn't -- I didn't say the

23   wife, I said your wife's dog, but to keep the wife happy,

24   you've got to like the dog.

25                    All right.  We're -- we're digressing, and I

Page 59

1  want to get through this, but I just want to go back to

2  one fundamental issue that you presented in your

3  statement, I don't know, three weeks or three months ago,

4  I can't keep track, where you -- you said the Schecher

5  Group is not making a profit because whatever it collects

6  stays in the hotel unit operational account, so, right,

7  that's what you were saying to me a few months ---

8              THE WITNESS:  Yes, and it's supported by the

9  budget.

10             THE COURT:  Okay.

11             THE WITNESS:  There's no profit built into

12  that budget.

13             THE COURT:  So if -- if you actually

14  collected lots of late -- late fees and interest and other

15  amounts that may be collectible under the documents, but

16  are in excess of what the budgeted number would have been,

17  in theory that would be excess money that would reduce

18  future years' budgets?

19             THE WITNESS:  Yes, what I would

20  intelligently do is apply that to the building reserves

21  because building reserves is an item that even the State

22  of Florida is concerned about, and if I was to collect

23  that money and apply it to building reserves, that would

24  impact the budget by not having to fund the building

25  reserves, which would result in a drastic reduction to the

Page 60

1    unit owners on their monthly ---

2                    THE COURT:  Okay.  All right.  So -- so your

3    play financially, just so I understand it, is appreciation

4    in the property that you own, the hotel unit, and the

5    profit, if any, of Casablanca in running the hotel?

6                    THE WITNESS:  When you say "my play" --

7                    THE COURT:  Or let -- let -- let ---

8                    THE WITNESS:  -- you mean my business

9    plan --

10                    THE COURT:  Well --

11                    THE WITNESS:  -- my business model?

12                    THE COURT:  -- what -- what you're entitled

13    to I guess is what I'm going at, because I think what --

14    what you've said is that the Schecher Group itself is not

15    generating a profit for you, its owner, it is intending to

16    collect only what is in the budget and in theory, if you

17    collect more through late fees and interest, it's going to

18    stay in the hotel account.

19                    So there's no profit built into the

20    declaration for the Schecher Group in terms of shared

21    costs is that -- is that accurate?

22                    THE WITNESS:  That's absolutely accurate.

23                    THE COURT:  Okay.  So I was saying when I --

24    and maybe was using an informal term, your financial

25    interest, if you're not making money from the Schecher

Page 61

1    Group, where do you make your money?

2                    And I was suggesting is it solely from -- if

3    profitable, Casablanca's operation of the hotel and

4    collecting more money than its expenses?

5                    THE WITNESS:  Excellent question, and I'd

6    like to answer that.

7                    Schecher Group is a real estate holding

8    company and buys real estate to collect rent.  So just

9    like every residential unit owner, nothing to do with this

10   budget, which everything Your Honor says is correct.  The

11   Schecher Group realizes its money from rent.  The Schecher

12   Group rents the -- its -- its property to Casablanca

13   Rental Services, the hotel company.  The hotel company

14   pays Schecher Group, I believe the number is $18,000 a

15   month.

16                   So my profit as the Schecher Group as the

17   unit owner, just like any other unit owner, comes from

18   renting my property.  I make a little -- I make close to

19   $200,000 a year in rent ---

20                   THE COURT:  What are you renting?

21                   THE WITNESS:  The hotel unit, which is

22   the -- and who better to rent the hotel unit than a hotel

23   operating company?  So --

24                   THE COURT:  Okay.

25                   THE WITNESS:  -- on -- on the one hand is

Page 62

1    the Schecher Group.  The Schecher makes close to 200,000

2    in rent.  On the other hand, I own the -- the hotel

3    company also, which gets 50 percent of the operating

4    revenue less whatever its expenses are.

5                    THE COURT:  Which includes the rent to

6    you -- to Schecher Group.

7                    THE WITNESS:  It includes that, it includes

8    payroll, it includes insurance, it includes everything.

9                    THE COURT:  Okay.

10                   THE WITNESS:  I mean, it's a -- it's an

11   operating company that doesn't just rent at Sixty Sixty,

12   it operates at Casablanca also, so ---

13                   THE COURT:  So you -- so you as Schecher,

14   individually -- Mr. Schecher, individually, through

15   Schecher Group will be earning money based on the rent of

16   the hotel company, and then the hotel company, which you

17   also own, would generate additional money for you if its

18   expenses, which includes the 18,000 a month, if its income

19   from its share of the rental exceeds its expenses, its

20   profit, in other words; right?

21                   THE WITNESS:  Yes, it ---

22                   THE COURT:  Profit from Casablanca, rent

23   from -- paid by Casablanca, those are the two ongoing

24   components of what you earn from this property?

25                   THE WITNESS:  Me, personally, Your Honor?

Page 63

1            THE COURT:  Yes.

2            THE WITNESS:  I -- I don't believe I've

3   earned -- I've taken ---

4            THE COURT:  Well, I know, but in ---

5            THE WITNESS:  Yeah, but in theory, I mean --

6            THE COURT:  Structurally.

7            THE WITNESS:  -- in reality, yes, Schecher

8   Group gets rent and the Casablanca Rental Services

9   hopefully makes a profit at the end of the year.

10            THE COURT:  Okay.

11            THE WITNESS:  And Richard Schecher, myself,

12   would share in -- example, with Casablanca Rental

13   Services, that's been in existence over 19 or -- over

14   18 years, for sure, but what I do with my employees,

15   whenever there's a profit, I take 25 percent and I

16   distribute that to all employees from the maids all the

17   way up to the managers.

18            THE COURT:  Okay.

19            THE WITNESS:  And then I take a percentage

20   of -- of the balance, and I put it into a reserve fund

21   because the hospitality industry is very volatile to

22   different -- if a German tourist gets robbed, no one comes

23   to Miami.  If something -- if Zika happens, nobody comes

24   to Miami.  I need funds available to keep the operation

25   alive and then whatever is left from there, would be a

Page 64

1     profit that Richard Schecher gets.

2                     THE COURT:  Okay.  All right.  So I'm

3     just -- these are just basic structural questions.  So

4     you -- you -- you would profit through ownership of the

5     Schecher Group from renting the property at the hotel, you

6     would profit if the hotel earns a profit, and then

7     whatever appreciation may exist in your ownership of the

8     hotel unit.

9                     THE WITNESS:  If I elect to sell it in the

10    future, yes, Your Honor.

11    BY MR. DAVIS:

12          Q.    You also rent some parking; isn't that

13    right?

14          A.    I rent the parking, also.

15          Q.    Okay.  Just to -- so we can ---

16                    THE COURT:  What, you mean to a valet

17    service or it's not a -- what do you mean you rent the

18    parking?

19                    THE WITNESS:  Again, I'm a little

20    embarrassed because I don't know exactly the structure,

21    but I know how it works.  I was going to be renting -- the

22    Schecher Group was going to be renting the parking out to

23    earn income because it's my asset, I can rent it and I

24    collect rent, that's what we do.

25                    But I think in order to sweeten the pie for

Page 65

1   the hotel company, I included that in their rent because

2   they were having financial difficulties, so whatever

3   revenue is generated from the parking actually goes to the

4   hotel company and not to Schecher Group at the present

5   time.

6           THE COURT:  Okay.  All right.  Well, that --

7   that's sort of intercompany.  All right.  I apologize for

8   taking up this much time to the attorneys in terms of

9   getting through this, but I think it's helpful just to

10  fill in some of the things that had been argued perhaps a

11  little differently by the attorneys.  Okay.

12          MR. DAVIS:  And that's -- Your Honor, again,

13  that's -- that's my goal so that Your Honor will get a

14  full understanding of this and -- and you'll see that --

15  just how this sales thing is absurd, but we'll get to

16  that.

17  BY MR. DAVIS:

18      Q.   As far as the expenses -- so you mentioned

19  that you rent out the hotel unit to Casablanca Rental

20  Services, it takes 50 percent based on -- depending on

21  their contract, could take half of the rental income.

22          What expenses associated with Casablanca

23  Rental Services are charged back to the Sixty Sixty owners

24  in the shared component budget?

25      A.   Absolutely nothing.

Page 66

1          Q.    I'm sorry, could you repeat that?

2          A.    Absolutely nothing.

3          Q.    All right.  So the -- you heard yesterday or

4    not yesterday, but at the last time we were here, there

5    was an allegation of commingling, you may be charging

6    expenses that shouldn't be.  So are any expenses of

7    Casablanca Rental Services charged in the Sixty Sixty

8    budget?

9          A.    Nothing whatsoever.

10         Q.    Thank you.

11               All right, and just to follow up lastly on

12   this ledger that you've got here, you have the column

13   heading there periodic interest.

14               What gives you the authority to charge

15   interest?

16         A.    I'm given the authority to charge interest

17   by the condominium declaration.

18         Q.    All right, and ---

19         A.    That's simple interest.

20         Q.    Okay.

21               THE COURT:  When you say simple interest, at

22   what percent?

23               THE WITNESS:  Eighteen percent, Your Honor,

24   as outlined in the condo doc.

25               THE COURT:  So each month there's an 18

Page 67

1   percent addition to the ledger based on the amount owed?

2   It's like a credit card?

3                   MR. DAVIS:  It works like a credit card.

4                   THE WITNESS:  Yeah, like a credit card,

5   Your Honor.

6                   THE COURT:  Okay.

7                   MR. DAVIS:  But -- but it's simple interest,

8   so it does not get into that running -- it's not

9   calculated on the running balance, it's calculated on the

10  interest-free balance.

11                  MR. GRUHER:  This is not a loan, this is not

12  a loan schedule.

13                  MR. DAVIS:  Yeah, it's -- it's not a loan,

14  it's contractual at 18 percent simple interest on the

15  non-interest accruing balance, but that -- that again, you

16  know, when we get to the specifics of the calculations,

17  we'll -- we'll do that.

18  BY MR. DAVIS:

19          Q.    What is SC-MLP that we see repeatedly here

20  on the list?

21          A.    Shared component, monthly late penalty.  SC,

22  shared component; MLP, monthly late payment.

23          Q.    And what gives you the authority to charge

24  that?

25          A.    The same documents that give me the

1    authority for the 18 percent.

2         Q.    That's the declaration?

3              THE COURT:  Which -- which line item,

4    SC/MLP?

5              MR. DAVIS:  It repeats, yes, Your Honor.

6    You can see SC/MLP, there is one October 11, 2017, in the

7    amount of the monthly assessment.

8              THE COURT:  Okay.

9    BY MR. DAVIS:

10        Q.    All right.  I'd like to get back to ---

11             THE COURT:  In one of the documents, I think

12   we confirmed, it's -- it's a hundred percent of each

13   monthly payment that's not made?

14             MR. DAVIS:  Yes, Your Honor.

15   BY MR. DAVIS:

16        Q.    I wanted to go back to a couple of things

17   that -- that the Judge mentioned, and then I'll get back

18   to my line of questioning.

19             You had mentioned about the -- the way you

20   determined the rental rates and what service you use, I

21   guess, to compare the Hilton and to figure out what rental

22   rate to charge.

23             The gentleman from KFI was here, and he

24   testified that he's staying at the Eden Roc, he said maybe

25   an extra $5 million to improve his units, and he was

Page 69

1    staying at the Eden Roc paying $750 a night, and says that

2    your rates are way too low.

3                   Is it -- is it possible to ---

4                   THE COURT:  I think he already explained

5    this.  Isn't this what you talked about earlier?

6                   MR. DAVIS:  Well ---

7                   THE COURT:  You're saying you're not going

8    to -- on this property, where it sits, and who it competes

9    with, putting a lot of money into the units would be

10   futile if -- if the expectation is to generate rates that

11   are just not -- not going to be competitive with

12   neighboring properties, is that ---

13                  THE WITNESS:  That's correct, Your Honor.

14                  THE COURT:  So I think we covered that.

15   BY MR. DAVIS:

16        Q.    All right.  Let's talk about -- aside from

17   improving the rooms, let's talk about the building and the

18   amenities offered between what Mr. Michaels said was a

19   fair comparison, the Eden Roc and Sixty Sixty.

20                  THE COURT:  Well, what -- I don't understand

21   the relevance of this.

22                  MR. DAVIS:  The relevance is, Judge, to show

23   that KFI has done absolutely no homework on this deal,

24   that they are, as Mr. Schecher said, tire kickers, because

25   if he can say that the Eden Roc is a comparable property

Page 70

1    to Sixty Sixty, it's an absolute -- absolute ludicrous

2    comparison and that's what we're going to show.

3                    THE COURT:  But I don't -- I don't have to

4    find feasibility of KFI's business plan.

5                    MR. DAVIS:  It shows that they didn't do

6    their homework and they're making us spin our wheels and

7    spend time here in court having a whole trial, when they

8    didn't do even the miniscule amount of homework to decide

9    whether or not this is feasible, and that's what's not

10   fair.

11                    THE COURT:  I don't think there was

12   testimony directly relevant to the sale as to what they

13   were going to charge and -- I don't -- I agree with you,

14   though, I think he admitted they haven't done a full

15   analysis of ---

16                    MR. DAVIS:  He said that -- that the

17   Eden Roc, that, you know, we should be getting what

18   they're getting over at the Eden Roc.

19                    I -- I'm -- I wrote that down, I put it in

20   my notes and when you look at the ---

21                    THE COURT:  Yeah, I -- well, I ---

22                    MR. DAVIS:  If he had any ---

23                    THE COURT:  I think he said that's what he's

24   paying at the Eden Roc and comparing it to the room rate

25   here.  I don't think he said our business plan is to

Page 71

1    improve the rooms and be able to charge $800 a night.

2                    Anyway, let -- Mr. Schecher obviously

3    already said that that's ludicrous and that that wouldn't

4    work from his experience in -- in running this hotel.

5                    MR. DAVIS:  Okay.

6    BY MR. DAVIS:

7         Q.    Is it possible to offer any of the types of

8    amenities that are offered at the Eden Roc at Sixty Sixty?

9         A.    No, not really.

10        Q.    Okay.

11                   THE COURT:  I mean, amenities could be

12   improved, though, right, if the commercial space was used

13   for -- if a restaurant was operating that would presumably

14   enhance the value; right?

15   BY MR. DAVIS:

16        Q.    Let's talk about the restaurant.

17                   THE WITNESS:  My opinion, Your Honor,

18   anything could be improved, but it's not going to -- to

19   make a difference one way or the other for very specific

20   reasons, very logical reasons.

21                   THE COURT:  People wouldn't pay a little

22   more if there was a -- if there was a restaurant on the

23   property, it wouldn't affect room rates?

24                   THE WITNESS:  They would pay a -- maybe a

25   little more.  We -- what we would end up doing is working

Page 72

1   the breakfast into it, but there -- there hasn't been a

2   restaurant at that property since it closed as a

3   Holiday Inn, and there's an excellent reason why there's

4   not a restaurant at the property.

5               THE COURT:  Why -- why is that?

6               THE WITNESS:  The reason there's no

7   restaurant is because number one, the monthly maintenance

8   fee for the restaurant is -- is higher than anybody would

9   even consider paying rent; number two, it's located on the

10  third floor of a building with restricted access; number

11  three, there's no frontage, no signage, no ability for the

12  general public to even know it's there; and number four,

13  more important, what -- what they could possibly serve

14  would be limited as I do at many of my other properties,

15  we provide a breakfast service to guests, which does add a

16  value, you may be able to get six to $8 more per night per

17  room, but after breakfast, the restaurant has no lunch

18  business, it has no dinner business, or no evening

19  business.

20              THE COURT:  Okay.  All right.  Let's --

21  let's move past that.  Go ahead.

22  BY MR. DAVIS:

23        Q.    Okay, and what about other services, other

24  types of amenities like -- like the spa and room service

25  and concierge, is it possible to provide those types of

1   amenities like the Eden Roc and the hotels on the ocean

2   have?

3          A.    No, nothing like the Eden Roc or anyone

4   could.

5          Q.    All right.  Let's get back to your budget.

6   I'd like to move your budget, the 2017 operating budget

7   that's at Tab -- I think it's 35 in my book.

8               THE COURT:  Right.

9               MR. DAVIS:  Is it 35?  I'd like to move that

10  into evidence, unless there's an objection.

11              THE COURT:  Is this -- is this a document

12  that was published by the Schecher Group and -- and ---

13              THE WITNESS:  Yes, Your Honor, I created

14  this document.

15              MR. LIEBERMAN:  I'm not sure that was the

16  question.

17              THE COURT:  But -- but was this something

18  that anybody has seen before or ---

19              THE WITNESS:  This was published on my

20  website.

21              THE COURT:  All right.  Well, anyway,

22  objection to its introduction, Mr. Lieberman?

23              Unlike the ledger, it's got no date on it.

24  Do you know when this document was created?

25              THE WITNESS:  I -- I probably have an e-mail

Page 74

1    where I mailed this out to all owners.

2              THE COURT:  But you think this was the

3    December 1st --

4              THE WITNESS:  This was ---

5              THE COURT:  -- 2016.

6              THE WITNESS:  Yeah, this was created

7    sometime in October of 2016.

8              THE COURT:  Okay.  Well, we can parse this

9    further if we get to a shared cost proceeding and this

10   is -- and this is offered.  We're not going to go through

11   it in -- in great detail, but ---

12             MR. LIEBERMAN:  I have no objection as a

13   demonstrative aid.

14             THE COURT:  All right.  So Exhibit 35 will

15   be admitted.

16             (Thereupon, Exhibit Number 35 was admitted

17   into Evidence.)

18             MR. DAVIS:  Thank you, Your Honor.

19   BY MR. DAVIS:

20        Q.   For the -- the line items in the budget,

21   first of all, are these items that are Sixty Sixty items

22   or any of these Casablanca Rental Services items?

23        A.   These are 100 percent shared component

24   items.

25        Q.   All right, and have you looked into trying

1    to reduce this budget?  Let's start with labor.  Is there

2    a way to reduce the labor charges that you have there, to

3    eliminate positions or something like that?

4          A.    The labor, no.

5          Q.    All right, and what about the building

6    expenses, you have as another category, water, electric,

7    gas, trash removal and internet, is there a way to reduce

8    those bills?

9          A.    Most likely not only because if -- if a new

10   owner comes in with 60 units that go live, that would

11   actually make the budget items larger.

12         Q.    Okay.

13         A.    There will be more consumption.

14         Q.    I'd like to direct you to Page 2 of the

15   budget, and the same question with the -- the top part is

16   the total contract services.

17               Is there any way to reduce the expenses for

18   the total contract services?

19         A.    Which -- which page are we on?

20         Q.    The second page of your budget.  I'm sorry,

21   that's the -- why don't we go to the second page.  The

22   second page you have the utilities and professional fees.

23         A.    Okay.

24         Q.    And then you start with contract services.

25   Is there any way to reduce these fees?

1          A.    Probably not because the contract services

2    are the alternative to save money with the elevator as a

3    perfect example.  If you had to pay the hourly rate for an

4    elevator contractor to come to the site when the elevator

5    breaks, especially they never break during business hours,

6    it's astronomical.  Tie everybody into a contract or

7    service contract is the most economical way to -- to

8    maintain cost and have a good budget.

9               THE COURT:  Are any of the line items for

10   these contract services to any companies that you own or

11   control?

12               THE WITNESS:  No, Your Honor.

13   BY MR. DAVIS:

14          Q.    All right, and finally Page 3 of the budget,

15   you see the total budget there and the -- the total budget

16   of $3,243,506.52, do you see that number there?

17               THE COURT:  Where are we?

18               MR. DAVIS:  On -- on --

19               THE WITNESS:  I do.

20               MR. DAVIS:  -- on Page 4 of the budget.

21               THE COURT:  Yeah, yeah.

22   BY MR. DAVIS:

23          Q.    Do you see that number there?

24          A.    I do.

25          Q.    All right.  Now, once you get that number

1  for your total budget, are these for expenses that you

2  already incurred or expenses that you expect to incur

3  during the year?

4          A.    No, as I testified, these are anticipated

5  expenses, that's what all budgets are -- are created, what

6  you anticipate the charges to be for the -- for that year.

7          Q.    And what if you ---

8                THE COURT:  But would any of it be any

9  payables that you had carrying over from the prior year?

10               THE WITNESS:  If you look in the budget,

11 there may be a -- there may be a line item for bad debt,

12 but, no, I -- no, I don't think ---

13               THE COURT:  Whatever -- whatever you maybe

14 still owed -- whatever Schecher Group may have owed, would

15 have been in the prior year budget that you're -- that

16 you're attempting to collect, it wouldn't -- it wouldn't

17 be carried over?

18               If -- if you only -- if you had a budget of

19 2.5 million for 2016, and you only collected two, you

20 wouldn't carry over that uncollected amount to the -- to

21 the next year, you would just try to collect it from the

22 prior year?

23               THE WITNESS:  That's correct, Your Honor.

24 If you -- if you look at -- at the budget itself, the line

25 items sort of speak for themselves.  They're all tied into

1    the budget, and I'm just doubly checking to make sure I'm

2    correct, that there's no line item here that I see ---

3                    THE COURT:  Well, if you're trying to

4    collect what's owed from each year, then I guess that

5    makes sense.  You can't carry it over --

6                    THE WITNESS:  Right.

7                    THE COURT:  -- into '17, and then still

8    collect it from '16, so ---

9                    THE WITNESS:  That's correct.  I'm trying to

10   collect what they owe, not in the budget, but by

11   foreclosure.  They either pay or they get foreclosed on.

12                   THE COURT:  Yeah.

13                   THE WITNESS:  Unrelated to the budget.

14                   THE COURT:  But for each unit owner's

15   ledger, it will show what they owe, and they will be

16   paying interest each month on what they owe -- owed from

17   prior years?

18                   THE WITNESS:  Yes, Your Honor, but the only

19   correlation between the unit owner ledger and this budget

20   or any budget is the line item that says HU shared

21   component, because the process is this budget gets into

22   the formula, it spits out the percentage of a particular

23   unit, it goes on his ledger.

24                   That ledger is for that unit owner, that

25   ledger is not for this budget.  It only records what that

1    unit owner owes.  There's nothing to say this ledger is

2    tied into this budget, other than one entry on that ledger

3    which is the HU shared component as determined by the

4    documents.

5              In the example they showed, there was a

6    second item in there, which was the two hundred and some

7    dollar special assessment that was being collected and

8    deposited in a separate special assessment account, not

9    commingled with the operating funds of the association --

10             THE COURT:  Why are you ---

11             THE WITNESS:  -- I mean, of the -- the

12   Schecher Group.

13             THE COURT:  All right.  I'm, I think,

14   confused again.

15             Why are you only saying that the individual

16   unit owners' ledger picks up the line item for HU shared

17   costs?  Isn't the total budget allocated percentage-wise

18   amongst all the unit owners?

19             THE WITNESS:  That is the HU shared cost.

20   The HU shared costs are allocated ---

21             THE COURT:  Oh, HU shared -- okay.  You mean

22   the -- the -- the what we've sometimes called the base

23   number, the overall cost --

24             THE WITNESS:  Yes, Your Honor.

25             THE COURT:  -- not -- not that one line item

1   of the HU's obligation to the association?

2                    THE WITNESS:  No.

3                    THE COURT:  I just misunderstood.  So, yeah,

4   we're on the -- we're on the same page.

5                    So the total budget is the total shared

6   cost, each unit owner's percentage is in the declaration,

7   that translates to a monthly amount, and then we looked at

8   the one for 505 was 914, and then there might be special

9   assessments.  And then in addition to that you have

10  whatever late fees ---

11                   THE WITNESS:  What I call unit specific

12  charges.

13                   THE COURT:  Okay.  Which would be credits

14  based on payments or credits from hotel revenues or

15  additional debits for late fees and interest.

16                   THE WITNESS:  Or if a unit owner stays in

17  his unit, he's on vacation, and he wants the hotel to

18  clean his unit, they might charge a $60 cleaning fee, and

19  he says put it on my -- my ledger, so they bill his

20  ledger.

21                   THE COURT:  Okay.  I was only stopping

22  because it seemed like that would be a Casablanca charge,

23  not a Schecher Group charge, but we're talking about

24  minimal items.

25                   THE WITNESS:  That's a unit ledger charge,

Page 81

1   Your Honor, that's why I'm trying to make the clear

2   distinction.  The ledger is not tied into this other than

3   it lists what's in this budget on his ledger.  They're not

4   tied together.

5                    THE COURT:  All right.  So maybe -- maybe I

6   do need to explore it just briefly.

7                    Does a unit owner's ledger include amounts

8   not just owed to the Schecher Group but also to

9   Casablanca?

10                   THE WITNESS:  No, it only includes what the

11  unit owner owes that was charged to his accounts.

12                   THE COURT:  All right.  But when you said by

13  example if a unit owner was -- had maid service, wouldn't

14  that maid service be provided by Casablanca, not Schecher

15  Group?

16                   THE WITNESS:  Yes, it would, Your Honor.

17                   THE COURT:  So then if it's included in the

18  ledger, isn't that a charge owed to Casablanca not the

19  Schecher Group?

20                   THE WITNESS:  It's a charge of the

21  Casablanca on the unit owner's ledger.  That unit owner

22  has the responsibility to pay both the Schecher Group and

23  the Casablanca, it's just recorded on his ledger.

24                   Like you get a monthly statement from a

25  credit card, you have charges on your credit card from

1    Macy's, from Burdines, from the gas station, you have all

2    these -- so consider your credit card statement nothing

3    more than my ledger statement.  It's exactly the same

4    purpose.

5              THE COURT:  But the Schecher Group's shared

6    costs, though, are secured by a lien on the units.

7    Casablanca charges wouldn't be secured by a lien, would

8    they?

9              THE WITNESS:  No, they're in the wind, they

10   just lose.

11             THE COURT:  Okay.  All right.  Let -- let's

12   move on.  I don't think we're talking about -- is it fair

13   to say there's -- there would be in the grand scheme of

14   things, a fairly small percentage of a unit owner's ledger

15   that might relate to services from Casablanca?

16             THE WITNESS:  It would be fair to say

17   probably less than one half of one percent, Your Honor.

18             THE COURT:  Okay.  All right.

19   BY MR. DAVIS:

20        Q.   So in order to figure out how much is owed

21   by all the various unit owners to the Schecher Group,

22   would it be just a math exercise of adding up those

23   ledgers or would there be some other way to do it?

24        A.   That would be the easiest way, it's basic

25   math.

1        Q.    Okay.  All right.  So from this budget where
2    you show the total budget amount of $3.2 million, you have
3    another sheet in there showing how that's distributed
4    across the -- well, it looks like how it's distributed
5    across the unit owners.  Is this how you do that?
6        A.    Yes --
7        Q.    Attached ---
8        A.    -- this is the --
9        Q.    Can you explain that?
10       A.    -- this represents a spreadsheet duplication
11   of the condo documents that -- the exhibit that shows the
12   percentage of the -- each unit owner.  So you just plug in
13   the budget, the total amount and this calculates what each
14   unit owner owes automatically.
15       Q.    Okay, and that's -- that's part of your
16   budget?
17       A.    Well, this isn't part of the budget, this is
18   how the budget gets distributed to the -- to the different
19   unit owners.
20       Q.    Do you -- do you review or preview the
21   budget with the unit owners before you send -- before you
22   send out the budget?
23       A.    As I testified earlier, we -- we used to
24   work directly with the condo association and that stopped
25   in probably October of 2016.

1          Q.    All right.  Are you required to review the

2    budgets?

3          A.    No, we -- we are not.  I am not.

4          Q.    All right.  Are the actual incurred costs

5    different than the actual amounts the unit owners paid?

6          A.    Absolutely.

7          Q.    And why is that?

8          A.    Well ---

9                THE COURT:  Wait, say -- I'm sorry,

10   state ---

11   BY MR. DAVIS:

12         Q.    Are the actual costs that the Schecher

13   Group -- and when I say you, I mean the Schecher Group, I

14   apologize if I'm mixing.

15               Are the actual costs incurred by the

16   Schecher Group with regards to Sixty Sixty different than

17   the actual amounts paid by the -- by the unit owners?

18               THE COURT:  You mean paid or budgeted?

19               MR. DAVIS:  Paid.

20               THE WITNESS:  Yes, and I can -- I can -- I

21   can give you a clear explanation by an example that was

22   raised in other people's testimony regarding the security,

23   and I -- and I think this -- this makes it crystal clear

24   to anybody who is a little confused, is the fact that --

25   and let's just use a hypothetical number for security.

1              I -- I will budget -- every building, nobody
2    will dispute, you need security.  Every building on
3    Miami Beach has a security officer.  So I will budget
4    $25,000 for security based upon interviewing different
5    security companies, trying to get the best price possible.
6    So the budgeted amount is 25,000.
7              Now, we go to the real life example where
8    these owners are only paying about 20 percent of the
9    budget.  So that means we do not have money to pay certain
10   things.  So then we make a decision, what do we have to
11   pay?
12             Well, we need the electric, we need this, we
13   need that, but we don't need security.  So at some point
14   into the year, I have to let the security company go and
15   just for simplicity purposes, let's say it took me six
16   months into the year.  I say security guy, I'm sorry, I
17   can't pay you, I have to let you go.  So we terminate our
18   agreement.
19             Now, I incurred six months of charges.  So
20   six months of 25,000 is $12,500.  However, because less
21   than 20 percent of the people are paying, I was only able
22   to pay that man 2,500.  So I have an accounts payable to
23   him of 10,000.
24             So if you look at the numbers, you'll see
25   why going by actual makes no sense at all.  The budgeted

1    amount was the 25,000.  The actual -- now understanding

2    there's two actuals, actual incurred was 12,500, actual

3    paid was 2,500, and there's an accounts payable of -- of

4    the difference.  And that goes back to the 3.1 we were

5    talking about, that would have been on that list back

6    there.

7                    So actual, it's not even a common sense way

8    or an acceptable mathematical way to approach a budget or

9    to approach this because when you say actual, what do you

10   mean, actual incurred?  Do you mean actual paid?  Do you

11   mean I have to pay the 25,000 before I can collect it?

12   That's absurd, nobody in the world does that.

13                   So it's critical that you understand actual

14   paid, actual incurred, and the budgeted amount, how they

15   all tie together.

16                   THE COURT:  But using your example, if you

17   had 25,000 in the 2016 budget and terminated security

18   halfway through the year, and you're still trying to prove

19   for -- for your shared cost determination the full 25,

20   right --

21                   THE WITNESS:  Well ---

22                   THE COURT:  -- is owed because it was

23   budgeted for that year, but if it was actually collected,

24   again, it would go into the account.

25                   THE WITNESS:  And again it gets confusing,

1    Your Honor, because one, in a sense, really doesn't

2    correlate to the other.  The budget is what you need for

3    security, whether you collect it or not.  I need 25,000

4    for security.

5                    Last year if they didn't pay me, doesn't

6    mean I -- or if they only paid me 2000, I would -- I could

7    be held legally liable for not giving -- and trust me, I

8    own an insurance company, I know how this works.  I will

9    be sued the first time somebody gets mugged in my building

10   when they say what security do you have, and my answer is

11   none.  They don't care whether or not I have the money to

12   pay for it.  Security is required.

13                    THE COURT:  Okay.  All right.  We're --

14   we're -- let's go back to Mr. Davis.  Let's see if we can

15   wrap up the budget things and get to other testimony

16   directly relevant to the sale so we can get through this.

17   BY MR. DAVIS:

18        Q.    How are you able to keep the building afloat

19   with collecting such a small percentage of monies?

20        A.    I secured an operational bridge loan --

21        Q.    Okay.

22        A.    -- or line of credit actually.

23        Q.    All right.  Okay.  I'd like to direct you to

24   Article 12.3 of the declaration.

25                    Do you have a copy handy there?

1          A.     What tab would it be?

2          Q.     Let me give you a copy.

3                 MR. GRUHER:  I have it.  I have a copy.

4    Your Honor, can I approach the witness with a copy of the

5    declaration?

6                 THE COURT:  Yeah, but where -- I don't have

7    an actual copy of this.  This is ---

8                 MR. DAVIS:  I can put it up on the screen,

9    Your Honor, if that will help.

10                THE COURT:  Yeah.  No, I mean, I know I have

11   it in the record, I just don't have it sitting in front of

12   me, but anyway, it's on the screen.

13   BY MR. DAVIS:

14         Q.     Okay.  I'd like to direct you to the part

15   that's underlined, and if you could just read that -- read

16   that and familiarize yourself with that for -- for a

17   moment.

18         A.     The part that's yellow?

19         Q.     Starting with the annual regular charges

20   provided for in this section.

21                THE COURT:  You don't have to read it out

22   loud.

23                MR. DAVIS:  Right.

24                THE COURT:  Just read it to yourself, and

25   then ---

1                MR. DAVIS:  Then I'll ask you a question.

2                THE WITNESS:  Okay.

3    BY MR. DAVIS:

4         Q.    All right.  What does that -- that portion

5    that you read, what does that -- what does that mean to

6    you as the owner of the hotel unit?

7         A.    Well, it -- it references the charges that I

8    can make to the residential and commercial unit owners.

9         Q.    Does it talk about the -- does it help you

10   understand the budgeting process?

11        A.    It does.

12        Q.    And how so?

13        A.    Well, it -- it says the annual charges may

14   be ---

15               THE COURT:  I'm going to -- I'm going to cut

16   this off -- hold on.  The declaration is the declaration.

17   We can argue from it.  I -- I understand, I've read it, I

18   don't think there's any need for testimony on this.

19               MR. DAVIS:  Okay.

20   BY MR. DAVIS:

21        Q.    Have you reviewed the budget for 2018?

22        A.    Yes.

23        Q.    Have you prepared a budget for that?

24               And that's Tab Number 36 in the book.  Did

25   you prepare that budget?

1        A.    Yes, I did.

2        Q.    All right.  Can you explain -- I'd like to

3   move this budget into evidence, Your Honor.

4              THE COURT:  Has this been published already?

5              THE WITNESS:  This is on the website.

6              THE COURT:  So this is what you just posted

7   recently for -- for -- for 2018?  This just has the

8   summary of each category, as opposed to what you had in

9   Tab 35.  Is --

10             MR. DAVIS:  Yes, Your Honor.

11             THE COURT:  -- is there the detail that's

12  also been published or ---

13             THE WITNESS:  The exact details of -- that's

14  here, this is my worksheet.  On the website was published

15  the summary of each line item.

16             For example, this goes --

17             THE COURT:  So you published ---

18             THE WITNESS:  -- into great detail of

19  labor --

20             THE COURT:  You published ---

21             THE WITNESS:  -- but on the website it will

22  say labor with one charge.

23             And then it goes into the building expenses,

24  utilities.  I believe if you look on the website you'll

25  see utilities with a total.  The published version didn't

1    go into great detail.  The great detail is available in

2    the office where anyone can come in and look at it if

3    they'd like.

4                    THE COURT:  All right.  Anyway, all right,

5    go ahead.

6    BY MR. DAVIS:

7         Q.    Can you explain why the budget seems to have

8    increased from -- we'd like to move this into evidence,

9    Your Honor.

10                   THE COURT:  Okay.

11                   MR. LIEBERMAN:  Again, Your Honor, as a

12   demonstrative aid, no objection.

13                   THE COURT:  All right.  I'll admit

14   Exhibit 36.

15                   (Thereupon, Exhibit Number 36 was admitted

16   into Evidence.)

17   BY MR. DAVIS:

18        Q.    Can you explain why the budget went up for

19   2018, seems to have increased a little bit?

20        A.    We'd have to go through each line item, but

21   expenses go up.  In general simple terms, expenses go up,

22   which would result in an increased budget.

23        Q.    All right, and on this second page of this

24   exhibit, is that the same percentage calculations you used

25   for 2017?

1          A.    It is.

2          Q.    All right.  How is the ---

3          A.    If we're looking at Tab 35 ---

4          Q.    Yes.

5                THE COURT:  36, I thought.

6   BY MR. DAVIS:

7          Q.    36, I'm sorry.

8          A.    Oh, I'm sorry.  I was looking at the wrong

9   one there.  Yeah, I'm sorry.

10         Q.    What's the difference between the ledger

11  balance, the accounts payable, and the accounts receivable

12  for the hotel unit?

13         A.    The ledger balance is a, as I said, like a

14  credit card statement of what that particular unit owner

15  owes.  The accounts payable are the bills currently

16  payable by the Schecher Group shared components, and the

17  accounts receivable would represent the amount of money

18  collectible by the Schecher Group shared components, and

19  the receivables basically come from the individual unit

20  owners.

21               THE COURT:  Well, the receivables then would

22  be the -- the total of all the ledger balances, wouldn't

23  it?

24               THE WITNESS:  Yes, Your Honor.

25  BY MR. DAVIS:

1          Q.     The number $4.11 million has been bandied --

2     bandied around in court and in the contract, proposed sale

3     and in the settlement conference.

4                 What does that number represent, if you

5     know?

6          A.     To me it represented -- I -- I attended a

7     conference with full intentions of staying there until a

8     deal was cut, and that represented a number, arbitrary

9     number in my mind that I would live with to have a deal

10    made with that particular person in front of me at that

11    time.

12                It -- it's not related to the -- the

13    receivables by the owners, it's just a -- a number I came

14    up with, going forward number I believed I could live with

15    to make the Sixty Sixty into what I think it should be.

16         Q.     Is the hotel unit for sale now?

17         A.     No.

18         Q.     All right.  The testimony from Mr. Michaels

19    indicated that your plan was to bankrupt the owners and

20    get their units and the entire building for $2 million, is

21    that what you're trying to do?

22         A.     Absolutely not, and that testimony is a

23    great insult to me.

24         Q.     What ---

25                THE COURT:  What are you trying to do?

```
1              MR. DAVIS:  That was my question.
2              THE WITNESS:  Your Honor, I ---
3              THE COURT:  I mean, you don't have to re --
4    I want to -- I don't want to -- not that I think you would
5    easily be bullied even from the Judge, but if it's -- if
6    it's confidential, it's part of your discussions with your
7    attorneys, you don't have to reveal it.
8              But if it's -- with that caution if you want
9    to answer the question, go ahead.
10             THE WITNESS:  What I want to do is what I do
11   in other places right now, Your Honor.  I -- it starts
12   with getting the unit owners on board or replace them with
13   unit owners that I consider responsible rather than what
14   we have today.
15             My plan is very simple, and I -- I've been
16   doing this for over 15 years at other locations, and it
17   will bring value to everybody at the building, including
18   myself, the unit owners, and I'll -- I'll use an example
19   that I -- I did at another property.
20             If I take 12 units and I make them part of
21   my vacation club, I have a global vacation club around the
22   world that has over 5,000 locations in 100 countries.  I
23   am a shareholder in a major resort in the
24   Dominican Republic that is expert at this.  We make over
25   $7 million a month clear profit, have for as long as I can
```

Page 95

1    remember, and I want to be able to duplicate this on

2    Miami Beach.

3                    This is not timeshare, I'm going to preface

4    this by saying this is not timeshare.  Now, if you take

5    36 units and multiply that by 52 weeks, there's a total of

6    1,800 some weeks available.  If I put the ---

7                    THE COURT:  Well, why -- why 36?

8                    THE WITNESS:  Fifty-two.  Because that's

9    my -- my target, I have 38 units in the hotel program

10   right now.  I believe I can easily get at least 36, but 36

11   becomes the multiplier because if more owners decide to

12   pay up and join, they're welcome, they're part of the deal

13   or if this new buyer comes in and buys, that's another

14   situation.

15                   But my plan is this, and -- and the math

16   speaks for itself, in the example of 36 units at 52 weeks,

17   that's -- we'll round it off and say that's 1,800 weeks.

18   I can sell a week either as an exit strategy of an

19   existing business I have elsewhere if they don't buy in

20   the Dominican Republic, they want Miami Beach, we sell

21   them this one.

22                   But at minimum price of $12,500 per week,

23   that will yield $23 million return on investment for these

24   36 people.  That equates to about $600,000 per unit for

25   each of these individual unit owners.

1          So where am I going with this?  I have a --

2   I have a big picture, my big picture includes replacing

3   the owner base with responsible owners that pay their

4   fees, taking those fees, improving the building, with that

5   improved building creating the vacation club that will

6   generate, at worst case scenario, a $23 million return

7   versus selling my unit for six million, and if I get more

8   unit owners in, which I anticipate, that 23 million turns

9   into 40 or some million.

10          THE COURT:  Okay.  Just to understand it,

11   you say it's not a timeshare, but you're not talking about

12   12,000 a week for just one week, you're talking about a

13   right to a week in perpetuity essentially; right?

14          THE WITNESS:  No, Your Honor.  What I'm

15   talking about is you ---

16          THE COURT:  What -- what are you getting?

17   What are you -- well, why don't you just explain.  What do

18   you mean by 12,000 a week?  What is that for?

19          THE WITNESS:  I'm -- I'm using the -- the

20   12,000 a week to illustrate the mathematical example, not

21   the benefit of joining the vacation club.  When you

22   spell -- spend 12,500, you're now a member of a vacation

23   club.  You -- you are attracted to the building Sixty

24   Sixty.  You may want to be there, but you can go there for

25   the one week that you want to go because that -- that's

1    part of your sales -- the sales agreement with you.

2              But you're -- you are exposed to 5,000

3    resorts worldwide, including Marriott and other -- other

4    properties where timeshare owners -- these are timeshare

5    resorts, where timeshare owners may have spent 25, 35 or

6    50,000 for a week in the same property.

7              So I'm actually giving you a sales pitch

8    now, but for 12,500, you come into this, you were

9    attracted by the Sixty Sixty, and you can go globally and

10   you're guaranteed you will never pay more than 795 a week.

11             We have a program that's been in existence

12   since the late '80s, where the members can go to, I think

13   there's an example on my website, that we picked a

14   property in Orlando, we picked Expedia's best rate

15   guaranty, and it was like 3,000 some dollars a week for

16   this room.

17             THE COURT:  Okay.  Let me -- let me -- let

18   me stop you just -- so the 12,500 is to buy a week as part

19   of the vacation club with the right to choose where you

20   want to spend your week and not spend -- not pay for that

21   particular week anything additional beyond 795 a week, is

22   that -- is that what you --

23             THE WITNESS:  That's correct.

24             THE COURT:  -- just said?

25             Okay.  So that's -- that's the marketing.

1   Now, but how does that translate into the -- the 600,000

2   per unit for unit owners in -- in this building if --

3   if -- if the building participates in the vacation club or

4   if a unit participates?

5             THE WITNESS:  If the unit participates, the

6   potential of that unit is to -- is to earn 600,000.  They

7   will have a contract with the vacation club that they get

8   a percentage of every sale.  So let's -- let's keep it

9   simple, the same as the hotel.  If that unit owner had a

10  50/50 contract and if that week was sold for 12 -- 12,000,

11  he would get 6,000.  So that particular unit would

12  generate for that owner half of 23 million or

13  $12 million --

14            THE COURT:  I'm not following.  I thought

15  the --

16            THE WITNESS:  -- for that group of 36, I

17  mean.

18            THE COURT:  -- the consumer was buying a

19  week which it -- which the consumer could use at any one

20  of the 5,000.

21            THE WITNESS:  Correct.

22            THE COURT:  So why is that 12,500 or

23  50 percent of it going just to a unit owner in one of the

24  5,000 places that the consumer can go?

25            THE WITNESS:  Because that particular unit

1   was the reason the person bought.  They -- they

2   psychologically buy because they want to come back here

3   every -- every year, in reality they never do.  And when

4   they see the scope and breadth of the program, they

5   probably would never come back more than a few times.

6                   But it's the incentive for those units that

7   I do not own or acquire, it's an incentive for this

8   particular unit owner -- it's -- the highest and best use

9   of the unit.

10                  Why would you not want to put it on and

11  if -- if you're part of the group of 36, you're going to

12  share in a potential $10 million revenue versus trying to

13  rent it on your own and maybe get $89 a night.

14                  THE COURT:  All right.  So rather than

15  trying to parse all the numbers in your example, the --

16  the gist of it is you think cooperative unit owners who

17  want to participate in a -- in a vacation club, that that

18  will enhance the value of their units?

19                  THE WITNESS:  No doubt about it, Your Honor.

20                  THE COURT:  Okay.

21                  MR. DAVIS:  And for owners that ---

22                  THE COURT:  So -- so --

23                  MR. DAVIS:  I'm sorry.

24                  THE COURT:  -- just curious, if -- if you've

25  got a group of unit owners now that, to say the least from

1    your perspective are uncooperative; right?

2               THE WITNESS:  Right.

3               THE COURT:  I mean, that's to say the very

4    least, I'm sure.

5               So just in -- in very broad terms, wouldn't

6    you be happier with a buyer coming in and getting rid of

7    Ms. Valez and Ms. Garcia, and all the other people that

8    are not your best friends?

9               THE WITNESS:  I was happy when MRC was

10   coming in.  I believe that's exactly what they want to do.

11   But unfortunately, these people have two faces,

12   Your Honor, the one that they show to the Court and the

13   one they show to me at the end, and the one they show to

14   me is the one that clearly demonstrates to me their only

15   objective is to acquire my hotel unit, and that does not

16   fit into my big picture.

17              THE COURT:  But at one point you were

18   willing to sell.  Is it just different -- different in

19   terms of where -- what's the difference now between the

20   timeframe, whatever it was a year or two ago, when you

21   were willing to sell the hotel unit?

22              THE WITNESS:  It became -- to be perfectly

23   honest, Your Honor, it became personal.  It's no longer a

24   smart business decision and it -- it became -- I don't

25   know how to say it nicely, but it just became something

1    that they pushed me to the limit.

2                    I'm not motivated by money, Your Honor.

3    Money is a byproduct of what I do and what I enjoy doing.

4    These people have pushed me to the limit where it's now

5    personal, and that's it.

6                    THE COURT:  So you won't sell the hotel unit

7    because you think that's the only way a buyer would do a

8    deal, and you don't want a buyer to do a deal at this

9    point because you want to screw the unit owners who you

10   hate?

11                   THE WITNESS:  No, sir, that's wrong,

12   absolutely wrong.

13                   THE COURT:  Okay.  What ---

14                   THE WITNESS:  I want a buyer that will come

15   in tomorrow.  I will do anything in my power to have a

16   buyer come in tomorrow, as long as I do not give up my --

17   my rights as a hotel unit owner, and as long as that buyer

18   agrees to live by the condo documents.

19                   I welcome a buyer, just like Your Honor said

20   earlier, I would rather deal with one intelligent

21   businessman than 82 crazy people who pay nothing.  I

22   thought MRC was that person, they turned out not to be.

23                   I know, based upon the testimony and -- and

24   what transpired between myself and KFI, they're not the

25   people either.  But I'm willing to do what -- I intend to

1    expedite anything to make a sale happen, as long as two

2    things don't happen, as long as I don't give up my rights,

3    and as long as that person makes it clear to Your Honor

4    that they're there to buy and to -- they can have

5    conflicting views, they can opt in or opt out, I don't

6    care.

7                I only care that they live by the condo

8    declarations because if they don't, we're going to be here

9    again next year for another year fighting with a new

10   debtor whose whole objective is to force me out.

11               I can close that building and rent out the

12   parking, that's it.

13               THE COURT:  Okay.  Go ahead.

14   BY MR. DAVIS:

15        Q.    I have two questions.  First of all, for

16   owners that are willing to pay their assessments and be

17   current, would they be able to take part in your -- your

18   program --

19        A.    Absolutely.

20        Q.    -- your plan?  All right.

21        A.    I want them to.

22        Q.    Okay, and have you worked with owners that

23   have tried to pay?

24        A.    I -- I've worked with several owners who --

25   who -- who have paid and who are trying to pay.

1      Q.    And are you ---

2      A.    Those are the -- those are the owners that

3  are overlooked by this -- by the Bankruptcy Court.

4  There -- there's a great deal of owners out there -- to

5  me, I'm frustrated and I apologize, because I see

6  everybody here protecting those people who don't pay,

7  without a single thought to all the people who are paying

8  or all the people who deeded back or made a deal to get

9  rid of their unit based upon the payments they know they

10  owe.

11      Q.    How will your plan help the association,

12  your plan of, you know, the vacation club and whatnot?

13  How will that help the debtor, if you know?

14             MR. LIEBERMAN:  Objection, Your Honor,

15  relevance, and want to narrow the scope.  We're running

16  out of time.

17             THE COURT:  All right.

18             MR. DAVIS:  It's relevant ---

19             THE COURT:  I'll -- I'll overrule it, but

20  let's -- let's -- how much more do you have?

21             MR. DAVIS:  Your Honor, I don't -- don't

22  know.  I know we've covered a lot, Your Honor, we've

23  covered a lot with your questions, which -- which I

24  welcome.

25             So I've got -- I've got some more.  I don't

```
 1   know, what time is it?  I've got some more, but I'll do my
 2   best to try to do it quickly.
 3                    THE COURT:  All right.  Because I may -- I
 4   may have to limit you, and -- and I would then -- I'll
 5   overrule the objection on this, but just urge you to try
 6   to focus on what's most relevant to the -- to the sale
 7   motion.
 8   BY MR. DAVIS:
 9        Q.    What have you heard about KFI's plan and how
10   KFI's plan will help the association?
11        A.    Well, what I heard, the testimony is that
12   they're -- they're -- similar to when they walked into my
13   office, and this is one of the reasons I -- I -- I refused
14   to go any further with them, the day they -- they flew
15   into Spruce Creek and they walked into my office, they
16   started off the conversation by we can end all your
17   troubles right now.  We can end the bankruptcy tomorrow.
18                    MR. LIEBERMAN:  Objection, Your Honor --
19                    THE COURT:  Hold on, hold on.
20                    MR. LIEBERMAN:  -- hearsay.
21                    THE COURT:  Hearsay objection.
22                    MR. LIEBERMAN:  Hearsay.
23                    THE COURT:  Mr. Davis.
24   BY MR. DAVIS:
25        Q.    What is your understanding as to ---
```

1              THE COURT:  I'll sustain the objection.  Go

2    ahead.

3    BY MR. DAVIS:

4         Q.   What is your understanding, without saying

5    exactly what KFI said to you, what is your understanding

6    as to what KFI wants to do with Sixty Sixty?

7         A.   They want to acquire the building, make it

8    into single ownership, and collapse the association, and

9    they want to either develop it, flip it for a profit or

10   demolish it and build a new building.

11        Q.   You were here with -- when Mr. Michaels

12   testified.  Did you hear anything as far as a plan to

13   operate the association or operate the units that would

14   help the association?

15        A.   I didn't hear anything that was going to

16   help the association.

17        Q.   KFI said their model required 50 units,

18   based upon their math, for them to receive an acceptable

19   return on investment.

20             Do you agree with that plan?

21        A.   Absolutely not.

22        Q.   Okay.  Why not?

23        A.   Because of the math.  If you look at the

24   current budget, if they take 50 units and just say --

25   which this will be lower than the actual amount, but let's

1    say the -- the -- the maintenance is 3,000 a month, 50

2    times 3,000 is a hundred and fifty thousand.  It is

3    mathematically impossible for them to even come close to

4    breaking even, whether they rent their own units

5    themselves under that brand they're talking about, or if

6    they opt into the hotel program, and -- and rent in the

7    hotel program.  It is mathematically impossible and

8    becomes even more impossible if they choose to opt out and

9    run their own hotel with 50 units.

10             I run a hotel on Hollywood Beach with

11   200 units.  I pay about $10,000 a month rent versus the

12   hundred and fifty they would pay, and last year I -- I

13   lost money, I lost $400,000 and that's with 200 units.

14             So it's just not possible.

15        Q.   They -- you mentioned something about

16   branding and I remember the KFI representative also

17   mentioned about rebranding the hotel.

18             How feasible is that?

19        A.   It's totally impossible.  Number one, you --

20   you can't brand a building you don't own, so that's out of

21   the question.

22             Now, I -- I heard him say that Brightling

23   owns the brands, so if you own something you can do

24   anything you want.  However, I don't think Brightling is

25   stupid, because when you brand a building, you put your

1    name on it.  They cannot put their name on the building

2    per the condo documents.

3              So then if they say they're going -- they

4    meant they were only going to brand their rooms, well

5    that's impossible also, but again, because Brightling owns

6    the company, he can go ahead and do anything he wants, but

7    logically, number one, the City of Miami Beach has strict

8    rules that if you're renting your own units, any

9    advertising has to have a disclaimer that says you are not

10   part of the approved hotel program.

11             So his Brand A would have to come with a

12   disclaimer that says I am not part of the SG Resorts hotel

13   program, and there's -- that defeats the whole purpose of

14   creating a brand.  There's not a brand in the world that

15   has a disclaimer attached to it.

16             And -- and then on top of that, the City of

17   Miami Beach, you can look in the public records, they've

18   been fining people as much as $1400 for every advertising

19   violation they can find.  The city has generated a ton,

20   millions of dollars in revenue from the fines.

21             So branding is out of the question.

22        Q.    Mr. Michaels was here also, and on the stand

23   accused you of commingling funds, owner revenue with the

24   hotel operation.  What -- is that true or false?

25        A.    Absolutely false.

1    Q.    Can you talk about management of the

2    building?  Who -- who manages the building?

3    A.    A company by the name of Condominium Hotel

4    Corporation, and yes, it is a company that I also own.  It

5    was contracted and manages the property for the Schecher

6    Group, because the Schecher Group has no employees, and no

7    ability to manage the building.

8    Q.    Can you explain the relationship between

9    Schecher Group Condominium Hotel Management Corporation

10   and Casablanca Rental Services --

11   A.    Yes.

12   Q.    -- specifically on the accounting between

13   the three?

14   A.    Each company is an independent condominium

15   separate and apart from the other.  The Schecher Group is

16   a real estate holding company, as I stated.  It owns three

17   properties on Miami Beach, I call it the Schecher

18   triangle, and it goes from the Sixty Sixty, to the

19   oceanside, which is Casablanca Hotel, back up to the

20   Casablanca Villas, and back to Sixty Sixty.  So that is

21   the Schecher Group and they -- they own hotel-related

22   properties.

23         Condominium Hotel Management Company was a

24   company I formed many years ago to respond to the needs of

25   another property, and that is a hotel and condominium

1    management company.  All of my companies have a niche, and

2    the Condominium Hotel Management worked for properties

3    that I either owned or was involved with in an effort to

4    keep expenses as low as possible.  So that's a separate

5    company, separate employees, separate payroll, separate

6    everything.

7              The hotel company, which is Casablanca

8    Rental Services, again, a separate company, separate

9    employees, separate function and they run the hotel

10   operation at both the Casablanca Hotel on Miami Beach and

11   the Sixty Sixty.

12        Q.   I want to get back to your meeting with KFI,

13   and talk about your -- your first impression in dealing

14   with them and your current thoughts about doing business

15   with them.

16        A.   My first impression, I thought these guys

17   were great.  We have so much in common it's scarey.  They

18   fly their own jets, I fly my own jet.  They own Brightling

19   owned casinos and hotels.  I own casinos and hotels.  They

20   live a lifestyle that I live.  I thought these guys

21   were -- were fantastic and I thought they -- they were

22   somebody that I -- I could possibly joint venture with at

23   that time, until I actually spent an hour with them.

24        Q.   And then what happened?

25        A.   This will sound corny, but -- but as I said

1    earlier, I'm not motivated by money.  Money is a byproduct

2    of what I do and what I love to do.  I have a 70 year

3    record of fantastic success by anybody's standard in the

4    insurance industry, in the finance industry and in the

5    hospitality industry.

6              I -- I live by a moral compass, and I -- I

7    try never to lose sight of the direction I'm going.  I

8    will not compromise my -- my integrity for -- for a

9    profit.  I will not compromise or do business with people

10   that I don't -- people have -- it's difficult to -- to

11   verbalize, but it's something my father instilled in me.

12   If you don't have what's inside me inside of you, I don't

13   want to do business with you.

14             Some of the biggest deals of my life were

15   made by a handshake.

16        Q.    Did you advise ---

17             THE COURT:  Well, the issue, part -- in part

18   is whether KFI is a good faith buyer.  So is there

19   something about them that -- that you know that I should

20   know that makes them different inside than -- than you and

21   your moral compass?  I mean ---

22             THE WITNESS:  Yes.

23             THE COURT:  What is it?  What -- what --

24   what's -- what's their deal?  Why -- why should I find

25   them to be bad people --

```
 1              THE WITNESS:  Okay.  I'm not --
 2              THE COURT:  -- not bad people, but ---
 3              THE WITNESS:  -- I'm not going to say
 4   they're bad people.
 5              THE COURT:  Well, not bad people.
 6              THE WITNESS:  I'm going to say what they're
 7   doing is not consistent with somebody with their -- with
 8   their level of success, their level of training and
 9   knowledge, and if they worked for Lehman Brothers, I look
10   at the elements before me, and that would be the contract,
11   number one, and I'll compare it to what -- what I do.
12              First off, if I'm going to deal with you,
13   I -- I -- I want to know if you're real.  I want to know,
14   are you going to buy my property, and what's going to stop
15   you from buying my property?
16              So -- and -- and my contract is drafted on
17   that.  When you have a due diligence period in any
18   contract, you usually put in that due diligence period
19   after discussions with -- with the buyer, what are the
20   issues, what would stop him from buying?  And it should be
21   something that you -- as a seller, you're -- you're not
22   morally disclosing or you're trying to push off a property
23   to him, other than being open and honest.
24              So I would limit my -- my discovery period
25   with a clause that -- to walk based upon one, two, three,
```

1    four, or how ever many items that are real concerns.

2                    THE COURT:  All right.  So it's too --

3                    THE WITNESS:  What makes it a bad faith ---

4                    THE COURT:  -- too -- too open ended a due

5    diligence period, that -- that ---

6                    THE WITNESS:  Too open ended.  When you can

7    give -- when I saw this, you -- you can walk from this

8    contract for any reason, and you don't have to give a

9    reason, that shows to me, as a professional, two things,

10   you have a desperate seller, willing to -- to -- to make a

11   deal at any cost, that will never happen, I'll predict

12   that right now; and you have a buyer who is not even a

13   real buyer because he's just kicking the tires, he's

14   buying time to put pressure on Schecher, so Schecher sells

15   out and he gets the building.

16                    And at the end of the day, he'll walk, just

17   like MRC walked, and at the end of the day, all of the

18   owners who are not in court, who have been paying,

19   including myself, are left paying holding the price tag

20   for something that should be settled in a foreclosure

21   action.

22                    If they would have foreclosed, we would not

23   be sitting here today.  They would not owe their attorneys

24   what they owe today.  They -- they would have acquired ---

25                    THE COURT:  All right.  But let's -- let's

1   go back to just KFI and the contract.

2                    So you don't think they're real, you think

3   they're -- they -- because they have a right to walk,

4   they're just going to walk if they don't make a deal with

5   you and you're not willing to deal with them, is that a

6   fair summary?

7                    THE WITNESS:  That's exactly what I believe,

8   Your Honor.

9   BY MR. DAVIS:

10          Q.    How about the amount of the deposit, does

11  that -- does that support your conclusion or detract from

12  it?

13          A.    That -- that further supports my conclusion

14  that they're -- it's bad faith, they're not real because

15  if they were real, put up a ten percent deposit.  Think

16  about it logically.  What's the difference -- it will

17  look -- it would -- if -- if I was the Judge, it would

18  look better to me because you can walk for any reason, put

19  up ten percent of whatever it is.  If it's -- if it's --

20  you're talking ten million, put up a million.

21                    I have people calling me on the phone

22  telling me right -- I can -- a guy that owns the

23  Clarion -- Ritz Carlton, I'll give you a million dollars

24  now, and I'll give you 14 million when you deliver the

25  keys.

Page 114

1              So if I wanted to make a deal and if I
2    wanted to screw everybody, and if I wanted to do anything
3    what people are proposing, I'd have made a deal with him.
4    I would have took his million dollars, I would have been
5    able to pay my lawyers, and put on an aggressive thing to
6    basically get rid of everybody, but that was not my plan.
7              Q.    How did this recent bankruptcy filing
8    affect, in your mind, the good faith or the intentions of
9    KFI, the bankruptcy filing in that LLC that was set up?
10             A.    To me that -- that's just another reason why
11   I would never do business with these people if I -- given
12   the choice, because it shows their moral compass.  It does
13   import -- it's broken.
14                  You -- you don't -- and you can justify it
15   however you want, if you pull over any bank robber, any
16   crook, they all -- they all can justify why they did
17   something, but everybody knows, whether they want to
18   accept it or not, what's right and what's wrong and what
19   they did is wrong, I'm sorry.
20                  And -- and to me, as a businessman, if they
21   did it once, my concern is that's their plan the minute
22   they buy, they're going to buy, and then the next day
23   they're going to file bankruptcy, there's no money coming
24   in and guess what happens?  Everything goes.
25                  I am not going to continue to borrow money.

1   I am not going to keep the building open.  I will close

2   it.  I will -- I'll pay insurance on a closed building and

3   I'll special assess them or fight them in court, but --

4   but, you know, that is not the way business or life should

5   be con -- conducted.

6             I would rather negotiate than litigate.  I

7   would rather work together than work -- work against each

8   other, but these people and -- and I heard Your Honor say,

9   well, it seems like we have a situation here, that these

10  people have money, these people need money, and a deal

11  should be made.

12            Well, I'm telling you that money isn't the

13  problem.  Money is a byproduct or it's a -- a side effect

14  of the problem, and the problem here has always been the

15  owners.  The owners elected not to pay only by choice.

16  Their own choice, they elected not to pay.

17            And when you talk about the bankruptcy, I

18  don't know about bankruptcy.  I went nuts when I read the

19  petition because all -- the majority of those bills listed

20  on the petition belong to the Schecher Group, not to the

21  debtor.  They belong to the Schecher Group.

22            I went on the internet and I researched

23  bankruptcy fraud, and I blew a fuse yelling at my attorney

24  saying this is fraud.  How can they do a petition when

25  they're using my bills?  And now just as a reasonable

1    common sense person, why would you spend $300,000 on legal

2    fees to -- to try to avoid paying a hundred thousand in

3    real bills without once picking up the phone and calling a

4    single creditor like I did when I opened the building.  I

5    brought every creditor in that building, sat eyeball to

6    eyeball, nose to nose and I made a deal with them so I can

7    open the building and pay them off over time.

8              Q.    What's your understanding as to a payment

9    strike?

10             A.    My understanding is pretty clear.  I mean, I

11   read it even in the newspaper when Mr. Lieberman was

12   interviewed by a reporter, the Miami paper, said his

13   clients elected to do a rent strike.  That's absurd

14   because it goes back to what I said.  Catch a bank robber,

15   he's going to give you a reason why he robbed the bank,

16   but there's no such thing as a rent strike based on our

17   condo documents.  They don't pay rent.  They pay

18   maintenance fees.

19                   The law is pretty specific in Florida, if

20   you don't pay your maintenance fees, you get liened and

21   you get foreclosed upon.  That is how it works in 99.99

22   percent of all the condominiums in the State of Florida,

23   and probably in the United States.

24             Q.    All right.  The KFI contract provides

25   something to the effect of 120 days to close.  If that

1    does not close, how much does that cost you every month in
2    bills, more or less?

3            A.    Well, that's a very good question because
4    there -- there -- there's two factors there.  There is --
5    there is the baseline loss, and then there's the real
6    loss.  So the baseline loss is nothing more than -- let's
7    say they have 60 units that they -- they said they have
8    under contract, I think.

9            So 60 -- and it's higher, but if you just
10   take $3,000 maintenance fee as an example, 60 times 3,000
11   is $180,000 a night -- I mean, a month.  My baseline loss
12   would be a hundred and eighty thousand times the three
13   months they take to close.  My real loss ---

14           Q.    Four months, 120 days is four months.
15           A.    Four months, so it's even bigger, I'm sorry,
16   I'm emotional right now.

17           THE COURT:  But what are the -- I guess
18   we'll get into this with the -- with the lawyers, unless
19   there's something you want to point to.

20           What -- what I need to explore, and maybe
21   it's through argument or otherwise, is what are the real
22   contingencies after the due diligence period that would
23   allow them to walk.  I know there's title issues, but I
24   don't know that -- that ---

25           MR. DAVIS:  Well, they can walk for any

1   reason whatsoever.

2                   THE COURT:  In the -- in the due diligence

3   period.

4                   MR. DAVIS:  Yeah.

5                   THE COURT:  But they can't walk for any

6   reason whatsoever after the due diligence period.

7                   MR. DAVIS:  The problem, Your Honor, is if

8   they do walk, there' a nonrefundable deposit, but it

9   doesn't go to Mr. Schecher, who's the only party that's

10  really suffering a loss here.  That's the problem, he ends

11  up suffering a hundred eighty thousand dollars a month for

12  four months, and that's -- that's his baseline loss, but

13  he has a bigger loss that -- that I'd like him to discuss,

14  as well, how much this would cost him if this deal does

15  not close.

16                  THE COURT:  Okay.  Mr. Lieberman.

17                  MR. LIEBERMAN:  Objection, Your Honor,

18  relevance.  We're talking about his prospective damages.

19  This is about the debtor's business judgment in entering

20  into this contract, which is reasonable business terms for

21  the debtor, and whether the -- whether the buyer is acting

22  appropriately in good faith, and Mr. Schecher's

23  calculations of what his profits would otherwise be are

24  not relevant to the debtor's calculation.

25                  MR. DAVIS:  If I may respond, Your Honor?

1    It's not calculating his profits, it's calculating his
2    loss, his actual losses.  It shows --
3                    THE COURT:  All right.  Brief -- briefly.
4                    MR. DAVIS:  -- it goes to the bad faith.
5                    THE COURT:  I'll allow it.  I -- I don't
6    think it's -- it's the key issue, but if -- if my decision
7    comes down to looking at some of the equities, it's --
8    it's potentially relevant.
9                    So your -- your carrying costs if the ---
10                   MR. LIEBERMAN:  Your Honor, if I ---
11                   THE COURT:  I had a deal years ago where
12   there were two groups of investors, we called the
13   friendlies and the unfriendlies, so just using that
14   terminology.
15                   If the unfriendlies continue not to pay
16   during this whole period, you're going to be out of pocket
17   or incurring debt on your credit line of about how much a
18   month?
19                   THE WITNESS:  I -- I don't even know,
20   Your Honor --
21                   THE COURT:  If you -- if you it keep it
22   open.
23                   THE WITNESS:  -- it's a large amount, but
24   that -- that's -- that's peanuts.  That misses the whole
25   point to what I'm trying to make.

1          THE COURT:  Okay.

2          THE WITNESS:  It's not my loan.  It's

3   nothing at all to do with me, personally.  It has to do

4   with the operation of the building, which is funded by the

5   shared component cost.

6          By them not closing, these owners are

7   paying -- the only money that's coming in right now, is

8   the exception of a -- a couple of owners that are not on

9   the hotel program that are paying their -- their fair

10  share.  There are, I believe, 38 owners on the hotel

11  program that their revenue goes towards the shared

12  component cost, but that revenue is only about half of

13  what they actually owe.

14         So I'm trying to run a budget -- a building

15  with funds coming in from a couple of owners who are

16  paying, 38 owners on the hotel program, who are paying

17  only a small part of what they owe, and then all these

18  other owners who pay absolutely nothing.

19         Now, I borrowed right now, as we sit here

20  today, 2.6 million or thereabouts, to keep the building

21  open.  That -- that money is all but gone just to pay the

22  gas, water, electric, payroll and things like that.

23         So where I lose is the fact that the delay

24  encourages these people not to pay, number one.  The

25  delay, I lose -- a simple mathematical calculation.  If

1   it's the 3,000 times their units, it's a hundred eighty

2   thousand a month times four.  But here we sit one year

3   later, and -- and what -- what bothers me the most, the

4   delay taking us out of high season.  High season is when

5   we make the most money.

6              So if these owners were on the hotel

7   program, we would be generating revenue for all of the

8   people who are only paying part, where they could probably

9   pay all, and if we got some of these 60 people into the

10  hotel program, it would be better and better for the -- so

11  the real loss is a combination of that baseline loss and

12  what we're losing in high season by not being able to

13  capture the revenue for the owners who are paying, and --

14  and for the owners who -- who refuse to pay, because

15  they're hold -- holding out hope that this buyer is going

16  to pay their debt off that they owe me.

17             THE COURT:  But why -- why aren't -- unless

18  I misunderstood, why aren't you capturing the revenue from

19  the owners who are part of the program?

20             THE WITNESS:  I am, Your Honor, I said I am,

21  but that revenue is only a small percentage of what they

22  actually owe.

23             THE COURT:  So the people -- oh, you're

24  talking about ---

25             THE WITNESS:  If -- if ---

```
1              THE COURT:  So there's people in the program
2    that are also not -- not paying.
3              THE WITNESS:  None of them are paying.  The
4    people -- the difference between the non-payers, they
5    don't pay.  The people in the hotel program, they allow
6    the revenue they generate from their unit to pay a
7    portion, and then there are some people that do pay --
8              THE COURT:  Okay.
9              THE WITNESS:  -- that are paying.
10             THE COURT:  All right.
11   BY MR. DAVIS:
12        Q.    Is the portion of the -- when someone is in
13   the hotel program, does the hotel revenue share that they
14   receive cover their full amount of the monthly
15   assessments?
16        A.    Absolutely not, that's what I'm trying to
17   explain.
18        Q.    Will it ever, do you foresee it ever
19   covering the full assessment?
20        A.    Never.
21        Q.    Okay.  Now, if the deal doesn't close and
22   these four months go by, will the association get paid
23   during that time?
24        A.    No.
25        Q.    Is the association foreclosing on any units
```

Page 123

1    trying to get paid?

2             A.    No, not that I'm aware of.

3             Q.    Now, there is a nonrefundable deposit.  Is

4    that enough to cover your losses --

5             A.    I -- I --

6             Q.    -- for this contract?

7             A.    -- don't remember the amount, but somehow

8    30,000 sticks in my -- my brain, and -- and that's not

9    only a joke, it's an insult to anybody --

10                 THE COURT:  No, it's not ---

11                 THE WITNESS:  -- who's a professional in the

12   real estate business.

13                 THE COURT:  Well, after the due diligence

14   period I think it's -- it's up to -- what is it, 300?  It

15   doesn't mean you're going to get it if they don't close,

16   but anyway, we -- I think we have the testimony about the

17   deposit.

18                 MR. DAVIS:  He doesn't -- he doesn't get it,

19   Your Honor, it goes to the association if it doesn't

20   close.

21                 THE COURT:  Right.  Mr. Davis, how -- if you

22   go to -- what's your trial date on the foreclosure --

23                 MR. DAVIS:  Our trial date is ---

24                 THE COURT:  -- the continued trial date?

25                 THE LAW CLERK:  February 22nd.

Page 124

1                    MR. DAVIS:  February.

2                    THE COURT:  February 22nd?

3                    MR. DAVIS:  20th through the 22nd.  We

4    had -- there was availability on the Judge's calendar for

5    dates in ---

6                    THE COURT:  Well, that's not -- that's not

7    my issue, but do you -- you expect the trial would

8    conclude during that period?

9                    MR. DAVIS:  Yes.

10                   THE COURT:  And you would obtain a judgment?

11                   MR. DAVIS:  Yes, Your Honor.  There were --

12   there were dates of availability before those February

13   dates, but Ms. Garcia said she was not available at any of

14   those dates, so we agreed on the February date.  I

15   foresee -- right -- right now what's going on, we finished

16   our case.  Defendants have -- this is for 30 or so units.

17   Defendants have started to put on their case.  A variety

18   of unit owners came up and testified.  We have those last

19   three days scheduled.

20                   We foresee that the case will conclude -- we

21   expect it to conclude at that date.  I'm not going to talk

22   about what went on during the trial and delays that we

23   had -- were faced, but it moved along very smoothly, I

24   thought, and we expect it to be done by the 22nd.

25                   THE COURT:  Okay.  All right.  Go ahead and

Page 125

1    finish your direct.

2              Mr. Lieberman, you need to leave when,

3    12:30?

4              MR. LIEBERMAN:  Yes, Your Honor, I

5    apologize.

6              THE COURT:  You don't need to apologize.  If

7    anything, I have taken up what might otherwise cut into

8    your cross, but can you finish in about ten minutes?

9              MR. DAVIS:  I think so, Your Honor.  I think

10   that you covered just about everything that I had in my

11   notes.

12             THE COURT:  Okay.  Well, can you finish in

13   one minute?

14             MR. DAVIS:  Well, I was looking just a

15   second or two just to make sure.

16             UNIDENTIFIED SPEAKER:  I can get him to

17   finish quicker, Judge, if you want.

18   BY MR. DAVIS:

19        Q.   Let me -- let me mention to you, if you turn

20   to Tab Number 32, Tab Number 32, an e-mail -- can you

21   identify that e-mail?

22        A.   This is an e-mail that I sent to

23   Mr. Adam Kent.

24        Q.   I'd like to move this into evidence.  What

25   was the purpose of that e-mail?

1          A.    It's informing Mr. Kent that it's currently

2    not for sale at any price, meaning the HU unit, and I plan

3    on seeing this bankruptcy and the foreclosure currently

4    taking place to its end, whichever that may be.

5              MR. DAVIS:  If I can move this e-mail into

6    evidence?  It's dated June 5, 2017.

7              THE COURT:  Okay.  Any objection?  Okay.

8    Exhibit 32 is in.

9              (Thereupon, Exhibit Number 32 was admitted

10   into evidence.)

11   BY MR. DAVIS:

12         Q.    Read the part about the responsible unit

13   owners.  What were you talking about there?

14         A.    I thank you for your group, for the interest

15   in buying the HU and my other units, but in the end, I am

16   committed to the responsible owners to save their

17   investment at the Sixty, as well as my own.  Selling out

18   now at the expense of my fellow owners to make a profit

19   works against my code.

20              THE COURT:  What -- who do you mean, "fellow

21   owners"?

22              THE WITNESS:  My fellow owners are all of

23   the owners who came in and made deals with me to pay off

24   their balances and to get current.

25              So these people paid off -- made a good

1     faith effort, we made deals, and I would be selling out

2     all of these people who trusted me.  I gave them my vision

3     of the future, and I guess they bought into it because

4     they paid their debt.  So I would be selling out those

5     people and again, I apologize for having a good moral

6     compass, but I am not going to -- to go against the people

7     that trusted me.

8                    THE COURT:  How did your communications to

9     unit owners that were in evidence earlier in this trial,

10    that you told unit owners basically that you had a

11    third-party buyer for 60,000 a unit and they weren't --

12    the buyer wasn't going to stay around.

13                   It seemed, unless I missed something, that

14    you deliberately misled the unit owners by making it seem

15    like it was a third-party buyer, when, in fact, it was

16    you.

17                   How does that fit with your moral code?

18                   THE WITNESS:  Nobody hid that.  It was made

19    clear to anybody who asked me.  I -- I was part of it.

20    I'm the representative speaking for the group.  The

21    group ---

22                   THE COURT:  You think disclosure is only

23    required when -- when asked on something -- something like

24    that?

25                   THE WITNESS:  It was a blanket offer to

1    everybody, Your Honor.  Whether I -- I should have

2    disclosed, did disclose, I don't see it being relevant.

3    Here is a bulk buyer willing to pay this amount of money.

4    If you want it, take it; if you don't want it, don't take

5    it.  Nobody forced anybody into making any decision.  The

6    bulk buyer's price was determined upon an -- an analysis

7    of the value at the time.

8              THE COURT:  Why didn't you tell the unit

9    owners it was you, though?  If you weren't trying to

10   mislead them, why would you not --

11             THE WITNESS:  Well, the honest --

12             THE COURT:  -- why didn't you disclose that?

13             THE WITNESS:  -- answer is they're all nuts.

14   They would take a -- the -- the littlest thing and try to

15   twist it into something that it's not.

16             My goal was to those that want to sell out,

17   give them an opportunity to get out.

18             THE COURT:  So you say you thought there

19   might be just an emotional reaction if they knew it was

20   you?

21             THE WITNESS:  I didn't think, there's

22   definitely an emotional reaction.  I'm the devil to these

23   people.  There's -- however, there's nothing they say

24   supported by any evidence or any fact, nothing whatsoever,

25   Your Honor.

1          THE COURT:  Okay.  All right.  So you've

2    answered my question.

3    BY MR. DAVIS:

4          Q.    Does the fact that KFI is setting up an

5    offshore entity structured to buy into Sixty Sixty affect

6    your point of view at all?

7          MR. LIEBERMAN:  Objection, Your Honor.  No

8    predicate, the facts aren't in evidence.  I think it

9    mischaracterizes the testimony.

10          THE COURT:  That may be right.  I don't --

11    he said that one of the --

12          MR. DAVIS:  I can reframe the question.

13          THE COURT:  -- trusts was at Cook Island,

14    but I don't know that he said that the entity that would

15    be created to buy Sixty Sixty was going to be an offshore

16    entity.

17    BY MR. DAVIS:

18          Q.    Is it -- is it your belief that KFI is

19    planning to set up an offshore entity to represent its

20    ownership interest at Sixty Sixty?

21          A.    I believe that by his testimony, but I don't

22    know if that's true or not.

23          Q.    All right, and being that you believe that,

24    does that affect in any way your view of KFI and the

25    chances of them paying assessments in the future?

1          A.    Well, they set up offshore entities to -- to

2    avoid -- for asset protection.  So whether or not that

3    would help, it just raised a red flag to me.  I don't know

4    if that would benefit them one way or another or hurt me

5    truly one way or another if the asset is here in America.

6    They just wouldn't have any cash money if they funnel all

7    their cash offshore, you wouldn't be able to attach the

8    cash.  You can still attach the asset that's here on

9    Miami Beach.

10              THE COURT:  Is one of your concerns here

11   that maybe they do close without making a deal and then

12   try to leverage you once they own 50 units, is that ---

13              THE WITNESS:  No, Your Honor, actually it's

14   the opposite.  I -- I -- I hope they do close, because if

15   they do close, they have no leverage over me whatsoever,

16   absolutely none.

17              They would be having a hotel operation to

18   opt in or opt out.  If they opt out, they don't have the

19   ability, according to the condo documents to operate a

20   hotel.  They have a hotel with no parking.  They have so

21   many issues to overcome, this is why I'm -- I'm saying

22   that I'd -- I'd be willing to bet, I'm a gambler, I'd be

23   willing to bet they don't close --

24              THE COURT:  Okay.

25              THE WITNESS:  -- for all of those logical

1   reasons.

2              THE COURT:  No, the reason I'm asking, and I

3   may have misunderstood, I thought Mr. Davis or Mr. Gruher

4   was suggesting that one -- one problem with the deal was

5   that they -- they would do just that, they would buy --

6   buy in and then not pay the assessments to -- to try to

7   exert some leverage, but that's -- that's not really

8   the -- your main concern.

9              THE WITNESS:  No, and -- and in fact, if

10  they did that, it actually helps me in the end because I

11  have one person to foreclose on instead of 82.

12             Like I said, Your Honor, it actually -- if

13  they close, it could probably be the best thing that would

14  happen to me because they -- they would pay off hopefully

15  the debt, so we reset.  So the day one, whether they pay

16  or not, I -- I like to prepare for the worst case

17  scenario.  So let's say they don't pay.  What do I do?

18             I will not make the same mistake twice.  I

19  will not fund an operation for somebody who is as rich as

20  I am.  I'll close the building, I'll special assess to

21  open it up based upon what's required to open it again,

22  they can pay it or not pay it, and the building will stay

23  closed until they pay, and when they don't pay I'll start

24  the foreclosure.

25             THE COURT:  Okay.

1                    THE WITNESS:  I'll be happy to rent the

2    parking until this is over.  So in reality by them buying

3    and closing it benefits me.

4                    THE COURT:  Okay.

5                    THE WITNESS:  And that's why I said, I'm

6    willing to -- to remove as many obstacles and roadblocks

7    as I can to get them to a fast closing.

8                    THE COURT:  All right.

9    BY MR. DAVIS:

10           Q.    When you say "fast closing, when would you

11   like them to close?

12           A.    I buy and sell millions of dollars in

13   properties, and the most it's ever taken me was 45 days.

14           Q.    All right.  Do you -- do you ---

15                   THE COURT:  But before the foreclosure trial

16   would be a target that would be important to you; right?

17                   THE WITNESS:  Absolutely, Your Honor.

18   BY MR. DAVIS:

19           Q.    Do you think it's possible in a deal like

20   this for them to actually close ---

21           A.    I'm sorry, I -- I ---

22           Q.    I'm sorry.  Do you think that given a deal

23   like this and based upon your experience, it is actually

24   possible for them to close within 45 days, which would be

25   the middle of January?

Page 133

1          A.    I -- I think they could close within 30 days
2    if they wanted to, with no -- no trouble whatsoever.
3          Q.    All right, and assuming that they close ---
4                THE COURT:  That's if they -- that's if they
5    just agree to the ledger balances; right?
6                I mean, if they wanted to ---
7                THE WITNESS:  If they agree to pay what's
8    owed me and everything else that the -- the seller has
9    agreed to, you can close tomorrow.  There's no reason to
10   even go 30 days.
11   BY MR. DAVIS:
12         Q.    And that would be the ledger balances?
13         A.    My -- my position is they owe the ledger
14   balances, yes.
15         Q.    All right, and then from them paying that
16   and getting ownership of those units, what concessions do
17   they get from you regarding how to operate the Sixty Sixty
18   building --
19         A.    There's --
20         Q.    -- if any?
21         A.    -- there's no concessions by anybody.
22   The -- the condominium documents are clear, but I will sit
23   down with them because they have a major investment in
24   that building.  I'll work with them to immediately redraft
25   a new budget because a lot of the expenses in this budget

1   could go away.

2              Example, legal.  I will work with them, just

3   like I told MRC.  MRC told me they have absolutely no

4   trouble at all with my budget.  They agreed to it.  They

5   just want input to the budget and I agreed 110 percent

6   input is -- is welcome.

7        Q.    So the total then for them to pay to get in

8   would be more or less, what, the 12 and a half million

9   dollar amount?

10       A.    Yes.

11       Q.    Okay.

12             THE COURT:  You said you're not willing to

13   negotiate to sell the hotel, and you may be right, that

14   they're not going to do this deal if they don't think they

15   can buy the hotel.  Mr. Kent is silently listening, but I

16   don't expect him to jump in and testify.

17             But would you be willing to negotiate the

18   debt to the Schecher Group as part of an expedited

19   closing?  I'm not saying 4.1, but would you sit down and

20   talk to them and if -- if -- if -- if this is ---

21             THE WITNESS:  Your Honor, I'm a negotiator,

22   not a litigator.

23             MR. DAVIS:  Yeah, I'm going to --

24             THE WITNESS:  I will negotiate with

25   anybody --

Page 135

1                    MR. DAVIS:  -- I'm -- I'm going to ask

2    Your Honor if I can --

3                    THE WITNESS:  -- as long as it's within

4    reason.

5                    MR. DAVIS:  -- if I can interrupt and

6    just -- I don't know if I can object to Your Honor's

7    question --

8                    THE COURT:  You can, but he answered it,

9    so ---

10                   MR. DAVIS:  -- but that's settlement

11   discussions.  I'd rather him not answer that, as -- as to

12   how low would he go, just for the same reason Mister --

13                   THE COURT:  No, no, I wasn't going to ask

14   him a number.  No, it was --

15                   MR. DAVIS:  -- Mr. Kent wouldn't ---

16                   THE COURT:  -- it was strictly -- he said he

17   won't negotiate to sell the hotel.

18                   I was just asking if he would negotiate the

19   debt and he said he's a negotiator.  It wasn't -- it

20   wasn't specific, I wasn't trying to invade what might be a

21   number.

22                   I don't know what Mr. Michaels would go up

23   to, I don't know what Mr. Schecher would come down to --

24                   MR. DAVIS:  Well, we heard what ---

25                   THE COURT:  -- and the open issue is still

1   are they really willing to do the deal without the

2   expectation of buying the hotel.

3                  MR. DAVIS:  We heard what Mr. Michaels was

4   not going up to and we know what the number is --

5                  THE COURT:  Okay.  All right.  Well,

6   let's --

7                  MR. DAVIS:  -- what Mr. Schecher seeks.

8                  THE COURT:  -- yeah, let's leave that

9   for ---

10                  MR. DAVIS:  So it seems like it would be

11  vast expanse --

12                  THE COURT:  Yeah.

13                  MR. DAVIS:  -- between the two.

14                  THE COURT:  I know.  All right.  So you're

15  done?

16                  MR. DAVIS:  I'm done, Your Honor.  Thank

17  you.

18                  THE COURT:  Okay.

19                  MR. DAVIS:  Sorry it took so long.

20                  THE COURT:  Let's -- let's take five minutes

21  and then you'll have 45 minutes to -- to cross.

22                  THE MARSHAL:  All rise.

23                  (Thereupon, a brief recess was taken, after

24  which the following proceedings were had:)

25                  THE COURT:  Okay.  Have a seat.

Page 137

1          We're back on the record ready for

2   cross-examination.  No?

3               MR. DAVIS:  Can I just clarify one thing,

4   Your Honor?

5               You asked me when those foreclosure sales

6   were set to -- or the foreclosures were set, and I gave

7   you the trial date, but to the extent they're foreclosure

8   sales, they would be at least 30 days after that.

9               Thank you.

10              THE COURT:  Okay.  All right.

11   Mr. Lieberman, cross of Mr. Schecher.

12              MR. LIEBERMAN:  Yes, Your Honor, thank you.

13                   CROSS-EXAMINATION

14   BY MR. LIEBERMAN:

15        Q.   Your full name is Richard J. Schecher, Sr.;

16   is that correct?

17        A.   Yes.

18        Q.   And you also go by Richard Schecher?

19        A.   Yes.

20        Q.   You regularly -- excuse me -- you regularly

21   posted videos to YouTube regarding the Sixty Sixty

22   Condominium and other buildings that you're involved in;

23   is that correct?

24        A.   I wouldn't say regularly, I do post, yes.

25        Q.   Presently, there are approximately 283

1    available that you've posted to the YouTube with respect

2    to those buildings; isn't that accurate?

3           A.    I don't know, I don't know how many.

4           Q.    Would you say that that's a ballpark number?

5           A.    Would I say what?

6           Q.    Would you say that 283 videos that are

7    presently available that were posted by you is a ballpark

8    number?

9           A.    I -- as I said, I don't know.  You can

10   easily count them to get the exact number.

11          Q.    Do you agree it's more than 200 videos?

12          A.    No, I don't.  I said I don't know.

13                THE COURT:  What's the difference how many?

14   Anyway, go ahead.

15                MR. LIEBERMAN:  There's -- there's no

16   difference just ---

17                THE COURT:  All right.

18   BY MR. LIEBERMAN:

19          Q.    You also post information on Instagram; is

20   that correct?

21          A.    I post on Instagram.  I don't know what you

22   mean by information.

23          Q.    You post on Instagram; is that accurate?

24          A.    I'm a social media kind of guy.  I post on

25   Facebook also.

Page 139

1          Q.    And you're pseudonym on Instagram is

2    Big Daddy Rich; is that correct?

3          A.    Yes.

4          Q.    And you also post on Twitter using the

5    handle @Schecher Group; correct?

6          A.    Yes.

7          Q.    With respect to YouTube, do you recall a

8    video that you published on May 15, 2017 entitled

9    Sixty Sixty, the deal on the table today?

10          A.    No, I do not.

11               MR. LIEBERMAN:  Okay.  Your Honor, I'm going

12    to direct Mr. Schecher's attention to ECF 246.

13    BY MR. LIEBERMAN:

14          Q.    Mr. Schecher, are you aware that in

15    connection with this bankruptcy case we filed a first

16    amended disclosure statement?

17          A.    I'm sorry, I can't hear.

18          Q.    Are you aware that in connection with this

19    bankruptcy case we filed a first amended disclosure

20    statement?

21          A.    In talking with my attorney, I'm sure I do.

22               MR. LIEBERMAN:  I apologize, Your Honor,

23    the --

24               THE COURT:  I don't ---

25               MR. LIEBERMAN:  -- video system seems to be

Page 140

1    blinking in and out.

2              THE COURT:  Jackie -- well, Jackie, do you

3    want to walk over there and see if you know what's going

4    on?

5              Jackie claimed to have done it without IT,

6    so let's see if she can fix it without IT.

7              MR. LIEBERMAN:  It was most certainly

8    working a moment ago, Your Honor.

9              ECRO:  It's not coming up now.

10             THE COURT:  I guess call the ---

11             MR. LIEBERMAN:  This -- this is in the

12   record, Your Honor, we can go to ECF 246.  I was just

13   trying to do it in a way that everyone can follow.

14             THE ECRO:  Can I exit out?

15             MR. LIEBERMAN:  Yeah, but I think -- I don't

16   think the problem is in the computer, I think the problem

17   is in the connection.

18             ECRO:  Where is it?

19             MR. LIEBERMAN:  It's right there, 246.

20             ECRO:  No, the video?

21             MR. LIEBERMAN:  I'm sorry?

22             ECRO:  You want the video?

23             MR. LIEBERMAN:  No, this isn't a video, this

24   is just a document.

25             ECRO:  Oh, okay.  I thought you wanted the

1    video.

2                    THE COURT:  You want us to get IT or any

3    of -- I guess ---

4                    THE LAW CLERK:  Yeah, let me (inaudible).

5                    MR. LIEBERMAN:  I had checked this and it

6    was working, Your Honor, I apologize for the delay.

7                    THE COURT:  No, it's not your fault.

8                    THE LAW CLERK:  Hi, Alex, this is Corinne.

9    I'm in Judge Mark's courtroom.  How are you?  We're having

10   some trouble with the evidence display.  Do you think

11   someone can come up? (Inaudible).

12                   ECRO:  Let's -- let's connect it on Lectern

13   1, remove it from here.

14                   THE COURT:  Actually, she's trying to open a

15   document now.

16                   THE LAW CLERK:  It's playing fine on the

17   laptop, but it won't, you know, display for the Judge and

18   I when we connect it to the evidence display system.

19   (Inaudible.)  Okay.  He thinks it's a resolution issue.

20                   THE COURT:  Well, why -- Mr. Lieberman, why

21   don't you just read from 243 whatever you ---

22                   MR. LIEBERMAN:  246, Your Honor.

23                   THE COURT:  Yeah, 246.

24                   MR. LIEBERMAN:  Is there -- is there a way

25   to pull up the --

Page 142

1                    THE COURT:  And put it on the screen, I
2    don't ---
3                    MR. LIEBERMAN:  -- the documents that have
4    been filed in the screen, notwithstanding going through my
5    own computer, because I had thought that we might have
6    access to filed documents even if ---
7                    THE COURT:  Yeah, I think the only way to do
8    it is from the computers on the table; right?
9                    THE LAW CLERK:  Right.
10                   THE COURT:  I mean ---
11                   THE LAW CLERK:  Alex is on his way up right
12   now.
13                   THE COURT:  I mean, I can pull it up, but I
14   can't display it.  If I could, I don't know how.
15                   THE LAW CLERK:  They're on their way up.
16                   THE COURT:  Do you -- do you have it in
17   front of you, Mr. Lieberman?
18                   MR. LIEBERMAN:  I do, Your Honor.
19                   THE COURT:  But you only have one copy?
20                   MR. LIEBERMAN:  I have the one copy and it
21   is in the record.
22                   THE COURT:  Well, 246 is the first amended
23   disclosure statement.
24                   MR. LIEBERMAN:  Yes, sir.
25                   THE COURT:  What -- what is in there that

1  you want to ask him about?

2              MR. LIEBERMAN:  Exhibit B, starting on

3  Page 95.

4              THE LAW CLERK:  I don't know how to adjust

5  the resolution here, maybe over there.

6              MR. LIEBERMAN:  You know what the problem

7  is, can you see when I open up the PDF?

8              THE COURT:  All right.  Well, what he's

9  referring to, Mr. Schecher, is -- I don't know if you will

10  be able to remember any details, something you published

11  on May 15th that -- where does it start?  Let me see.

12              The deal, Sixty Sixty buyout, 15 million.

13  Sixty Sixty, the deal on the table today, that's ---

14              ECRO:  Uh-uh, no, I don't see it there.

15              MR. LIEBERMAN:  I would have just printed

16  it.

17              ECRO:  I can sit next to him just so

18  (inaudible).

19              MR. LIEBERMAN:  It was working yesterday.

20              ECRO:  I know.

21              MR. LIEBERMAN:  I didn't think we were going

22  to have this problem.

23              THE MARSHAL:  In the past they had to bring

24  their own computer to play because it won't play on

25  that --

Page 144

1                    THE LAW CLERK:  On the other one?

2                    THE MARSHAL:  -- is what they did.

3                    MR. LIEBERMAN:  You know what, can we do it

4      on the projector?

5                    THE MARSHAL:  No, this is just a

6      (inaudible).

7                    MR. LIEBERMAN:  I know, I know, but I'll

8      project the screen.

9                    THE COURT:  Yeah.

10                   THE LAW CLERK:  Yeah, that's a good idea.

11                   THE COURT:  Well, we can print those few

12     pages, too.

13                   MR. LIEBERMAN:  I think we're working on a

14     solution here, Judge, Your Honor.

15                   THE COURT:  Page 95 to what?

16                   MR. LIEBERMAN:  95 to 99, Your Honor.

17                   THE COURT:  All right.

18                   THE LAW CLERK:  There, thank you.

19                   THE MARSHAL:  Close that up there.

20                   MR. LIEBERMAN:  There we go, problem solved.

21     BY MR. LIEBERMAN:

22          Q.    Mr. Schecher, can I direct your attention to

23     Page 95 of the second amended disclosure statement that

24     should appear on your screen now?

25                   MR. GRUHER:  Your Honor, can I approach the

Page 145

1   witness and see what's on his screen?

2                    THE COURT:  It's --

3                    MR. LIEBERMAN:  It's on everybody's screen.

4                    THE COURT:  -- it's the same as on the ---

5                    UNIDENTIFIED SPEAKER:  It's the same.

6                    MR. GRUHER:  And that's an exhibit -- for

7   the record, that's an exhibit to the disclosure statement?

8                    THE COURT:  Yeah.

9                    MR. LIEBERMAN:  Yeah.  There was ---

10                   MR. GRUHER:  Thank you, Your Honor.

11  BY MR. LIEBERMAN:

12          Q.   And, Mr. Schecher, what I'm going to do is

13  I'm going to scroll through the four pages.

14                   THE COURT:  Will you go grab it --

15                   THE LAW CLERK:  Of course.

16                   THE COURT:  -- it's on Marcy's desk.

17  Thanks.

18  BY MR. LIEBERMAN:

19          Q.   This is Page 1 of the exhibit.  This is

20  Page 2 of the exhibit.

21          A.   Can you go slower, so I can -- if you're

22  going to ask me questions.

23          Q.   I'm going to -- I'm going to go back there,

24  I just want to show you the whole thing first.

25                   This is Page 3 of the exhibit, Page 4 of the

1   exhibit, and Page 5 of the exhibit.

2                    Now, I'm going to go back to Page 1 of the

3   exhibit.

4                    THE COURT:  Mr. Lieberman, do you want to

5   take a minute and let them try to fix it or do you want to

6   just keep going the way you are?

7                    MR. LIEBERMAN:  Un -- unfortunately,

8   Your Honor, we're -- we're very short on time, and I need

9   to make a very few points.  I'd like to just move this

10  forward.

11                   THE COURT:  Okay.  All right.  Alex, don't

12  worry about it for now.  It's just ---

13                   MR. LIEBERMAN:  I think we figured out a

14  reasonable work around at least --

15                   THE COURT:  We'll just use the overhead.

16                   MR. LIEBERMAN:  -- for the time being.

17                   THE COURT:  I'm printing out those pages,

18  too, if we need to.

19                   MR. LIEBERMAN:  Thank you, Your Honor.

20                   THE COURT:  Okay.  Go ahead.

21  BY MR. LIEBERMAN:

22        Q.    Mr. Schecher, looking back at Page 1 of the

23  exhibit, on Page 95 of the first amended disclosure

24  statement, does that appear to be a video that you posted?

25        A.    Yes, it shows me right there in the corner.

1          Q.    That's your picture underneath the image of

2    the video?

3          A.    Yes, it is.

4          Q.    And is that your name, Richard J. Schecher,

5    Sr.?

6          A.    Yes, sir.

7          Q.    And is the title of the video Sixty Sixty,

8    the deal on the table today?

9          A.    It is.

10         Q.    And does the image appear to be from the one

11   second mark of the video?

12         A.    Yeah, if that's the one second mark, it

13   appears that way.

14         Q.    And ---

15               THE COURT:  I don't know what that means,

16   what do you mean second mark?

17               MR. LIEBERMAN:  It's -- it's a video.  This

18   particular video is nine minutes and 38 seconds long.

19               THE COURT:  All right.

20               MR. LIEBERMAN:  This screen shot is from the

21   one second mark of the video.

22               THE COURT:  Oh, from the first -- from

23   the -- okay.  All right.

24               MR. LIEBERMAN:  Yes, Your Honor.

25   BY MR. LIEBERMAN:

1          Q.    And the second page, you'll agree that
2    that's from the one minute mark of the video?
3          A.    Yes.
4          Q.    The third page is from the nine minute and
5    25 second mark?
6          A.    Yes.
7          Q.    The fourth page from the three minute and
8    26th second mark?
9          A.    Yes.
10         Q.    And the last page is the five minute mark?
11         A.    Yes.
12         Q.    And this is a video that you posted?
13         A.    Pardon me?
14         Q.    This is a video that you posted?
15         A.    Yes.
16               MR. LIEBERMAN:  Your Honor, I'd like to
17   submit this into evidence.
18               MR. DAVIS:  Objection, Your Honor.  The best
19   evidence -- the best evidence would be the actual video,
20   and this -- this leaves out any -- any audio content or
21   any intervening screens that -- that may be there.
22   BY MR. LIEBERMAN:
23         Q.    Mr. Schecher, did you take ---
24               THE COURT:  Overruled.  I'll -- I'll admit
25   it.  Go ahead.

1              (Thereupon, Exhibit B was admitted into

2    evidence.)

3    BY MR. LIEBERMAN:

4         Q.   Mr. Schecher, did you take this video down

5    from YouTube?

6         A.   I don't know if I did or not.

7         Q.   Would it surprise you to learn this video is

8    not available on YouTube?

9         A.   No, it wouldn't.

10        Q.   And it states that this video was published

11   on May 15, 2017; is that correct?

12        A.   It was -- I'm sorry, say that again.

13             THE COURT:  Did you post it on May 15, 2017?

14             THE WITNESS:  I posted it on whatever date

15   is listed on the YouTube website.

16   BY MR. LIEBERMAN:

17        Q.   Right, and that date is May 15, 2017?

18        A.   If that's the date on the website that shows

19   the day it was posted, that is the correct date.

20             THE COURT:  The time is short, get -- get to

21   the meat of it, Mr. Lieberman.

22   BY MR. LIEBERMAN:

23        Q.   The video detailed your offer to a potential

24   buyer to either buy you out of the hotel unit or to become

25   a joint venture partner; is that correct?

1        A.    Yes.

2        Q.    And as part of the deal, you offered to sell

3   your hotel unit for $6 million?

4        A.    I don't know, I'd have to see the video.  I

5   don't remember.

6        Q.    I'm going to ask you to turn to Page 96,

7   which is the second page of the exhibit.

8              Can you read this part, this top line?

9        A.    That is a price point, and it says hotel

10  unit, building and property, six million.

11       Q.    And below that, does it say 86 individual

12  units for $10,750,000?

13       A.    That's what it says.

14       Q.    You don't own those units; correct?

15       A.    That's correct.

16       Q.    Can you please read the line starting with

17  lien removal?

18       A.    Lien removal APO/FBS, 2,800,000.

19       Q.    Turn the page.  Again, please read the text

20  that starts in the yellowish color.

21       A.    Sorry, in yellow?  I'm -- I don't see

22  anything in yellow.

23       Q.    It's next to the pointer, it starts with HU.

24       A.    Okay.  Read that?

25       Q.    Yes, please.

Page 151

1          A.     HU has majority of RUOs in foreclosure; RUOs

2     receivable in excess of six million; 75 percent of process

3     is complete; control destiny and costs.

4          Q.     And this is what you describe as being some

5     of the deal benefits?

6          A.     That's what it says.

7          Q.     I turned the page for you, and again I'm

8     going to ask you to read the green text that starts with

9     Option Number 1.

10         A.     Option 1, take out the HU owner, pay

11    7,800,000.

12         Q.     I want you to read it all, please.

13         A.     HU/APO, HU foreclosure and debtor; buyer

14    becomes HU owner; buyer closes on RUOs; buyer earns

15    24 percent on the 1,800,000; buyer drives down RUO prices.

16         Q.     And please explain how the buyer would earn

17    24 percent on the $1.8 million under this option.

18         A.     I -- at this moment I cannot.

19         Q.     And in this video -- and in this video under

20    Option 1, you also suggested that the buyer would have the

21    ability to drive down the RUO price; is that correct?

22         A.     I'm not suggesting anything.  The video is

23    listing what it says here, deal options.  These are

24    options that were placed on a table on a deal that,

25    according to you, was removed from the internet because

1   obviously it's a deal that never took place or we chose

2   not to move forward with any consideration for such a

3   deal.

4           Q.    This deal did contemplate the buyer driving

5   down the RUO prices; correct?

6           A.    I -- that's an option.  A deal -- it's not a

7   deal.  A deal is something -- these are options on the

8   table, literally.

9           Q.    Please read Option Number 2, please.

10          A.    Option 2, HU owner -- HU -- JV ---

11                THE COURT:  Does that mean joint venture?

12                THE WITNESS:  Yes.  JV with HU owner pay

13  one million as option money; fund purchase of all UOs and

14  association units; fund legal costs to defeat association

15  and capture control; earn 18 percent on all advance

16  funding; obtain percentage to close out association;

17  collapse condo association; buyout HU at set price.

18  BY MR. LIEBERMAN:

19          Q.    On December 1, 2017 you published a YouTube

20  video titled hotel owner speaks out about the Sixty Sixty

21  future; correct?

22          A.    I don't know.  If you have it, I'm sure that

23  I published it.

24                THE COURT:  December 1, 2000 and ---

25                MR. LIEBERMAN:  '17, Your Honor.

Page 153

1              THE COURT:  Five days ago?

2              MR. LIEBERMAN:  Yes, Your Honor.

3              THE COURT:  So I didn't really follow all

4     these deal options and so forth, but is it fair to say

5     that with these other terms that are described, you were

6     still looking at a deal back in May that would have

7     included the sale of the hotel unit?

8              THE WITNESS:  And that's consistent with my

9     previous testimony.

10              THE COURT:  Yeah, right.

11              THE WITNESS:  Yes.

12              MR. LIEBERMAN:  Your Honor, it appears that

13     the District Court's internet access does not provide full

14     access to YouTube.

15              THE COURT:  Beyond my pay grade to know

16     that.

17              MR. DAVIS:  Your Honor, I object on

18     relevance, anyway, what the point is of any of the YouTube

19     videos?

20              THE COURT:  It might impeach what he said if

21     we knew what it said.

22              Do you remember what you posted five days

23     ago?

24              THE WITNESS:  I do.

25              THE COURT:  As best you -- we're trying

Page 154

1    to ---

2    BY MR. LIEBERMAN:

3         Q.    So you would agree that a big part of the

4    problem with the Sixty Sixty building are the current unit

5    owners; correct?

6         A.    Yes.

7         Q.    And you're aware that you filed an objection

8    to the sale motion; correct?

9         A.    Yes.

10        Q.    And do you -- you're aware that your

11   objection includes an exhibit that purports to demonstrate

12   your calculations of the shared costs due?

13        A.    You're talking too fast.

14        Q.    I apologize.

15             Are you aware that the objection that you

16   launched -- lodged includes an exhibit that includes your

17   calculations of what you believe the unit owners owe you?

18        A.    Yes.

19        Q.    And are you aware that that exhibit reflects

20   that substantially all of the unit owners owe you more

21   than a hundred thousand dollars?

22        A.    All of the unit owners or all of the unit

23   owners in foreclosure?

24        Q.    Your exhibit -- I'll bring up the exhibit

25   for you.

Page 155

1           Do you understand that this is Docket Entry

2    457, which is your objection to the motion to approve

3    sale?

4           A.    Well, I understand if you put it down, I can

5    say yes, but I'm not -- I have no reason to believe it's

6    not.

7           Q.    Okay, and if you were to look at this

8    exhibit, it shows every unit and what their purported

9    outstanding balance is; is that accurate?

10          A.    If you go down -- let me see.  It appears to

11   be, yes.

12          Q.    And if you look at the total outstanding

13   amounts, it appears that substantially all of the unit

14   owners owe more than a hundred thousand dollars; is that

15   accurate?

16          A.    Is that accurate?  I don't think so.  This

17   guy doesn't owe more than a hundred thousand, this guy

18   doesn't.

19               THE COURT:  Most, I guess.

20               THE WITNESS:  This guy doesn't, this guy

21   doesn't.  So, no, that's not an accurate statement.

22   BY MR. LIEBERMAN:

23          Q.    Well ---

24               THE COURT:  This -- this -- this is a ledger

25   that you provided to your attorneys to show what you

1    believed as of the date of this document, I don't see the

2    date on it now, was the total amount owed.

3                    THE WITNESS:  Yes, sir.  Yes, Your Honor.

4                    THE COURT:  Okay.

5    BY MR. LIEBERMAN:

6            Q.    In fact, there were only three units on this

7    spreadsheet that are below $35,000; is that accurate?

8            A.    I don't know.  I -- I never bothered to

9    break it out by any dollar amount.  That's the -- the list

10   of the unit owners and that's the list of what they owe.

11                   If you want to go who owes more than this or

12   less than this, feel free.  I -- I don't know.

13           Q.    Mr. Schecher, I'm just asking you to look at

14   the exhibit that you ---

15                   THE COURT:  Why are we wasting time?  It

16   says what it says.  It's in ---

17                   MR. LIEBERMAN:  Your Honor, my -- my point

18   is that there was a discussion during Mr. Schecher's

19   direct testimony that he is not taking a particular course

20   of action because of the good unit owners, and what I

21   think that their documents reflect is that there aren't

22   good unit owners, and that we need to get a new unit owner

23   in the building.

24                   THE COURT:  Okay.  Well, the document says

25   what it says, and however many are under a hundred, are

```
 1    under a hundred.  I kind of agree with Mr. Schecher's
 2    answer, to take time to pick out which ones, unless you're
 3    particularly interested in any one line item.
 4                    MR. LIEBERMAN:  No, I think it would be very
 5    quickly to pick out which ones, but it's irrelevant.
 6                    I mean, the relevance is that the unit
 7    owners are delinquent over a hundred thousand dollars and
 8    that there aren't this mass of good unit owners that are
 9    being protected under Mr. Schecher's plan.  An ideal plan
10    would replace those unit owners with a better unit owner.
11                    THE COURT:  Okay.  Anyway, further
12    questions?  Are you going to try to play the video through
13    the cell phone or ---
14                    MR. LIEBERMAN:  Yeah.
15    BY MR. LIEBERMAN:
16         Q.    Your video includes a financial -- a
17    proposal to turn around the financial condition of the
18    Sixty Sixty building; correct?
19                    THE COURT:  We're talking now about what you
20    posted five days ago.
21                    THE WITNESS:  Five days ago.  I remember it
22    being a -- a video posting to the owners who are in
23    foreclosure or facing foreclosure, trying to educate them
24    on certain things.  I'm not aware of any deal or ---
25                    THE COURT:  All right.  Well, let's see if
```

Page 158

1   we can play it.

2              THE WITNESS:  Let's watch the video.  I

3   mean, it is what it is.

4   BY MR. LIEBERMAN:

5       Q.    Well, Your Honor, I think that -- and you've

6   testified to this in direct, that you could develop a plan

7   where unit owners could achieve $600,000 per unit owner in

8   the first year; is that accurate?

9       A.    Yeah, yeah, you're right, that might be in

10  that video.  I don't remember what's ---

11      Q.    Well, there's ---

12      A.    Huh?

13      Q.    There's considerable value in these units;

14  is that accurate?

15      A.    No, that's not accurate, no.

16      Q.    But you testified that under your plan, you

17  could create a process where these units could achieve

18  $600,000 in the first year; is that accurate?

19      A.    Yes, if I did something, but as it sits

20  today there is no value in them.

21              THE COURT:  So your -- your answer is --

22  you're distinguishing between existing value and potential

23  value, is that ---

24              THE WITNESS:  Well, I'm trying to answer.

25  He said is there value in them today?  The answer is no.

Page 159

1                    THE COURT:  Okay.

2                    THE WITNESS:  Can there be value is the

3      right -- yes, of course there can.  It requires something

4      happening.

5                    THE COURT:  So KFI wouldn't have to buy the

6      hotel unit to take advantage of this vacation club

7      opportunity and make ---

8                    THE WITNESS:  I would welcome them as --

9      absolutely.

10                   THE COURT:  All right.  So if they would

11     close without buying the hotel unit and pay you a

12     determined price or negotiated amount for the shared

13     costs --

14                   THE WITNESS:  Like I said --

15                   THE COURT:  -- bring them in?

16                   THE WITNESS:  -- I'm a negotiator, I'll --

17     I'll negotiate right now, I'll knock ten percent off the

18     12.5 million, let them pay that.

19     BY MR. LIEBERMAN:

20          Q.    Schecher Group is not obligated to pay

21     Florida Building Supply, is it?

22          A.    I can't -- you have to look at me.  I

23     have ---

24                   THE COURT:  Is Schecher -- is the Schecher

25     Group obligated to pay Florida Building & Supply?

1          THE WITNESS:  No, they're not legally

2   obligated, no.

3   BY MR. LIEBERMAN:

4          Q.    So you would agree that the Schecher

5   Group -- the costs to pay Florida Building & Supply were

6   not incurred by the Schecher Group, would you agree with

7   that?

8          A.    Legally -- legally --

9          Q.    Contractually.

10         A.    -- if I didn't want to pay them, no, I could

11  probably raise a legal argument that I -- I don't have to

12  pay them, but on the same token in the real world, all the

13  work was performed on my property.  So even if they

14  somehow escape the association, they're going to sue me,

15  and the way the courts ruled, the work was done on my

16  property, so I'm going to pay them sooner or later.

17              I'd rather pay them now and make it go away

18  because they -- they did an outstanding job, they lived up

19  to everything they promised and they -- they're owed the

20  money.

21         Q.    But you'd agree that that cost was incurred

22  by the association and not the Schecher Group; correct?

23         A.    Yes, I absolutely agree to that.

24         Q.    And notwithstanding that they -- the cost

25  was incurred by the association and not the Schecher

1    Group, the Schecher Group has been charging a special

2    assessment to collect those costs; is that accurate?

3              A.    The Schecher Group, in cooperation with the

4    association, collected the funds and placed them in a

5    separate account for the FBS.  So they collected it on

6    behalf of the association at the instruction of the

7    association back when the deal was made.

8              Q.    But you would agree that it is not a cost

9    that is incurred by Schecher and should not have included

10   in the budget of Schecher; is that accurate?

11             A.    I don't necessarily would agree.

12             Q.    You would agree that the costs of Florida

13   Building Supply were, in fact, included in the budget of

14   Schecher Group; is that accurate?

15             A.    I'd have to see the budget you're

16   referencing to, and if it's in there, I'll agree to that,

17   yes.

18                   THE COURT:  Well, we looked at ledgers, and

19   I think it was the two hundred and --

20                   MR. LIEBERMAN:  $48.04.

21                   THE COURT:  -- 248 a month.

22                   THE WITNESS:  Well, again, Your Honor, I

23   testified the ledger is not the budget.

24                   The only correlation between the two, the

25   ledger is the statement provided to the owner.  The $241

1    reflected in the ledger was a credit to that owner for

2    his -- he had a separate coupon, if you remember I said,

3    and a separate check he made payable to a lockbox at a

4    bank.

5              We did the accounting for the association,

6    we being Condominium Hotel Management Corp.  In 2013 they

7    were hired to not only manage the building, but they

8    provided the accounting services to the association.

9              So, yes, those payments were made to

10   Condominium Hotel Management Corp., and deposited into, I

11   believe, the BB&T Bank in a separate bank account when the

12   only thing that went into that bank account were the funds

13   for the FBS eight-year loan payment, and the reference of

14   that number was one of the payments of the eight-year loan

15   payment.

16             THE COURT:  So it was on the ledger, but

17   you're not sure if it was part of the budget, is that ---

18             THE WITNESS:  I -- I --

19             THE COURT:  Or you think it wasn't ---

20             THE WITNESS:  -- I just looked at the

21   budgets earlier, and I don't -- I don't remember -- and I

22   made the budgets, and as I sit here, I don't remember ever

23   seeing a line item that said FBS on it.

24             THE COURT:  So not ---

25             THE WITNESS:  We can easily go back and

1  look, but I don't think you're going to find one on the

2  budget for that, and if I'm wrong, I'm wrong.

3  BY MR. LIEBERMAN:

4        Q.   Well, isn't it true that you passed a

5  special assessment for Florida Building & Supply?

6        A.   Did I pass the special assessment for --

7  yes.

8        Q.   The Schecher Group.

9        A.   At the instruction of the association.

10       Q.   Wouldn't -- I mean, isn't it the -- the

11  association's obligation that it incurred, and the

12  association's obligation to issue its own assessments, and

13  the association's obligation to collect these monies?

14       A.   And it's their -- their obligation to pay

15  their fees, too.  It doesn't mean it happens.

16       Q.   Is that yes?

17       A.   Is that a yes?

18       Q.   Yes, this was the association's cost that it

19  incurred and the association's obligation; correct?

20       A.   I'll agree with you on that.

21       Q.   And it was not the Schecher Group's costs,

22  and it was not a cost incurred, and it should not have

23  been collected by the Schecher Group; is that accurate?

24       A.   No, it's not accurate.

25       Q.   Okay.

Page 164

```
 1          A.    The first part of it is, the last part

 2   isn't.

 3          Q.    You do agree that the Schecher Group did

 4   charge unit owners for Florida Building & Supply; is that

 5   accurate?

 6          A.    No, it's not accurate.  The Schecher Group

 7   sent out the billing for the Florida Building & Supply on

 8   behalf of the association, and the Schecher -- it wasn't

 9   even the Schecher Group if you want to get accurate, it

10   was Condominium Hotel Management Corp.

11                They set it up, they gave a separate bank

12   account for association, nothing to do with the

13   Schecher Group, and all funds paid went into that separate

14   bank account.

15          Q.    And who is the owner of that separate bank

16   account?

17          A.    I don't know the answer to that question.

18                THE COURT:  I'm -- I'm -- I'm confused or

19   maybe I'm understanding, and -- and then there's an issue

20   here.

21                So there's amounts owed on the ledger that

22   were amounts that if paid were -- were going to go towards

23   the F -- the Florida Building & Supply debt?

24                THE WITNESS:  It's confusing, Your Honor,

25   and to answer your question more specifically, maybe even
```

1    better, if you look at the ledger, the one that we were

2    looking at at 505, there weren't charges on there, there

3    were only recorded payments.

4            There was a -- a special assessment passed,

5    and I believe there's correspondence, I can't remember

6    back to 2013, but I believe it was passed by the

7    association and collected for the association on behalf of

8    Condominium Hotel Management Corp.

9            On the unit ledgers, you're going to find

10   that series of the monthly payments reflecting the owners

11   who paid.  At some point in time, when FBS walked off the

12   job for nonpayment and filed their liens and everything,

13   the balance that was due, I believe the original

14   contracted amount was 1.9 million, the amount due FBS was

15   around a million.

16           So the difference between that 241 in this

17   example, and what is owed, was at that time put on the

18   ledger by Schecher Group as a special assessment because

19   we no longer had the luxury of accepting monthly payments.

20   The vendor, FBS, demanded payment in full.

21           So we accelerated the eight years, adjusted

22   it to the amount due, and there was a special assessment,

23   and, yes, at that point, that's the only special

24   assessment that I'm aware of the Schecher Group, but in

25   reality it was Condominium Hotel Management placed on the

1    unit owner's ledgers.

2    BY MR. LIEBERMAN:

3         Q.    So you would agree that within the

4    $12 million number that you have as being outstanding

5    pursuant to your budgets, approximately $1.8 million of

6    that represents Florida Building & Supply expenses?

7         A.    No, I would not.

8         Q.    Some portion of the $12 million represents

9    an expense that's payable to Florida Building Supply; is

10   that accurate?

11        A.    Yes, I would.

12        Q.    Okay.  You -- you're also aware that Florida

13   Building Supply filed a claim in the debtor's bankruptcy

14   case?

15        A.    I am.

16        Q.    And are you aware that Florida Building

17   Supply claims that the association is a hundred percent

18   obligated for its debt?

19        A.    I wouldn't expect anything different.

20        Q.    Would you agree that if your budget includes

21   all of Florida Building & Supply's debt, and Florida

22   Building & Supply is asserting its own claim, that that

23   would be double billing the association for the same

24   expense?

25        A.    I -- I don't think I would agree to that

1    because I've been paying Florida Building Supply all

2    along.  Every time a unit is foreclosed upon and the new

3    buyer pays, there is a dollar amount that's collected and

4    gets paid to Florida Building Supply.

5              So I don't know what their debt is, I don't

6    keep up track of that, but for simple -- simplicity, if

7    they're owed a million bucks, and if I collected -- if I

8    was deeded back, foreclosed upon or purchased six units,

9    the -- the accelerated balance being 14,000 on each one of

10   the six, Florida Building Supply collected from the sale,

11   the transaction, that proportionate share, 14,000, 15, or

12   whatever it was.

13             So, yes, I will acknowledge that Florida

14   Building Supply is being paid for -- for their debt.  We

15   are paying down their debt.  It isn't the amount it was

16   when they first filed.

17             THE COURT:  Don't they have a junior lien?

18   When you're foreclosing, isn't your -- is their lien

19   senior to your lien?

20             THE WITNESS:  Your Honor, I -- I'm not a --

21             THE COURT:  It may be a legal issue.

22             THE WITNESS:  -- a lawyer, I don't know all

23   of this.  I know that I had a -- I called the owner of

24   Florida Building Supply into my office.  He was one of the

25   guys I said I got nose to nose and eyeball to eyeball

1   with, and I told him, listen, I know you're owed the

2   money, I know you did all the work, I know that if you're

3   not paid you're just going to sue me anyway.

4              So I'm telling you as I sit here, as I

5   foreclose, I'm going to pay you out of each foreclosure

6   what you're due.

7              THE COURT:  Okay.

8              THE WITNESS:  If I foreclose on everybody,

9   you're going to be paid in full, and I've lived up to that

10  word.

11             THE COURT:  Okay.  All right.  So it may not

12  involve lien priorities, it was just a practical decision,

13  perhaps, but, Mr. Lieberman, I don't know what your timing

14  is, if you're --

15             MR. LIEBERMAN:  Two more questions.

16             THE COURT:  -- trying to get to a hearing at

17  1:30?

18             MR. LIEBERMAN:  Just one more question,

19  really.

20             THE COURT:  No, no, I was going to say, if

21  you -- if you want --

22             MR. LIEBERMAN:  Your Honor, I want to close.

23             THE COURT:  -- if you want me to close -- if

24  want me to call whatever judge you're -- you're appearing

25  in front of and let them -- let them know you're running

1   late.

2           I don't mean to keep you, but I mean if you

3   have a problem, I guess -- well, what do you want to do?

4           MR. LIEBERMAN:  I would like to ask two more

5   questions and we'll see where we are.

6           THE COURT:  Okay.

7           MR. LIEBERMAN:  I expect that I may have to

8   run quickly after that.

9           THE COURT:  All right.  Go ahead.

10  BY MR. LIEBERMAN:

11      Q.   Mr. Schecher, Schecher Group has no

12  employees of its own; correct?

13      A.   Correct.

14      Q.   And the hotel that's run by Casablanca pays

15  all of its own expenses; correct?

16      A.   Correct.

17      Q.   And including those expenses for the

18  operations of the front desk; is that accurate?

19      A.   No.

20      Q.   So Casablanca does not pay for the

21  operations of its own front desk; is that accurate?

22      A.   Well, I wouldn't -- it's not its own front

23  desk.  That's the front desk of the building.  That front

24  desk has to be there 24/7.  It has to check in not only

25  hotel guests, checks in owners, checks in owner guests,

1   and checks in invitees.  So that front desk belongs to and

2   is a shared component as defined in the condo documents.

3            Q.    So the front desk checks in hotel occupants;

4   is that accurate?

5            A.    Yes, they do.

6            Q.    And the front desk checks in unit owners; is

7   that accurate?

8            A.    Yes, they do.

9            Q.    But a hundred percent of that cost is borne

10  by the unit owners; is that accurate?

11           A.    That's accurate.

12           Q.    Even the ones that aren't in the hotel

13  program; is that accurate?

14           A.    It's a -- it's a building cost.

15           Q.    That's not my question, I just want you to

16  focus.

17           A.    You're accurate.  It's -- it's a shared

18  component cost to have a front desk operational 24/7.

19  It's also an extreme life safety issue and there's

20  probably an ordinance that requires in the event of an

21  emergency, for evacuation, you have -- and I know this to

22  be the case, you need to have a list of everybody that's

23  in the building whether a hotel --

24           Q.    Mr. Schecher --

25           A.    -- owner or otherwise.

1          Q.     -- I don't dispute that it's appropriate to
2     have a 24-hour desk at a hotel, I just was trying to find
3     out who pays for it.
4          A.     Well, you're right, it's paid as part of the
5     shared component.
6          Q.     And unit owners pay this part even if
7     they're not on the hotel program; is that accurate?
8          A.     The unit owners pay all shared component
9     costs --
10         Q.     Yes?
11         A.     -- regardless of what it is.
12         Q.     So yes?
13         A.     Yes, of course.
14         Q.     Your earlier testimony was that your budget
15    does not include a shortfall from a prior year; is that
16    accurate?
17         A.     I said I didn't see any in the budget.
18         Q.     Well, you would agree that a budget should
19    not include a shortfall for the prior year because that
20    would constitute double billing; is that correct?
21         A.     Yes.
22         Q.     I'm going to turn your attention to
23    Defendant's Exhibit or the Schecher Group's Exhibit 36.
24                Can you read the line item next to the star,
25    please?

Page 172

1            A.    Estimated delinquent owner deficit, the

2    prior was three million one hundred and ninety.

3            Q.    And next to that?

4            A.    There's a 20 percent factor, and there's a

5    number that is 6,393,213, and this number represents my

6    estimate of what's going to be delinquent for this year

7    that I need to budget for.

8                  It's no relationship to double billing or

9    double adding in.  I'm just saying that I'm estimating ---

10           Q.    I'm sorry, can you just read the box next to

11   it, please?

12           A.    I can't really see it, it's not clear.

13                 THE COURT:  The one that says from owners

14   foreclosed?

15                 MR. LIEBERMAN:  Yes.

16                 THE COURT:  It says from owners foreclosed

17   upon or who re --

18                 THE WITNESS:  I can read it from here.

19                 THE COURT:  -- refuse ---

20                 THE WITNESS:  From owners foreclosed upon

21   who refuse to pay estimated debt, 20 percent of the prior

22   budget amount.  That pretty much confirms what I just

23   said.

24   BY MR. LIEBERMAN:

25           Q.    Right.  So this budget actually includes

1    20 percent of the delinquent owner deficit from 2017; is

2    that accurate?

3            A.    No, that's not, read what it says.

4    Estimate -- it says right here, estimate deficit,

5    20 percent of the prior year.  It isn't -- I'm estimating

6    that I'm only going to be delinquent if we get replaced

7    owners -- every budget in Florida with a condominium has a

8    line item for a deficit, and that's all this is, it's a

9    line item for a deficit.

10           You can't -- you can't tie it into double

11   billing or anything else.  It's a new line item, a new

12   number for this year, estimated to be what's there.

13           Q.    Based on what you didn't collect last year;

14   is that accurate?

15           A.    Yes, and based upon what I think -- two

16   factors, based upon what was delinquent last year, it

17   gives me a picture into the past, and then a window into

18   the future of what do I think is going to change to make

19   it even more or less, and I think things are going to

20   change, and I estimated it to be less.

21               THE COURT:  So ---

22               THE WITNESS:  I estimated it to be in this

23   particular case, 20 percent.  I believe I'm going to

24   collect 80 percent more than I was able to collect the

25   prior year.

1           THE COURT:  So does that mean that if -- if
2   you believed you were going to collect a hundred percent,
3   the budget would be 3.1 instead of 3.7?
4           THE WITNESS:  Yes, Your Honor, it would be
5   subtracted out of the budget, but in the reality of life
6   and the history of this property, I've over -- I'm
7   overenthusiastic with this number, you might say.
8           THE COURT:  So you're -- you're budgeting an
9   amount that based on the 20 percent default would yield
10  the amount of your other -- of actual projected costs?
11          THE WITNESS:  I'm guessing -- yes.  I'm
12  guessing that this is going to be what it is.  If
13  everybody pays, there's a refund at the end, that's where
14  an actual would actually come into play to adjust the
15  following year's budget.
16          THE COURT:  Now, is this -- is this line
17  item that we're looking at for 2018, is that also a line
18  item in the prior years, do you know?
19          THE WITNESS:  I believe it was, Your Honor.
20  It may have been.
21          MR. LIEBERMAN:  It was not, it was added
22  this year.
23          THE WITNESS:  Okay.  Then it wasn't.
24          THE COURT:  Okay.
25          MR. LIEBERMAN:  That's all I have,

Page 175

1   Your Honor.

2                   THE COURT:  Okay.

3                   MR. DAVIS:  I have just a couple questions

4   on redirect, if I may, Your Honor?

5                   THE COURT:  Very quickly.

6                   MR. DAVIS:  Very quickly.

7                        REDIRECT EXAMINATION

8   BY MR. DAVIS:

9        Q.    Mr. Schecher, you were asked about the

10  special assessment.  Was the special assessment approved

11  and -- by the association and put into a settlement

12  agreement?

13       A.    Yes, it was.

14       Q.    All right, and the estimated deficit that we

15  just talked about, and I believe that's in evidence, that

16  was already talked about.

17             The estimated deficit from foreclosed

18  owners, is it your belief that when a unit is foreclosed

19  upon, the amount that that owner owed is now

20  uncollectible?

21       A.    Yes.

22       Q.    I'm sorry?

23       A.    Yes.

24             MR. DAVIS:  All right, and, in fact,

25  Your Honor, that is what happens.  We'd like to move the

1    mediation settlement agreement, it's Tab Number 34, it's

2    in our book, into evidence and that discusses the special

3    assessments that the association approved.

4                        THE COURT:  This was -- included Florida

5    Building?

6                        MR. LIEBERMAN:  That included the -- yes,

7    $975,000 special assessment, is that Florida Building's

8    claim?

9                        THE WITNESS:  There's nothing in my Tab 34.

10                       MR. DAVIS:  Let me show the witness.  May I

11   approach the witness?

12                       THE COURT:  Yes.

13                       THE WITNESS:  I'm sorry, the question again?

14   BY MR. DAVIS:

15        Q.    What were those -- do you recall what those

16   two special assessments were for?

17        A.    Yes.

18        Q.    And what were they -- they for?

19        A.    The one -- the original one for 375, there

20   was a spreadsheet attached to that that gave the

21   specific -- specific line items for each one, and it had

22   to do with financial shortages.  They're basically both

23   financial shortages, and the 971,860, again, I can't

24   remember exactly, but each one had a specific spreadsheet

25   attached to an account for every one of these, and the

1   Court ruled, yes, they were valid and the agreement was

2   the association was going to help collect this amount of

3   money.

4                    THE COURT:  But was this Florida Building &

5   Supply or no?

6                    THE WITNESS:  I -- no, this is not the

7   million from Florida Building Supply, but, again, I'm --

8                    THE COURT:  Then ---

9                    THE WITNESS:  -- guessing, but I believe

10  delinquent payments to Florida Building Supply is in -- in

11  the assessments there.

12                    THE COURT:  So I'm not admitting this

13  because it's beyond the scope of the cross.

14                    MR. DAVIS:  Okay.  Thank you, Your Honor.

15                    THE COURT:  All right.  So, Mr. Lieberman,

16  we'll let you get out of here.  I renew my offer.  You

17  can -- do you want me to call the Judge in case you're

18  running late, and let them know we kept you or do you

19  think you'll make it or ---

20                    MR. LIEBERMAN:  I'm -- I suspect I'll be

21  late.  I was going to have my office call and advise.  It

22  is in front of Judge Olson.

23                    THE COURT:  All right.  Well, you can -- you

24  can give them -- it's -- it's -- it's -- it's Olson?

25                    MR. LIEBERMAN:  Yes, Your Honor.

1    THE COURT:  Oh, well, we'll call him.  We'll

2 tell them if -- if you're -- if you're late, that he can

3 hold me in contempt and send me to jail instead of you --

4    MR. LIEBERMAN:  Better than me, Your Honor.

5    THE COURT:  -- or try anyway.

6    So -- we're not finished at least for

7 argument.  Is there -- are the lawyers available Friday

8 morning or no?  I know this is never ending it seems, but

9 we're getting -- we're getting close?

10    Is there -- is there -- are there other

11 witnesses you were going to call, Mr. Davis or Mr. Gruher,

12 or you're done with witnesses, just argument left?

13    MR. DAVIS:  We're finished.

14    MR. LIEBERMAN:  Your Honor, Friday morning

15 works -- works for me.

16    THE COURT:  Okay.

17    MR. DAVIS:  Friday is fine with me.

18    THE WITNESS:  Are we done?

19    THE COURT:  Okay.  Yeah, you're -- you're

20 done, Mr. Schecher, you don't -- you don't need to be

21 back, but you're welcome to be back.

22    So let's -- let's go ---

23    MR. GRUHER:  Your Honor, if you don't mind,

24 I'm just going to -- I had to put my phone back on.  I'm

25 going to check the 8th.

1                    THE COURT:  Okay.  Well, let's tentatively

2    figure on ten o'clock Friday morning, if we -- if we can.

3    We can go -- that's our court lunch, right, but it doesn't

4    start until 2:00, I think.

5                    THE LAW CLERK:  Correct.

6                    THE COURT:  Yeah, so let's start at 10:00,

7    keep -- keep the sun out of my eyes.

8                    THE MARSHAL:  All rise.

9                    MR. GRUHER:  Ten o'clock, Your Honor, on

10   Friday.

11                   THE COURT:  Yep, see you again.

12                   MR. GRUHER:  All right.  Thank you, Judge.

13                   (Thereupon, the hearing was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 180

```
 1
 2
 3                          CERTIFICATION
 4
 5   STATE OF FLORIDA        :
 6   COUNTY OF MIAMI-DADE    :
 7
 8              I, Margaret Franzen, Court Reporter and
 9   Notary Public in and for the State of Florida at Large, do
10   hereby certify that the foregoing proceedings were
11   transcribed by me from a digital recording held on the
12   date and from the place as stated in the caption hereto on
13   Page 1 to the best of my ability.
14              WITNESS my hand this 29th day of December
15   2017.
16
17
18              _____
19                      MARGARET FRANZEN
20              Court Reporter and Notary Public
            in and for the State of Florida at Large
21                   Commission #FF100898
                      April 14, 2018
22
23
24
25
```

# EXHIBIT "C"

1       IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
               IN AND FOR MIAMI-DADE COUNTY, FLORIDA

2

3

    SCHECHER GROUP, INC.,

4
                    Plaintiff,

5

    -vs-

6

    SEE ATTACHED,

7
                    Defendants.

8   _____/

9

10              TRANSCRIPT OF BENCH TRIAL PROCEEDINGS

11                         Volume 2
                      (Pages 289 - 656)

12

13                 Monday, November 20, 2017
                    10:07 a.m. - 5:25 p.m.

14               Miami-Dade County Courthouse
                         Room 303

15                73 West Flagler Street
                      Miami, FL 33131

16

17

18

19

20

21

22

23              The above-entitled cause came on for
    hearing before the Honorable Beatrice A. Butchko, Circuit

24  Court Judge, taken before Robyn Maxwell, RPR, FPR, RSA,
    and Notary Public in and for the State of Florida at

25  Large.

Page 290

1           Schecher Group, Inc. vs. Importadora Interwheels SA
                      Case No. 2014-013771 CA 01
2
3            Schecher Group, Inc. vs. Ruben Lamothe, et al.
                      Case No. 2016-026445 CA 01
4
5            Schecher Group, Inc. vs. Jorge Correa, et al.
                      Case No. 2016-026446 CA 01
6
7         Schecher Group, Inc. vs. Waterstone Investments, LLC,
                      Case No. 2016-026447 CA 01
8
9        Schecher Group, Inc. vs. Jean Francois Filion, et al.
                      Case No. 2016-026450 CA 01
10
11            Schecher Group, Inc. vs. David Georg, et al.
                      Case No. 2016-026455 CA 01
12
13             Schecher Group, Inc. vs. Loremar Corp.
                      Case No. 2016-026470 CA 01
14
15     Schecher Group, Inc. vs. Florida Building & Supply, Inc.
                      Case No. 2016-026555 CA 01
16
17         Schecher Group, Inc. vs. Ralf Bauchrowitz, et al.
                      Case No. 2016-026742 CA 01
18
19             Schecher Group, Inc. vs. Frank Jordan
                      Case No. 2016-026743 CA 01
20
21          Schecher Group, Inc. vs. Lydia Apodaca, et al.
                      Case No. 2016-026745 CA 01
22
23             Schecher Group, Inc. vs. Mialo, LLC
                      Case No. 2016-026746 CA 01
24
25

Page 291

```
 1        Schecher Group, Inc. vs. Maria N. Schoentag, et al.
                    Case No. 2016-026747 CA 01
 2
 3           Schecher Group, Inc. vs. BambaMiami, Inc.
                    Case No. 2016-026749 CA 01
 4
 5        Schecher Group, Inc. vs. Jose Louis Varela, et al.
                    Case No. 2016-026750 CA 01
 6
 7            Schecher Group, Inc. vs. Pariano, LLC
                    Case No. 2016-026751 CA 01
 8
 9        Schecher Group, Inc. vs. Valentin Investments, LLC
                    Case No. 2016-026752 CA 01
10
11        Schecher Group, Inc. vs. Ralf Bauchrowitz, et al.
                    Case No. 2016-026742 CA 01
12
13            Schecher Group, Inc. vs. Frank Jordan
                    Case No. 2016-026743 CA 01
14
15        Schecher Group, Inc. vs. Lydia Apodaca, et al.
                    Case No. 2016-026745 CA 01
16
17             Schecher Group, Inc. vs. Mialo, LLC
                    Case No. 2016-026746 CA 01
18
19        Schecher Group, Inc. vs. Maria N. Schoentag, et al.
                    Case No. 2016-026747 CA 01
20
21           Schecher Group, Inc. vs. BambaMiami, Inc.
                    Case No. 2016-026749 CA 01
22
23        Schecher Group, Inc. vs. Jose Louis Varela, et al.
                    Case No. 2016-026750 CA 01
24
25
```

```
                                            Page 292

 1            Schecher Group, Inc. vs. Pariano, LLC,
                 Case No. 2016-026751 CA 01
 2

 3       Schecher Group, Inc. vs. Valentin Investments, LLC
                 Case No. 2016-026752 CA 01
 4

 5          Schecher Group, Inc. vs. Ralf Bauchrowitz
                 Case No. 2016-026755 CA 01
 6

 7       Schecher Group, Inc. vs. Alfer Investments Corp.
                 Case No. 2016-026757 CA 01
 8

 9       Schecher Group, Inc. vs. Maria T. Velez, et al.
                 Case No. 2017-001375 CA 01
10

11          Schecher Group, Inc. vs. LC Geraci, LLC
                 Case No. 2017-001688 CA 01
12

13         Schecher Group, Inc. vs. Penthouse 68, LLC
                 Case No. 2017-001703 CA 01
14

15       Schecher Group, Inc. vs. Bank of New York Mellon
                 Case No. 2017-004022 CA 01
16

17      Schecher Group, Inc. vs. Maria R. Girardo de la Peña
                        Velez, et al.
18               Case No. 2017-004086 CA 01
19

           Schecher Group, Inc. vs. HSBC Bank USA, N.A.
20               Case No. 2017-004093 CA 01
21

           Schecher Group, Inc. vs. Villita, LLC
22               Case No. 2017-004120 CA 01
23

          Schecher Group, Inc. vs. Aspire Higher, LLC
24               Case No. 2017-004122 CA 01
25
```

Page 293

1      Schecher Group, Inc. vs. Cecilia N.  Zsilavi, et al.
                Case No. 2017-004123 CA 01
2
3          Schecher Group, Inc. vs. Dagraju, LLC
                Case No. 2017-004128 CA 01
4
5        Schecher Group, Inc. vs. Miguel Fava, et al.
                Case No. 2017-004132 CA 01
6
7          Schecher Group, Inc. vs. Elsitta, LLC
                Case No. 2017-004138 CA 01
8
9         Schecher Group, Inc. vs. Numero 991, LLC
                Case No. 2017-004206 CA 01
10
11    Schecher Group, Inc. vs. International Consulting Corp.
                Case No. 2017-004211 CA 01
12
13  Schecher Group, Inc. vs. Elsa J. de Pablos Bermudez, et al.
                Case No. 2017-005290 CA 01
14
15      Schecher Group, Inc. vs. Henryk Kwiatkowski, et al.
                Case No. 2017-005296 CA 01
16
17       Schecher Group, Inc. vs. Boston RV Corporation
                Case No. 17-005298 CA 01
18
19        Schecher Group, Inc. vs. Ivan Mahana, et al.
                Case No. 2017-005300 CA 01
20
21
22
23
24
25

```
1   APPEARANCES:
2
3                   On behalf of the Plaintiff:
                        STEVE M. DAVIS, ESQUIRE
4                       sdavis@becker-poliakoff.com
                        ADAM CERVERA, ESQUIRE
5                       acervera@bplegal.com
                        BECKER & POLIAKOFF P.A.
6                       121 Alhambra Circle
                        Tenth Floor
7                       Coral Gables, FL 33134
                        305.260.1013
8
9                   On behalf of the Defendants:
                        INGER MICHELLE GARCIA, ESQUIRE
10                      attorney@ingergarcia.com
                        FLORIDA LITIGATION GROUP, P.A.
11                      4839 Volunteer Road
                        Suite 514
12                      Davie, Florida 33330
                        954.394.7461
13
14
                    On behalf of Schecher Group and bankruptcy
15                  counsel for the Sixty Sixty Association:
                        BARRY PHILLIP GRUHER, ESQUIRE
16                      bgruher@gjb-law.com
                        GENOVESE, JOBLOVE & BATTISTA, P.A.
17                      200 East Broward Boulevard
                        Suite 1110
18                      Fort Lauderdale, FL 33301
                        954.453.8000
19
20
21
22
23
24
25
```

1  covered in the budget, which is the owner deficit and the

2  loans, that it's inappropriate, and therefore overstates

3  the ledgers.

4          MS. GARCIA:  I have no other questions of

5      this witness, Your Honor.

6          THE COURT:  Thank you.

7          Cross-examination.

8          MR. DAVIS:  Yes, Your Honor.

9              CROSS-EXAMINATION

10  BY MR. DAVIS:

11      Q.    Good morning, Mr. Gerstle.

12      A.    Good morning, Mr. Davis.

13      Q.    You testified that you had thought there

14  was something selective on the enforcement of the late

15  fees; is that right?

16      A.    Yes.

17      Q.    But it appeared on every single ledger.

18          So that would not seem to be selective

19  then, would it?

20      A.    Everyone that approached him was waived,

21  you know, and so they're waiving the late fees and

22  they're not enforcing it on, you know, some of the people

23  and enforcing it on others.

24      Q.    And you'd agree with me though that an

25  association, or in this case a hotel unit owner, has the

Page 392

1     option to settle with various people by offering various

2     incentives if they want to pay, can't he?

3              A.    I do.

4              Q.    And as part of that offer to settle, he can

5     waive late fees, can't he?

6              A.    I think he could.

7              Q.    And, in fact, associations do that.

8                    And you'd agree he's not an association?

9              A.    I agree he's not an association.

10             Q.    But associations waive late fees all the

11    time, don't they?  And that doesn't mean selective

12    enforcement, does it?

13             A.    No.

14             Q.    Okay.  All right.  You also said that -- so

15    you'd agree with me that there was nothing --

16                   THE COURT:  Mr. Davis, could you please

17            speak a little slower for the court reporter?

18                   MR. DAVIS:  Yes.  I'm sorry.

19                   THE COURT:  It's very exciting in terms of

20            Hollywood.  But for the court reporter, it must be

21            a challenge.

22    BY MR. DAVIS:

23             Q.    You agree with me that assessing is done

24    according to budgets?

25             A.    Yes.

Page 393

1          Q.     Right.  And in fact, every business

2     assesses based on a budget?  They don't get the bill

3     first and then assess?

4          A.     Yes.

5          Q.     It wouldn't make any sense.

6                 Okay.  So you looked at the budgets,

7     correct?

8          A.     Yes.

9          Q.     What specifically -- you didn't mention

10    anything that you saw specifically that was out of whack

11    in the budget, like an expense for labor, an expense for

12    taxes, an expense for insurance.

13                None of those are out of whack, are they?

14         A.     No.  What I mentioned was the loan payment

15    and the deficit, two separate line items.

16         Q.     But you don't know what that loan payment

17    was for, if it was for a prior deficit or if it was for

18    future operations, do you?

19         A.     It's my understanding when owners didn't

20    pay, he had to put money in for them to continue to

21    operate.

22         Q.     Okay.  So then if it's a loan that was

23    taken out to fund future operations, then there's

24    nothing --

25         A.     To pay past due bills.

Page 394

1          Q.    But you don't know one way or the other, do

2     you?

3          A.    I don't know for a fact, no.

4               THE COURT:  So you assumed what the loan

5          payment was for, that it was to pay past debt?

6               THE WITNESS:  I had heard that it was

7          people were not paying and he had to put money in.

8               THE COURT:  So you had heard people were

9          not paying.  So you assumed the loan was to pay

10         that?

11              THE WITNESS:  Well, I had heard that in

12         testimony.  I was here on the --

13              THE COURT:  What testimony.

14              THE WITNESS:  -- the last day when

15         Mr. Schecher was testifying.

16              THE COURT:  Okay.

17    BY MR. DAVIS:

18         Q.    Okay.  As a CPA, when you do an audit, do

19    you base your audit on what you hear or on books and

20    records?

21         A.    Books and records.

22              THE COURT:  Well, wait a minute.  Wait.

23         Hold on.

24              So your testimony today is based on

25         testimony -- based on the testimony that you just

1          heard last week and not based upon your review of

2          the records before trial?

3                    THE WITNESS:  No.  The testimony is that

4          you don't double dip.  I don't know why he put in

5          the loan.

6                    THE COURT:  Oh, got it.

7     BY MR. DAVIS:

8          Q.    So you don't know if there was double

9     dipping or not?

10         A.    I know that they put in for a deficit and

11    loan.  If it's to pay off past bills, it's double

12    dipping.  I don't know in this case for sure that he was

13    putting in money for future.

14                   THE COURT:  Then what are we talking about?

15                   MR. DAVIS:  It's not my witness, Your

16         Honor.

17    BY MR. DAVIS:

18         Q.    You didn't perform an audit of the books

19    and records, did you?

20         A.    No.

21         Q.    You don't know if the loan payment is for

22    past expenses or future expenses, do you?

23                   MS. GARCIA:  Asked and answered.

24                   THE COURT:  No.  Overruled.

25                   Answer it again.

1           THE WITNESS:  No.

2     BY MR. DAVIS:

3           Q.    And so you don't know -- as you sit here

4     today, you have no idea if there's double dipping or not,

5     do you?  It's only speculation?

6           A.    No.  Again, if you put it in the assessment

7     and in the budget.  So to me, that's double dipping.

8           Q.    But if it's for future expense, it's not

9     double dipping, right?

10          A.    Well, he has the loan in the assessment and

11    the loan in the budget, '17 and '18.

12          Q.    Did you make a determination whether the

13    loan entry is a principal payment or an interest payment?

14    You didn't do that assessment, did you?

15          A.    No.

16          Q.    So if that loan item in the budget is

17    interest only, then it's clearly not double dipping,

18    right?

19          A.    Correct.  But it would say interest.  It

20    wouldn't say loan, to me.

21          Q.    But you don't know?

22          A.    No.  Well, I know it says loan payments.

23          Q.    But you don't know if that payment is for

24    interest or principal and interest?

25          A.    Well, to me an interest payment is not a

1    loan payment.  So I don't know, but it's called loan

2    payments.

3              Q.    You don't know?

4              A.    Right.

5              Q.    Right.  Okay.

6                    Now, you talked about insurance proceeds.

7              A.    Yes.

8              Q.    You didn't analyze what those proceeds were

9    used for, did you?

10             A.    No, I did not.

11             Q.    So to say that unit owners are missing

12   credits for loan proceeds, you have no idea if there were

13   any --

14             A.    Insurance proceeds.

15                   THE COURT:  You misspoke.

16                   MR. DAVIS:  Oh, I'm sorry.  Okay.

17   BY MR. DAVIS:

18             Q.    So for those insurance proceeds, you have

19   no idea what those proceeds were for, do you?

20             A.    Not specifically, no.

21             Q.    And what does that mean, "not

22   specifically"?

23             A.    Well, I know there was a flood --

24             Q.    Yes.

25             A.    -- that caused damage, that there was an

Page 398

1    assessment, and there was a problem with the fire panel

2    and a part was thrown out and the building was closed and

3    there was an assessment.

4            Q.    Right.

5            A.    So I know that those two instances happened

6    and, you know, nothing else -- you know, no other

7    discussions that I'm aware of in the association.  There

8    were no other assessments in the assessment.  So I have

9    no other reason to assign it to anything else.

10           Q.    You don't know whether those insurance

11   proceeds were for things where the unit owners would be

12   entitled for a credit for it, do you?

13           A.    Well, I know that they're billed for the

14   maintenance and for special projects, so they're billed

15   for everything that's spent in the building.  So if

16   there's an unbudgeted windfall, substantial, which I

17   would say 500,000 is, then I do believe that they would

18   be -- they would have been billed for the costs, because

19   the money can't come from anywhere else.

20           Q.    Okay.  We're talking about hypothetically

21   here, because you didn't really do the thorough analysis

22   on that, right?

23           A.    Correct.

24           Q.    All right.  So hypothetically, you'd agree

25   with me that a toilet overflowing is not going to be a

1    budgeted expense, right?

2              A.    Correct.

3              Q.    Unless he's incarnate and can see the

4    future, right, it's not going to be a budgeted expense.

5                    So to the extent that a toilet overflow

6    causes damage, that damage would not be in the budget,

7    right?

8              A.    Correct.

9              Q.    And therefore if insurance money came in to

10   fix that damage, there's no reason that the unit owners

11   should be entitled to that money if it goes to fix the

12   unbudgeted damage, right?

13             A.    Well, if there's damage, then they -- they

14   wouldn't get insurance proceeds.

15                   THE COURT:  Is it --

16   BY MR. DAVIS:

17             Q.    Just answer my question.

18                   THE COURT:  Just answer that question.  And

19             then if you need to explain, you can explain.

20             A.    I believe they would be entitled to a

21   credit for insurance proceeds even if the flood was not

22   in the budget.

23   BY MR. DAVIS:

24             Q.    Well, you think the -- if the flood was not

25   in the budget and insurance money came in to fix the

Page 400

1   damage and it was used to fix the damage of the hotel

2   unit, you think that the unit owners should be entitled

3   to some credit if the money was used to fix unbudgeted

4   damage?

5           A.    No.  The flood which damaged a number of

6   units, which I don't know if it included the hotel unit

7   or not.

8           Q.    It did.

9           A.    But the -- there was an assessment to the

10  owners for the flood.  So I don't know for a fact whether

11  the insurance proceeds related to that flood damage, but

12  that's the assumption I'm making, that some of the

13  insurance proceeds related to an assessment, whether it

14  was that one or the fire panel, that the owners were

15  charged in their ledgers.

16          Q.    So as far as these insurance proceeds go,

17  if the unit owner, the hotel unit owner, has insurance

18  for his property, right --

19          A.    Uh-huh.

20          Q.    -- and his property or its property, the

21  Schecher Group's property, was damaged and it has

22  insurance, it's certainly entitled to use its insurance

23  proceeds to fix its damaged property, correct?

24          A.    100 percent.

25          Q.    A hundred percent?

1            A.    However, his hotel unit owner proceeds

2    would not be recorded in the shared component records

3    because they're an owner proceeds.  They're his

4    individual unit proceeds.  They're not shared components.

5            Q.    Well, we're talking about something else.

6    Let's stay focused on the hotel unit owner.

7            A.    Right.  The hotel unit owner proceeds would

8    not be income on our shared or our shared facility

9    financials.

10            Q.    "Our," you mean?

11            A.    The shared component.

12            Q.    Okay.  The insurance proceeds come in.

13    Let's put accounting aside.

14            A.    Right.

15            Q.    Let's just use common definitions, common

16    sense.

17            A.    Okay.

18            Q.    The shared component owner has insurance

19    for his property, right?

20            A.    Yes.

21            Q.    All right.  Now there's damage to the

22    shared component property, right?

23            A.    His property or the shared component?

24            Q.    His property.

25            A.    The hotel unit?

1           Q.    The hotel unit is the shared component.

2           A.    Okay.

3           Q.    So you know that, right?

4           A.    Right.  But the shared also pays for

5  insurance.

6           Q.    The shared component --

7           A.    Has insurance that it pays for.

8           THE COURT:  That's what Mr. Davis is

9           talking about.

10  BY MR. DAVIS:

11           Q.    That's what I just said.

12           A.    That insurance --

13           Q.    That insurance is for the shared component.

14           A.    Uh-huh.

15           Q.    So now the shared component gets damaged.

16           A.    Uh-huh.

17           Q.    The shared component owner collects

18  insurance proceeds, right?

19           A.    Right.

20           Q.    To pay for that damage?

21           A.    Right.

22           Q.    And that money is used to repair that

23  damage --

24           A.    Right.

25           Q.    -- which is unbudgeted.

1           And so under those circumstances, the

2    individual unit owners would not be entitled to any of

3    those proceeds, would they?

4           A.    Again, the --

5           Q.    Yes or no?

6           A.    I think they would be entitled.

7           Q.    Under what possible reason?

8           A.    Because the hotel unit owners pay into the

9    shared components.

10          Q.    No, no, no.

11          A.    They pay for the insurance for the shared

12   components.

13          Q.    Let's not confuse terms.

14               THE COURT:  No, no, no.  Okay.  Stop.

15               Just because they pay part of the premium,

16          and even if they do --

17               THE WITNESS:  All the premiums.

18               THE COURT:  -- that doesn't mean they're

19          entitled -- it doesn't mean they're entitled to

20          the proceeds that is payment for repair of the

21          joint components or what's the --

22               MR. DAVIS:  The shared components.

23               THE COURT:  Shared components.

24               But hold on a second.  The witness did say

25          something that I need an answer to.

1           Mr. Davis, I follow your question.  If the
2      hotel unit owner has insurance and the hotel unit
3      owner property is destroyed and their insurance
4      pays for the repairs, that expense was not
5      budgeted for because it was not known.  It's an
6      unexpected event.  The individual unit owners
7      would not be entitled to a payback of any
8      proceeds.
9           However, the unit -- correction.  The
10     witness said that if the unit owners were assessed
11     a special assessment due to damage to that hotel
12     unit owner's property, then they would be entitled
13     to a credit.
14          So my question is:  When the toilet
15     overflowed causing damage to the hotel unit
16     owners' property, were the individual unit owners
17     assessed to repair that common element?  And I
18     know that that's not the term.  And if so, did
19     they get an offset?
20          MR. DAVIS:  Let me first clarify the terms,
21     because I think we're mixing up the terms.
22          THE COURT:  Please do.  Please do.
23          MR. DAVIS:  So when I refer to "hotel unit
24     owner," that's the shared component owner.  That's
25     his property --

1            THE COURT:   That's the Schecher Group?

2            MR. DAVIS:   The Schecher Group.

3    BY MR. DAVIS:

4        Q.    His property is called "the hotel unit."

5    And I think what you're referring to as hotel units might

6    have been the residential unit owners, which are the

7    rooms, and I think we might have been confusing terms

8    here.

9            THE COURT:   So "hotel unit owner" is the

10           Schecher Group.   They are the owner of the big

11           building.   Okay.

12   BY MR. DAVIS:

13       Q.    Now, we have the residential unit owners,

14   who owned the individual rooms.

15       A.    Right.

16       Q.    So my question is -- did you understand the

17   distinction?

18       A.    Yeah.   Again, I'm going back to what I'm

19   trying to say --

20       Q.    Yes.

21       A.    -- is that if they were assessed, which

22   normally what happens is they get assessed for the damage

23   and file a proof of loss, and months later the insurance

24   proceeds come in.   After the assessment was passed and

25   billed for the owners to fix the damage, then once they

1  quantify what they received, then usually a credit is

2  given.

3         Q.    But as you sit here today and what I

4  believe what you just testified to is you really don't

5  know exactly what those insurance proceeds were for and

6  what they were assessed for, if there was actually a

7  double dip?  You may be assuming because you heard it,

8  but you didn't see anything in the books and records that

9  actually say that?

10         A.    I saw the special assessment noted, you

11  know, passed of 975, I think, or 375 and 900.  And there

12  was -- so I don't know specifically how those insurance

13  proceeds relate to those two assessments, but I know

14  those were the only two damages and that -- it's my

15  understanding that the proceeds related to one of those

16  two events --

17         Q.    Well --

18         A.    -- of which they were assessed for.

19         Q.    But you don't know though if those two

20  special assessments were for Florida Building & Supply

21  for other construction, for fixing code violations?

22         A.    That was the 1.9 that -- the original

23  assessment back in 2014.

24         Q.    Now, insurance proceeds.

25               So insurance proceeds don't cover

1    deductibles either, do they?

2             A.    No.

3             Q.    All right.  And so it would be appropriate

4    then -- if there is a deductible there, it would be

5    appropriate to assess the owners for that, wouldn't it?

6             A.    Yes.

7             Q.    Did you do any analysis on that fact?

8             A.    No, because again we're not saying that

9    they shouldn't have been assessed at all.  We're saying

10   that whatever proceeds they received relative to the

11   damage that they were assessed for, they should receive a

12   credit.

13            Q.    Where is your --

14            A.    Yes, they --

15            Q.    Where is your analysis on how much that

16   credit should be?

17            A.    I do not have an analysis.

18            Q.    So you're talking in theory here, but you

19   didn't actually do an audit of the books to see if your

20   theories are true or not?

21            A.    We don't have any of the proof of loss

22   information.

23            Q.    The answer is no, correct?

24            A.    No.  The answer's no.

25            Q.    You didn't do it?

1          A.     No.

2          Q.     Now, your surplus analysis, to me, this was

3     like Enron.  They were making lots of money too until

4     they weren't.

5              All right.  So your surplus analysis does

6     not consider -- well, it considers, just based on

7     accounting, that it doesn't matter whether they actually

8     have the money.  But your surplus analysis is, well, if

9     they got the money, they'd actually have more money than

10    they do.  But they didn't actually have the money.

11             I'm glad my wife isn't here to hear how

12    you -- don't type that.  I think it's -- all right.

13    Anyway --

14             THE COURT:  Or, you know, thank goodness

15         the record is in print and doesn't show me

16         laughing at that last question.

17             MR. DAVIS:  Yeah.

18             THE COURT:  Do you want to rephrase that so

19         I know what you're asking?

20             MR. DAVIS:  I will try.  I will try.

21    BY MR. DAVIS:

22         Q.     So your surplus analysis, you're not here

23    claiming that all this money came in, actually came in,

24    and there's a surplus of extra money that something has

25    to be done with that money?  You're not saying that, are

1   you?

2           A.    What I'm saying is that their internal --

3           Q.    Can you answer my question, please?

4           A.    No, I'm not saying that.

5           Q.    Okay.  And on this surplus, do you know if

6   the loan proceeds were calculated into that?  So

7   forgetting about the money that never arrived, could it

8   be that the loan, money was borrowed to pay for future

9   expenses and that money showed up as income?

10          A.    That I know because that was shown on a

11  balance sheet as a liability, not as revenue.  So it

12  wouldn't be in my surplus because it's not revenue.  The

13  surplus is only revenue and expenses.

14          Q.    Well, your surplus is not actually revenue.

15  It's expected revenue.

16          A.    It's billed revenue.

17          Q.    Billed revenue, but not real revenue?

18          A.    Earned revenue, not collected revenue.

19                So it is revenue on an accrual basis, as

20  every financial required by state law has to be on an

21  accrual basis.  So they all show on an accrual basis.

22          Q.    So let's try to make this real simple.

23                You can say there's a surplus, but if we

24  had a lig little piggy bank here, it would be empty?

25          A.    Yes.

Page 410

1          Q.    Okay.

2                THE COURT:  Okay.  That's a good way.

3          That's very nice and simple.  Thank you for that.

4          Empty piggy bank is something that I can quantify.

5     BY MR. DAVIS:

6          Q.    All right.  Let's talk --

7          A.    However, if I could finish --

8                THE COURT:  Yeah.

9          A.    -- there's in the piggy bank an IOU from

10    the owners that, if collectible, turns into surplus

11    through the foreclosures and other judgments.

12               So there is -- there could be a surplus, if

13    you collect what you're owed, however means you get to do

14    that, through foreclosure or whatever, then the money

15    goes in the piggy bank.

16               THE COURT:  But in the meantime, that

17          building needs to be maintained.  And with the

18          empty piggy bank, we're in trouble?

19               THE WITNESS:  Right, always.

20               MR. DAVIS:  All right.  I think we

21          understand.

22    BY MR. DAVIS:

23          Q.    Increased maintenance, the maintenance goes

24    up.

25               In your experience in condos, condo hotels,

1    the maintenance does go up year to year, doesn't it?

2            A.    Yes.

3            Q.    It can.  I mean, various expenses will go

4    up.  They may have an increased labor cost.  They might

5    have improvements that might need to be done.  They might

6    have a bad debt expense.

7                  Expenses do go up, right --

8            A.    Yes.

9            Q.    -- over the years?  Okay.

10                 And there's nothing wrong with having an

11   increased budget every year?

12           A.    No.

13           Q.    People don't like it, but there's nothing

14   wrong with that, right?

15           A.    No.

16           Q.    And if there is litigation, of which there

17   has been plenty of litigation in this matter, having --

18   putting litigation fees in a budget, there's nothing

19   wrong with that either, is there?

20           A.    There's nothing -- to the degree you expect

21   to incur costs, not, you know, foreclosure unit owner

22   costs, but shared common costs, there's nothing wrong

23   with putting that.

24           Q.    And you would agree with me that pursuant

25   to the declaration of condominium, charging things like

Page 412

1   accounting fees, management fees, attorney's fees, those

2   are all typical expenses that should be charged back to

3   the unit owners?

4           A.   Charged as long as they're actually

5   incurred.  In other words, I can't charge for management

6   and not incur the expense and/or I can't charge an amount

7   that doesn't reflect a fair allocation between the person

8   doing the work and all of the other jobs that that person

9   may have.

10          Q.   But you could put it in your budget, right?

11          A.   I can put it in my budget.  But if I don't

12  spend it, then I need do a true up.

13          Q.   And if you don't collect it, you also need

14  to do a true up?

15          A.   Yes.

16          Q.   Okay.  All right.  So you mentioned

17  something about litigation costs as being possibly double

18  charged, but you didn't do the analysis to see were these

19  unit owners being double charged for litigation or was it

20  maybe a retainer, maybe it was one bill or there may be

21  another bill.

22               You have no way of saying here, as you sit

23  here today, that unit owners were double charged for any

24  expense, do you?

25          A.   Well, any expense, again, I think they were

1    double charged for the deficit in the loan, but I --
2    without future proceeds or past proceeds, I can't say.
3            Q.    You think that --
4            A.    We haven't analyze the legal, no.
5            Q.    So you think they were, but you haven't
6    analyzed it to know whether they actually were or not,
7    right?
8            A.    In the legal?  No.
9            Q.    And the other two with the loan expenses?
10           A.    Again --
11                 THE COURT:  Okay, guys.  Stop.  There's one
12           question being posed and an answer given as to
13           something else, but then you ultimately answered.
14                 So the question being posed was as to
15           litigation costs were not audited.  You said yes,
16           you didn't analyze the legal per se.
17                 Then the other question that was not being
18           posed that you threw in the answer was the deficit
19           in the loan.  But just for my clarification, the
20           preceding line of questions by counsel already
21           addressed that issue.  You didn't analyze the loan
22           and do not know whether or not that loan was for
23           prospective costs?
24                 THE WITNESS:  Yes.
25                 THE COURT:  Okay.  Gotcha.

Page 414

1    BY MR. DAVIS:

2           Q.    Let's talk about the late fee for a moment.

3                 So which -- late fee was posted a few days

4    earlier?

5           A.    Yes.

6           Q.    And therefore incurred a little bit of

7    extra interest.

8                 Did you do the analysis on just how much

9    that amounted to --

10          A.    No.

11          Q.    -- in interest?

12          A.    We don't know.  We haven't done an analysis

13   of whether that, you know, because they followed the

14   condo provision in the declaration that meant the late

15   fee should have been a condo late fee or we haven't

16   calculated anything relative to that, just to make a

17   statement that they posted it every single month on the

18   wrong day?

19                THE COURT:  Five days early?

20                THE WITNESS:  Right.

21   BY MR. DAVIS:

22          Q.    Five days early.

23                And that was for 2017?

24          A.    Correct.

25          Q.    But 2016 --

1           A.    And they did a retroactive, which I'm

2     assuming they applied the same way they did in '17.  So

3     they did in '16 also.

4           Q.    Okay.  2016, they did not post it monthly,

5     correct?

6           A.    They did a retroactive.

7           Q.    They did it at the end of the year.

8                 So to the extent that there was interest

9     due each month along the way, the unit owners actually

10    saved money in 2016, right?

11          A.    I haven't calculated the amount that they

12    charged.  So that might have included interest.  I don't

13    know.

14          Q.    Okay.  Well, let's assume for a moment that

15    that end of year late fee did not include interest.

16    Assume for a moment that that was not including interest.

17    It was just posted at the end of the year to make up for

18    the 12 months of late fees.

19                Would you agree with me that posting it at

20    the end of the year, the unit owners actually saved on

21    interest?

22          A.    Yes.

23                THE COURT:  That's for 2016?

24                MR. DAVIS:  Yes.

25                THE COURT:  Okay.

Page 416

1   BY MR. DAVIS:

2          Q.    So they saved the whole year of whatever

3   that amounts on each of those payments on each of those

4   late fees?

5          A.    Yes.

6          Q.    So then 2 --

7                THE COURT:  Okay.  Let me follow up.

8                Even though the assessment may have been

9          assessed on the wrong day, no harm, no foul, if

10         they assessed it at the end of the year without a

11         late fee for interest?

12               THE WITNESS:  If there -- you know, if it

13         still applies -- and you know, to be a hundred

14         percent, it doesn't apply and be that $25, then

15         yes, there's no harm.

16               THE COURT:  Okay.

17               MR. DAVIS:  Okay.  No more questions, Your

18         Honor.

19               THE COURT:  I have a question.

20               How many years -- strike that.

21               In what years was the assessment made on

22         the wrong day for the corresponding assessment?

23               I have it in my notes.

24               MR. DAVIS:  The late fees?

25               THE COURT:  The late fees.

1              MR. DAVIS:  The late fees, they only
2         started charging them in 2016.  And in 2016, it
3         was done at the end of the year, the one
4         assessment.
5              In 2017 is when they started doing it
6         monthly on the 10th or 11th instead of the 15th.
7         So that's my point, was they actually saved.  If
8         we look at where we're at today versus where we
9         were in 2016, they actually paid less interest,
10        right, because the 2016 it was assessed at the end
11        of the year instead of monthly?
12             THE WITNESS:  Yes, mathematically that's
13        correct.
14   BY MR. DAVIS:
15        Q.   Mathematically, yes.
16             So, in fact, the five days of interest on
17   one of those late fees, I mean, for the ten months -- I
18   don't know if you did the math, but I did it -- it
19   amounts about $40.
20        A.   I haven't done the math.
21        Q.   Sound about right or you don't know?
22        A.   I don't know.
23        Q.   Okay.
24             THE COURT:  So for 2017, that problem
25        doesn't exist, the billing on the wrong date?

1              THE WITNESS:  It does exist.

2              MR. DAVIS:  The 2016, it did not exist.

3        2017 --

4              THE COURT:  They continued to do it monthly

5        on the wrong date?

6              THE WITNESS:  Yes.

7              MR. DAVIS:  They did it on the wrong day.

8              THE COURT:  What about 2015?

9              MR. DAVIS:  They were not charging late

10       fees.  They only started in 2016.  And that's

11       reflected in the ledgers.

12             THE COURT:  So the error, the would be

13       error or the alleged error, is something that can

14       be figured out by mathematical calculation?

15             MR. DAVIS:  Yes, Your Honor.  If we

16       actually did the math and took the one that was

17       done at the end of the year in 2016 and did it

18       each month along the way, and then 2017 put them

19       all on the 15th, they'd actually end up paying

20       more interest than it is now.  So they actually

21       saved money because of their mistake.

22             THE COURT:  Okay.

23             MR. DAVIS:  That's just math.  Thank you.

24             THE COURT:  Redirect?  Redirect?

25             MS. GARCIA:  No, Your Honor.

1          THE COURT:  Okay.  Thank you, sir.  You're

2     excused.

3          THE WITNESS:  Thank you very much, Your

4     Honor.

5          THE COURT:  Have a nice afternoon.

6          It's 12 noon.  Let's take a recess till

7     1:10, please.  Or actually, it's 12:15.  Let's

8     take a recess till 1:15.

9          (Recess taken, 12:14 p.m. to 12:15 p.m.)

10          THE COURT:  Let's go back on the record,

11     please.

12          We had a momentary conversation off the

13     record about this afternoon's proceedings, and you

14     were going to report on the Skype.

15          MR. DAVIS:  On what we did, because I

16     wanted to do the maximum amount possible to get

17     this to work, because I know that sometimes

18     relying on technology is not always a great thing,

19     but we wanted to do what we could.

20          So we have a dedicated laptop for Skype.

21     Rather than plug it into my cell phone, we've got

22     jet pack that's dedicated to the laptop, and it

23     gets direct to cellular.  So we're not using the

24     Court's Wi-Fi, because unfortunately the Court's

25     Wi-Fi is --

# EXHIBIT "D"

## HU BUDGET AND ASSESSMENT ANALYSIS

In this HU Budget and HU Assessment Analysis, the Shared Costs are assessed in advance according to the HU Budgets, which are prepared and published annually by the Schecher Group, and other special charges or assessments (the "HU Assessments") as described in the following example for CU-1 below:

1.      A budget is determined for the year 2013 (Exhibit "1"). That budget includes the expected expenses for the year.

2.      The total of $1,085,434 is divided across all units per the declaration percentages. (Exhibit "2").

3.      For CU-1, applying the Allocable Share percentages as provided in Exhibit "7" of the Declaration, results in $5,355.08 being owed each month for HU Assessments. Due to the rounding up of the numbers, however, $5,355.15 appears on the Statement of Account (Unit Ledgers) each month for 2013 (Exhibit "3"). A similar budgeting process occurs for CU-2, CU-3 & CU-4, and the remaining Residential Units. The same process repeats each year.



```
              2014 Annual Budget →application to Debtor Units
                   $1,085,434    |divided by 12 for monthly HU Assessment
                                 |
         --------------------------------------------------------------------------
         |             |             |             |             |
        CU1           CU2           CU3           CU4           505
      5.9203%       5.2198%       2.3901%       2.084%       1.0275%
         |             |             |             |             |
      $5,355.08     $4,721.46     $2,161.91     $1,883.59     $929.40
      Exhibit "C"   Exhibit "D"   Exhibit ""E"  Exhibit "F"   Exhibit "G"
```

*Note that some numbers are rounded.

# EXHIBIT "1"

Sixty Sixty Condominium Association. Inc
Operating Budget
January 1, 2013 to December 31, 2013

| 87 units | Condo Association Budget CE | | Shared components HU Budget | |
|---|---|---|---|---|
| Sixty Sixty Condominium Association. Inc | 2013 Proposed Monthly Association Budget CE | 2013 Proposed Annual Association Budget CE | 2013 Proposed Monthly Budget HU-SC | 2013 Proposed Annual Budget HU-SC |
| **Income:** | | | | |
| Owner's Maint. Fee Income | 15,513 | 186,151 | 90,725 | 1,088,694 |
| Rental Income (Restaurant Lease) | 2,000 | 24,000 | - | |
| Rental income ( Assc Units 6) | | | | |
| Reserve Interest | | | - | |
| Total Maintenance Fees WITH/OUT Reserves | 13,513 | **162,071** | 90,453 | **1,085,434** |
| **Total Maintenance Fees With Reserves** | | | 119,287 | 1,431,440 |
| Special Assessment | | | - | - |
| Late Fee Income | | | | |
| | 7 | 80 | 167 | 2,000 |
| Misc. Income | | | - | - |
| Documents Printing Inc. | | | 35 | 420 |
| Legal & Collection Fees | | | 70 | 840 |
| NSF Fee Income | | | - | |
| **Total Income** | | 80 | 272 | 3,260 |

2

## EXHIBIT "2"

Sixty Sixty SC-HU & Condo Assoc.-CE 2013 Budget

| Quantity | unit % SC-HU | Unit % CE | Total | SC-HU Unit Monthly Fee W/O Reserves | |
|---|---|---|---|---|---|
| 000-A | 1.0440 | 0.3696 | 20 | 944.33 | |
| 000-B | 1.0000 | 0.3540 | 28 | 904.53 | |
| 000-C | 0.8462 | 0.2996 | 8 | 765.41 | |
| 0000-D | 1.0275 | 0.3638 | 10 | 929.40 | * 505 is a "D" |
| 0000-E | 1.0467 | 0.3706 | 10 | 946.77 | |
| 0000-F | 2.0192 | 0.7149 | 2 | 1,826.42 | |
| 0000-G | 0.9560 | 0.3385 | 1 | 864.73 | |
| 0000-H | 0.9615 | 0.3404 | 1 | 869.70 | |
| 0000-I | 1.0055 | 0.3560 | 1 | 909.50 | |
| 0000-J | 1.0357 | 0.3667 | 1 | 936.82 | |
| UNIT C-1 | 5.9203 | 2.0960 | 1 | 5,355.08 | |
| UNIT C-2 | 5.2198 | 1.8480 | 1 | 4,721.46 | |
| UNIT C-3 | 2.3901 | 0.8462 | 1 | 2,161.91 | |
| UNIT C-4 | 2.0824 | 0.7373 | 1 | 1,883.59 | |
| HU | - | 64.5962 | 1 | | |
| | | | | 0 | |
| **Totals** | | | **87** | **1,085,449** | |

3

# EXHIBIT "3"

**Sixty Sixty Condominium Assoc**
**1489 WEST PALMETTO PARK RD**
**#505**
**BOCA RATON FL  33486**

6060 Indian Creek Drive # CU-1

| | |
|---|---|
| Account #: | 00CU-1 |
| Lot/Unit #: | CU-1 |
| Due Date: | 01/01/2018 |
| **Amount Due:** | **$582,909.72** |

| Date | Description | Charges | Credits | Balance |
|---|---|---|---|---|
| 05/31/2013 | Balance Forward | | | |
| 06/01/2013 | HU ShrdCompCsts | $5,355.15 | | $5,355.15 |
| 06/01/2013 | Payment Rec'd  1/1 | | $1,490.59 | $3,864.56 |
| 06/01/2013 | Payment Adjust  1/1 | $1,490.59 | | $5,355.15 |
| 07/01/2013 | HU ShrdCompCsts | $5,355.15 | | $10,710.30 |
| 07/01/2013 | Payment Rec'd  2/1 | | $3,309.89 | $7,400.41 |
| 07/01/2013 | Payment Rec'd  27/1 | | $877.66 | $6,522.75 |
| 07/01/2013 | Payment Adjust  27/1 | $877.66 | | $7,400.41 |
| 07/01/2013 | Payment Adjust  2/1 | $3,309.89 | | $10,710.30 |
| 07/19/2013 | Payment Rec'd  44510 | | $1,063.58 | $9,646.72 |
| 08/01/2013 | HU ShrdCompCsts | $5,355.15 | | $15,001.87 |
| 08/01/2013 | Payment Rec'd  3/1 | | $3,309.89 | $11,691.98 |
| 08/01/2013 | Payment Rec'd  28/1 | | $767.02 | $10,924.96 |
| 08/01/2013 | Payment Adjust  28/1 | $767.02 | | $11,691.98 |
| 08/01/2013 | Payment Adjust  3/1 | $3,309.89 | | $15,001.87 |
| 09/01/2013 | HU ShrdCompCsts | $5,355.15 | | $20,357.02 |
| 09/01/2013 | Payment Rec'd  4/1 | | $3,309.89 | $17,047.13 |
| 09/01/2013 | Payment Rec'd  29/1 | | $696.23 | $16,350.90 |
| 09/01/2013 | Payment Adjust  29/1 | $696.23 | | $17,047.13 |
| 09/01/2013 | Payment Adjust  4/1 | $3,309.89 | | $20,357.02 |
| 09/17/2013 | Payment Rec'd  44509 | | $706.63 | $19,650.39 |
| 09/17/2013 | Payment Rec'd  44509/2 | | $100.00 | $19,550.39 |
| 10/01/2013 | HU ShrdCompCsts | $5,355.15 | | $24,905.54 |
| 10/01/2013 | Payment Rec'd  5/1 | | $3,309.89 | $21,595.65 |
| 10/01/2013 | Payment Rec'd  30/1 | | $1,828.17 | $19,767.48 |
| 10/01/2013 | Payment Adjust  30/1 | $1,828.17 | | $21,595.65 |
| 10/01/2013 | Payment Adjust  5/1 | $3,309.89 | | $24,905.54 |
| 10/15/2013 | Payment Rec'd  44512 | | $964.57 | $23,940.97 |
| 10/23/2013 | Payment Rec'd  44513/cor | | $46.64 | $23,894.33 |
| 11/01/2013 | HU ShrdCompCsts | $5,355.15 | | $29,249.48 |
| 11/01/2013 | Payment Rec'd  6/1 | | $3,309.89 | $25,939.59 |
| 11/01/2013 | Payment Rec'd  31/1 | | $1,030.32 | $24,909.27 |
| 11/01/2013 | Payment Adjust  31/1 | $1,030.32 | | $25,939.59 |

# EXHIBIT "4"

Sixty Sixty Condominium assoc.
1489 WEST PALMETTO PARK RD
#505
BOCA RATON FL 33486

6060 Indian Creek Drive # C-2
Account #:      00CU-2
Lot/Unit #:     CU-2
Due Date:       01/01/2018
**Amount
Due:**          **$512,693.48**

| Date | Description | Charges | Credits | Balance |
|---|---|---|---|---|
| 05/31/2013 | Balance Forward | | | |
| 06/01/2013 | HU ShrdCompCsts | $4,721.52 | | $4,721.52 |
| 06/01/2013 | Payment Rec'd  1/2 | | $1,294.46 | $3,427.06 |
| 06/01/2013 | Payment Adjust 1/2 | $1,294.46 | | $4,721.52 |
| 07/01/2013 | HU ShrdCompCsts | $4,721.52 | | $9,443.04 |
| 07/01/2013 | Payment Rec'd  2/2 | | $2,918.26 | $6,524.78 |
| 07/01/2013 | Payment Rec'd  27/2 | | $773.81 | $5,750.97 |
| 07/01/2013 | Payment Adjust 27/2 | $773.81 | | $6,524.78 |
| 07/01/2013 | Payment Adjust 2/2 | $2,918.26 | | $9,443.04 |
| 07/19/2013 | Payment Rec'd  44510 | | $937.97 | $8,505.07 |
| 08/01/2013 | HU ShrdCompCsts | $4,721.52 | | $13,226.59 |
| 08/01/2013 | Payment Rec'd  3/2 | | $2,918.26 | $10,308.33 |
| 08/01/2013 | Payment Rec'd  28/2 | | $676.26 | $9,632.07 |
| 08/01/2013 | Payment Adjust 28/2 | $676.26 | | $10,308.33 |
| 08/01/2013 | Payment Adjust 3/2 | $2,918.26 | | $13,226.59 |
| 09/01/2013 | HU ShrdCompCsts | $4,721.52 | | $17,948.11 |
| 09/01/2013 | Payment Rec'd  4/2 | | $2,918.26 | $15,029.85 |
| 09/01/2013 | Payment Rec'd  29/2 | | $613.85 | $14,416.00 |
| 09/01/2013 | Payment Adjust 29/2 | $613.85 | | $15,029.85 |
| 09/01/2013 | Payment Adjust 4/2 | $2,918.26 | | $17,948.11 |
| 09/17/2013 | Payment Rec'd  44509 | | $623.01 | $17,325.10 |
| 10/01/2013 | HU ShrdCompCsts | $4,721.52 | | $22,046.62 |
| 10/01/2013 | Payment Rec'd  5/2 | | $2,918.26 | $19,128.36 |
| 10/01/2013 | Payment Rec'd  30/2 | | $1,611.86 | $17,516.50 |
| 10/01/2013 | Payment Adjust 30/2 | $1,611.86 | | $19,128.36 |
| 10/01/2013 | Payment Adjust 5/2 | $2,918.26 | | $22,046.62 |
| 10/15/2013 | Payment Rec'd  44512 | | $850.36 | $21,196.26 |
| 10/23/2013 | Payment Rec'd  44513/cor | | $41.12 | $21,155.14 |
| 11/01/2013 | HU ShrdCompCsts | $4,721.52 | | $25,876.66 |

5

# EXHIBIT "5"

**Sixty Sixty Condominium Assoc.**
**6060 Indian Creek Drive # CU-3**
**Miami Beach FL  33141**

6060 Indian Creek Drive # CU-3

| | |
|---|---|
| Account #: | 00CU-3 |
| Lot/Unit #: | CU-3 |
| Due Date: | 01/01/2018 |
| **Amount Due:** | **$238,388.64** |

| Date | Description | Charges | Credits | Balance |
|---|---|---|---|---|
| 05/31/2013 | Balance Forward | | | |
| 06/01/2013 | HU ShrdCompCsts | $2,161.94 | | $2,161.94 |
| 06/01/2013 | Payment Rec'd  1/3 | | $588.39 | $1,573.55 |
| 06/01/2013 | Payment Adjust 1/3 | $588.39 | | $2,161.94 |
| 07/01/2013 | HU ShrdCompCsts | $2,161.94 | | $4,323.88 |
| 07/01/2013 | Payment Rec'd  2/3 | | $1,336.26 | $2,987.62 |
| 07/01/2013 | Payment Rec'd  27/3 | | $354.33 | $2,633.29 |
| 07/01/2013 | Payment Adjust 27/3 | $354.33 | | $2,987.62 |
| 07/01/2013 | Payment Adjust 2/3 | $1,336.26 | | $4,323.88 |
| 07/19/2013 | Payment Rec'd  44510 | | $429.36 | $3,894.52 |
| 08/01/2013 | HU ShrdCompCsts | $2,161.94 | | $6,056.46 |
| 08/01/2013 | Payment Rec'd  3/3 | | $1,336.26 | $4,720.20 |
| 08/01/2013 | Payment Rec'd  28/3 | | $309.66 | $4,410.54 |
| 08/01/2013 | Payment Adjust 28/3 | $309.66 | | $4,720.20 |
| 08/01/2013 | Payment Adjust 3/3 | $1,336.26 | | $6,056.46 |
| 09/01/2013 | HU ShrdCompCsts | $2,161.94 | | $8,218.40 |
| 09/01/2013 | Payment Rec'd  4/3 | | $1,336.26 | $6,882.14 |
| 09/01/2013 | Payment Rec'd  29/3 | | $281.08 | $6,601.06 |
| 09/01/2013 | Payment Adjust 29/3 | $281.08 | | $6,882.14 |
| 09/01/2013 | Payment Adjust 4/3 | $1,336.26 | | $8,218.40 |
| 09/17/2013 | Payment Rec'd  44509 | | $285.26 | $7,933.14 |
| 10/01/2013 | HU ShrdCompCsts | $2,161.94 | | $10,095.08 |
| 10/01/2013 | Payment Rec'd  5/3 | | $1,336.26 | $8,758.82 |
| 10/01/2013 | Payment Rec'd  30/3 | | $738.06 | $8,020.76 |
| 10/01/2013 | Payment Adjust 30/3 | $738.06 | | $8,758.82 |
| 10/01/2013 | Payment Adjust 5/3 | $1,336.26 | | $10,095.08 |
| 10/15/2013 | Payment Rec'd  44512 | | $389.19 | $9,705.89 |
| 10/23/2013 | Payment Rec'd  44513/cor | | $18.84 | $9,687.05 |
| 11/01/2013 | HU ShrdCompCsts | $2,161.94 | | $11,848.99 |
| 11/01/2013 | Payment Rec'd  6/3 | | $1,336.26 | $10,512.73 |
| 11/01/2013 | Payment Rec'd  31/3 | | $415.96 | $10,096.77 |

6

# EXHIBIT "6"

Sixty Sixty Condominium Assoc.
6060 Indian Creek Drive # CU-4
Miami Beach FL 33141

6060 Indian Creek Drive # CU-4
Account #:    00CU-4
Lot/Unit #:    CU-4
Due Date:    01/01/2018
**Amount Due:**    **$297,299.71**

| Date | Description | Charges | Credits | Balance |
|------|-------------|---------|---------|---------|
| 05/31/2013 | Balance Forward | | | |
| 06/01/2013 | HU ShrdCompCsts | $1,883.61 | | $1,883.61 |
| 06/01/2013 | Payment Rec'd  1/4 | | $549.17 | $1,334.44 |
| 06/01/2013 | Payment Adjust 1/4 | $549.17 | | $1,883.61 |
| 07/01/2013 | HU ShrdCompCsts | $1,883.61 | | $3,767.22 |
| 07/01/2013 | Payment Rec'd  2/4 | | $1,164.20 | $2,603.02 |
| 07/01/2013 | Payment Rec'd  27/4 | | $308.71 | $2,294.31 |
| 07/01/2013 | Payment Adjust 27/4 | $308.71 | | $2,603.02 |
| 07/01/2013 | Payment Adjust 2/4 | $1,164.20 | | $3,767.22 |
| 07/10/2013 | Payment Rec'd  44508 | | $63.28 | $3,703.94 |
| 07/19/2013 | Payment Rec'd  44510 | | $373.88 | $3,330.06 |
| 07/19/2013 | Payment Adjust 44510 | $63.28 | | $3,393.34 |
| 08/01/2013 | HU ShrdCompCsts | $1,883.61 | | $5,276.95 |
| 08/01/2013 | Payment Rec'd  3/4 | | $1,164.20 | $4,112.75 |
| 08/01/2013 | Payment Rec'd  28/4 | | $269.79 | $3,842.96 |
| 08/01/2013 | Payment Adjust 28/4 | $269.79 | | $4,112.75 |
| 08/01/2013 | Payment Adjust 3/4 | $1,164.20 | | $5,276.95 |
| 09/01/2013 | HU ShrdCompCsts | $1,883.61 | | $7,160.56 |
| 09/01/2013 | Payment Rec'd  4/4 | | $1,164.20 | $5,996.36 |
| 09/01/2013 | Payment Rec'd  29/4 | | $244.89 | $5,751.47 |
| 09/01/2013 | Payment Adjust 29/4 | $244.89 | | $5,996.36 |
| 09/01/2013 | Payment Adjust 4/4 | $1,164.20 | | $7,160.56 |
| 09/17/2013 | Payment Rec'd  44509 | | $248.57 | $6,911.99 |
| 10/01/2013 | HU ShrdCompCsts | $1,883.61 | | $8,795.60 |
| 10/01/2013 | Payment Rec'd  5/4 | | $1,164.20 | $7,631.40 |
| 10/01/2013 | Payment Rec'd  30/4 | | $643.04 | $6,988.36 |
| 10/01/2013 | Payment Adjust 30/4 | $643.04 | | $7,631.40 |
| 10/01/2013 | Payment Adjust 5/4 | $1,164.20 | | $8,795.60 |
| 10/15/2013 | Payment Rec'd  44512 | | $339.58 | $8,456.02 |
| 10/23/2013 | Payment Rec'd  44513/cor | | $16.39 | $8,439.63 |
| 11/01/2013 | HU ShrdCompCsts | $1,883.61 | | $10,323.24 |

7

# EXHIBIT "7"

**Sixty Sixty Condo Association**
C/O VESCHIO LAW GROUP LLC
1489 WEST PALMETTO PARK RD
#505
BOCA RATON FL 33486

6060 Indian Creek Drive # 505
Account #:      29100505
Lot/Unit #:      505
Due Date:      01/01/2018
**Amount Due:**      **$160,231.72**

| Date | Description | Charges | Credits | Balance |
|------|-------------|---------|---------|---------|
| 05/31/2013 | Balance Forward | | | $16,997.13 |
| 06/01/2013 | HU ShrdCompCsts | $929.41 | | $17,926.54 |
| 07/01/2013 | HU ShrdCompCsts | $929.41 | | $18,855.95 |
| 07/10/2013 | Payment Rec'd  1606 | | $652.06 | $18,203.89 |
| 07/22/2013 | Attorney Fees | $125.00 | | $18,328.89 |
| 08/01/2013 | HU ShrdCompCsts | $929.41 | | $19,258.30 |
| 08/05/2013 | Payment Rec'd  1634 | | $672.91 | $18,585.39 |
| 09/01/2013 | HU ShrdCompCsts | $929.41 | | $19,514.80 |
| 09/06/2013 | Payment Rec'd  1677 | | $611.35 | $18,903.45 |
| 10/01/2013 | HU ShrdCompCsts | $929.41 | | $19,832.86 |
| 10/07/2013 | Payment Rec'd  1722 | | $698.60 | $19,134.26 |
| 10/24/2013 | Payment Rec'd  1746 | | $980.56 | $18,153.70 |
| 11/01/2013 | HU ShrdCompCsts | $929.41 | | $19,083.11 |
| 12/01/2013 | HU ShrdCompCsts | $929.41 | | $20,012.52 |
| 12/09/2013 | Payment Rec'd  1768 | | $757.52 | $19,255.00 |
| 12/24/2013 | Payment Rec'd  1790 | | $978.56 | $18,276.44 |
| 01/01/2014 | Special Assmnt | $248.04 | | $18,524.48 |
| 01/01/2014 | HU ShrdCompCsts | $904.68 | | $19,429.16 |
| 01/29/2014 | Payment Rec'd  1818 | | $189.31 | $19,239.85 |
| 02/01/2014 | HU ShrdCompCsts | $904.68 | | $20,144.53 |
| 02/01/2014 | Special Assmnt | $248.04 | | $20,392.57 |
| 03/01/2014 | HU ShrdCompCsts | $904.68 | | $21,297.25 |
| 03/01/2014 | Special Assmnt | $248.04 | | $21,545.29 |
| 03/05/2014 | Payment Rec'd  1852 | | $312.00 | $21,233.29 |
| 04/01/2014 | HU ShrdCompCsts | $904.68 | | $22,137.97 |
| 04/01/2014 | Special Assmnt | $248.04 | | $22,386.01 |
| 04/22/2014 | Payment Rec'd  1915 | | $1,198.46 | $21,187.55 |
| 04/22/2014 | Payment Rec'd  1885 | | $428.02 | $20,759.53 |
| 05/01/2014 | HU ShrdCompCsts | $904.68 | | $21,664.21 |
| 05/01/2014 | Special Assmnt | $248.04 | | $21,912.25 |
| 05/23/2014 | Payment Rec'd  1947 | | $1,198.46 | $20,713.79 |

8

# EXHIBIT "E"

2017 Sixty Sixty Operating Budget

| LABOR | Full Time Employee | Part Time Employee | Hours Per Week | Rate | Weekly | Annual | |
|---|---|---|---|---|---|---|---|
| On Site Mgr | 1 | | 40 | na | na | $ 50,000.00 | |
| Adm Assistant | 1 | | 40 | | | $ 42,000.00 | |
| Total Management | 2 | | 80 | | | $ 92,000.00 | |
| | | | | | | | |
| Building Employees | | | | | | | |
| Concierge\Valet | 6 | | 40 | $ 13.00 | $ 3,120.00 | $ 162,240.00 | |
| Front Desk | 1 | | 40 | $ 14.00 | $ 560.00 | $ 29,120.00 | |
| Front Desk | 1 | | 40 | $ 12.00 | $ 480.00 | $ 24,960.00 | |
| Front Desk | 1 | | 40 | $ 12.00 | $ 480.00 | $ 24,960.00 | |
| Front Desk | 1 | | 32 | $ 12.00 | $ 384.00 | $ 19,968.00 | |
| Front Desk | 1 | | 16 | $ 13.00 | $ 208.00 | $ 10,816.00 | |
| Total Front Desk | | | | | $ 5,232.00 | $ 272,064.00 | |
| | | | | | | | |
| Chief Engineer | 1 | | 40 | $ 17.00 | $ 680.00 | $ 35,360.00 | |
| Cleaning\Janitorial | 1 | | 40 | $ 13.00 | $ 520.00 | $ 27,040.00 | |
| Maint | 1 | | 40 | $ 14.00 | $ 560.00 | $ 29,120.00 | |
| TOTAL Maintenance Staff | | | | | | $ 91,520.00 | |
| | | | | | | | |
| Total Labor Cost | | | | | | $ 455,584.00 | |
| Holiday Pay | | | | | | $ 8,465.00 | |
| | | | | | | | |
| TOTAL ALL LABOR | | | | | | $ 464,049.00 | |

| BUILDING EXPENSES | Monthly | Annual |
|---|---|---|
| UTILITIES | | |
| Electric | $ 18,000.00 | $ 216,000.00 |
| Water & Sewer | $ 13,200.00 | $ 158,400.00 |
| Gas Utilities | $ 2,000.00 | $ 24,000.00 |
| Trash Removal | $ 1,200.00 | $ 14,400.00 |
| Internet & Wifi | $ 3,000.00 | $ 36,000.00 |
| Telephone | $ 5,800.00 | $ 69,600.00 |
| | | |
| Total Utilities | $ 43,200.00 | $ 518,400.00 |

| PROFESSIONAL FEES | Monthly | Annual |
|---|---|---|
| Management Fee | $ 2,009.00 | $ 24,108.00 |
| Legal Expense (Budgeted) | $ 54,166.67 | $ 650,000.00 |
| Dues & Subscriptions RDP SYSTEM | $ 287.50 | $ 3,450.00 |
| Total Professional | $ 56,463.17 | $ 677,558.00 |

| CONTRACT SERVICES | Monthly | Annual | | | | | |
|---|---|---|---|---|---|---|---|
| Landscaping | $ 417.00 | $ 5,004.00 | | | | | |
| Interior Plants & Aquarium | $ 1,500.00 | $ 18,000.00 | | | | | |
| Window Cleaning Semi-Annual | $ 1,500.00 | $ 3,000.00 | | | | | |
| Pool\Spa Cleaning Service | $ 400.00 | $ 4,800.00 | | | | | |
| Office Equipment Lease Fax & Copy | $ 450.00 | $ 5,400.00 | | | | | |
| Generator Contract Repair | $ 200.00 | $ 2,400.00 | | | | | |
| Life Safety Equip (Smoke & Fire) | $ 476.00 | $ 5,712.00 | | | | | |
| Building Pest Control | $ 620.00 | $ 7,440.00 | | | | | |
| Employee Uniforms | $ 277.00 | $ 3,324.00 | | | | | |
| HAVC Water Treatment | $ 195.00 | $ 2,340.00 | | | | | |
| HAVC Maintenance & Repairs | $ 3,250.00 | $ 39,000.00 | | | | | |
| Security Service & Cameras | $ 9,000.00 | $ 108,000.00 | | | | | |
| Radio Pager Service | $ 54.00 | $ 648.00 | | | | | |
| Elevator Contract & Repairs | $ 2,500.00 | $ 30,000.00 | | | | | |
| Cable TV Contract | $ 2,600.00 | $ 31,200.00 | | | | | |
| Parking & Valet Damage Reserve | $ 450.00 | $ 5,400.00 | | | | | |
| Crystal Water Co | $ 225.00 | $ 2,700.00 | | | | | |
| Door Locks & Keys Replacement, Maintenance, Repair | $ 115.00 | $ 1,380.00 | | | | | |
| HU Share of CE | $ 45,894.21 | $ 550,730.52 | | | | | |
| **Total Contract Services** | **$ 70,123.21** | **$ 826,478.52** | | | | | |
| | | | | | | | |
| **REPAIRS & MAINTENANCE** | **Monthly** | **Annual** | | | | | |
| Hardware  Supplies | $ 1,200.00 | $ 14,400.00 | | | | | |
| Irrigation | $ 125.00 | $ 1,500.00 | | | | | |
| Cleaning Janitorial Supplies | $ 1,600.00 | $ 19,200.00 | | | | | |
| Paint Supplies | $ 1,200.00 | $ 14,400.00 | | | | | |
| R&M Gen Equipment | $ 208.00 | $ 2,496.00 | | | | | |
| R&M Fire Safety Maint | $ 200.00 | $ 2,400.00 | | | | | |
| R&M Radio\Pagers | $ 83.00 | $ 996.00 | | | | | |
| R&M Gates & Fences | $ 208.00 | $ 2,496.00 | | | | | |
| R&M Exterior | $ 215.00 | $ 2,580.00 | | | | | |
| R&M Interior | $ 215.00 | $ 2,580.00 | | | | | |
| R&M Electrical | $ 150.00 | $ 1,800.00 | | | | | |
| R&M Miss. Equipment | $ 550.00 | $ 6,600.00 | | | | | |
| R&M Misc Supplies | $ 250.00 | $ 3,000.00 | | | | | |
| R&M Building Repairs | $ 450.00 | $ 5,400.00 | | | | | |
| R&M Non Rental Unit Expenses | $ 125.00 | $ 1,500.00 | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| R&M Jacuzzi & Pool Repairs | $ 250.00 | $ 3,000.00 | | | | | |
| R&M Elevator After Hour Charges | $ 350.00 | $ 4,200.00 | | | | | |
| R&M Contigecy | $ 250.00 | $ 3,000.00 | | | | | |
| Tree & Lawn Replacement | $ 250.00 | $ 3,000.00 | | | | | |
| **Total Repair & Maintenance** | **$ 7,879.00** | **$ 94,548.00** | | | | | |
| | | | | | | | |
| **Taxes- Insurance - Reserves** | Monthly | Annaul | | | | | |
| **Building Insurance Coverages** | $ 20,882.08 | $ 250,585.00 | | | | | |
| **Property Taxes** | $ 1,541.67 | $ 18,500.00 | | | | | |
| **Building Reserves** | $ 16,507.33 | $ 198,088.00 | | | | | |
| **TOTAL** | **$ 38,931.08** | **$ 467,173.00** | | | | | |
| | | | | | | | |
| **LOANS & OTHER** | **Total Due** | **Monthly Payment** | **Annual** | **PAY OFF** | | | |
| Debt Consolidation & Operations Loan @18% Interest Only | **$ 1,085,000.00** | $ 16,275.00 | ######### | $ 1,085,000.00 | | | |
| | | | | | | | |
| **TOTAL ANNUAL BUDGET** | **$ 3,243,506.52** | | | | | | |
| | | | | | | | |
| **TOTAL ANNUAL BUDGET Less Reserves** | **$ 3,045,418.52** | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| Unit # | PCT of HU Shared Components | (1)    NEW HU 2017BUDGET AMOUNT | HU Annual Budget Amt | (2)    HU Monthly Budget Amt |
|---|---|---|---|---|
| 501 | 1.0440% | $3,243,506.52 | $33,862.21 | $2,821.85 |
| 502 | 1.0440% | $3,243,506.52 | $33,862.21 | $2,821.85 |
| 503 | 1.0000% | $3,243,506.52 | $32,435.07 | $2,702.92 |
| 504 | 0.8462% | $3,243,506.52 | $27,446.55 | $2,287.21 |
| 505 | 1.0275% | $3,243,506.52 | $33,327.03 | $2,777.25 |
| 506 | 1.0000% | $3,243,506.52 | $32,435.07 | $2,702.92 |
| 507 | 1.0000% | $3,243,506.52 | $32,435.07 | $2,702.92 |
| 508 | 1.0467% | $3,243,506.52 | $33,949.78 | $2,829.15 |
| 601 | 1.0440% | $3,243,506.52 | $33,862.21 | $2,821.85 |
| 602 | 1.0440% | $3,243,506.52 | $33,862.21 | $2,821.85 |
| 603 | 1.0000% | $3,243,506.52 | $32,435.07 | $2,702.92 |
| 604 | 0.8462% | $3,243,506.52 | $27,446.55 | $2,287.21 |
| 605 | 1.0275% | $3,243,506.52 | $33,327.03 | $2,777.25 |
| 606 | 1.0000% | $3,243,506.52 | $32,435.07 | $2,702.92 |
| 607 | 1.0000% | $3,243,506.52 | $32,435.07 | $2,702.92 |
| 608 | 1.0467% | $3,243,506.52 | $33,949.78 | $2,829.15 |
| 701 | 1.0440% | $3,243,506.52 | $33,862.21 | $2,821.85 |
| 702 | 1.0440% | $3,243,506.52 | $33,862.21 | $2,821.85 |
| 703 | 1.0000% | $3,243,506.52 | $32,435.07 | $2,702.92 |
| 704 | 0.8462% | $3,243,506.52 | $27,446.55 | $2,287.21 |
| 705 | 1.0275% | $3,243,506.52 | $33,327.03 | $2,777.25 |
| 706 | 1.0000% | $3,243,506.52 | $32,435.07 | $2,702.92 |
| 707 | 1.0000% | $3,243,506.52 | $32,435.07 | $2,702.92 |
| 708 | 1.0467% | $3,243,506.52 | $33,949.78 | $2,829.15 |
| 801 | 1.0440% | $3,243,506.52 | $33,862.21 | $2,821.85 |
| 802 | 1.0440% | $3,243,506.52 | $33,862.21 | $2,821.85 |
| 803 | 1.0000% | $3,243,506.52 | $32,435.07 | $2,702.92 |
| 804 | 0.8462% | $3,243,506.52 | $27,446.55 | $2,287.21 |
| 805 | 1.0275% | $3,243,506.52 | $33,327.03 | $2,777.25 |
| 806 | 1.0000% | $3,243,506.52 | $32,435.07 | $2,702.92 |
| 807 | 1.0000% | $3,243,506.52 | $32,435.07 | $2,702.92 |
| 808 | 1.0467% | $3,243,506.52 | $33,949.78 | $2,829.15 |
| 901 | 1.0440% | $3,243,506.52 | $33,862.21 | $2,821.85 |

| | | | | |
|---|---|---|---|---|
| 902 | 1.0440% | **$3,243,506.52** | $33,862.21 | **$2,821.85** |
| 903 | 1.0000% | **$3,243,506.52** | $32,435.07 | **$2,702.92** |
| 904 | 0.8462% | **$3,243,506.52** | $27,446.55 | **$2,287.21** |
| 905 | 1.0275% | **$3,243,506.52** | $33,327.03 | **$2,777.25** |
| 906 | 1.0000% | **$3,243,506.52** | $32,435.07 | **$2,702.92** |
| 907 | 1.0000% | **$3,243,506.52** | $32,435.07 | **$2,702.92** |
| 908 | 1.0467% | **$3,243,506.52** | $33,949.78 | **$2,829.15** |
| 1001 | 1.0440% | **$3,243,506.52** | $33,862.21 | **$2,821.85** |
| 1002 | 1.0440% | **$3,243,506.52** | $33,862.21 | **$2,821.85** |
| 1003 | 1.0000% | **$3,243,506.52** | $32,435.07 | **$2,702.92** |
| 1004 | 0.8462% | **$3,243,506.52** | $27,446.55 | **$2,287.21** |
| 1005 | 1.0275% | **$3,243,506.52** | $33,327.03 | **$2,777.25** |
| 1006 | 1.0000% | **$3,243,506.52** | $32,435.07 | **$2,702.92** |
| 1007 | 1.0000% | **$3,243,506.52** | $32,435.07 | **$2,702.92** |
| 1008 | 1.0467% | **$3,243,506.52** | $33,949.78 | **$2,829.15** |
| 1101 | 1.0440% | **$3,243,506.52** | $33,862.21 | **$2,821.85** |
| 1102 | 1.0440% | **$3,243,506.52** | $33,862.21 | **$2,821.85** |
| 1103 | 1.0000% | **$3,243,506.52** | $32,435.07 | **$2,702.92** |
| 1104 | 0.8462% | **$3,243,506.52** | $27,446.55 | **$2,287.21** |
| 1105 | 1.0275% | **$3,243,506.52** | $33,327.03 | **$2,777.25** |
| **1106** | 1.0000% | **$3,243,506.52** | $32,435.07 | **$2,702.92** |
| **1107** | 1.0000% | **$3,243,506.52** | $32,435.07 | **$2,702.92** |
| 1108 | 1.0467% | **$3,243,506.52** | $33,949.78 | **$2,829.15** |
| 1201 | 1.0440% | **$3,243,506.52** | $33,862.21 | **$2,821.85** |
| 1202 | 1.0440% | **$3,243,506.52** | $33,862.21 | **$2,821.85** |
| 1203 | 1.0000% | **$3,243,506.52** | $32,435.07 | **$2,702.92** |
| 1204 | 0.8462% | **$3,243,506.52** | $27,446.55 | **$2,287.21** |
| 1205 | 1.0275% | **$3,243,506.52** | $33,327.03 | **$2,777.25** |
| 1206 | 1.0000% | **$3,243,506.52** | $32,435.07 | **$2,702.92** |
| 1207 | 1.0000% | **$3,243,506.52** | $32,435.07 | **$2,702.92** |
| 1208 | 1.0467% | **$3,243,506.52** | $33,949.78 | **$2,829.15** |
| 1401 | 1.0440% | **$3,243,506.52** | $33,862.21 | **$2,821.85** |
| 1402 | 1.0440% | **$3,243,506.52** | $33,862.21 | **$2,821.85** |
| 1403 | 2.0192% | **$3,243,506.52** | $65,492.88 | **$5,457.74** |
| 1405 | 1.0275% | **$3,243,506.52** | $33,327.03 | **$2,777.25** |
| **1406** | 1.0000% | **$3,243,506.52** | $32,435.07 | **$2,702.92** |
| 1407 | 1.0000% | **$3,243,506.52** | $32,435.07 | **$2,702.92** |

| | | | | |
|---|---|---|---|---|
| 1408 | 1.0467% | **$3,243,506.52** | $33,949.78 | **$2,829.15** |
| 1501 | 1.0440% | **$3,243,506.52** | $33,862.21 | **$2,821.85** |
| 1502 | 1.0440% | **$3,243,506.52** | $33,862.21 | **$2,821.85** |
| 1503 | 2.0192% | **$3,243,506.52** | $65,492.88 | **$5,457.74** |
| 1505 | 1.0275% | **$3,243,506.52** | $33,327.03 | **$2,777.25** |
| 1506 | 1.0000% | **$3,243,506.52** | $32,435.07 | **$2,702.92** |
| 1507 | 1.0000% | **$3,243,506.52** | $32,435.07 | **$2,702.92** |
| 1508 | 1.0467% | **$3,243,506.52** | $33,949.78 | **$2,829.15** |
| 1605 | 0.9560% | **$3,243,506.52** | $31,007.92 | **$2,583.99** |
| 1606 | 1.0055% | **$3,243,506.52** | $32,613.46 | **$2,717.79** |
| 1607 | 0.9615% | **$3,243,506.52** | $31,186.32 | **$2,598.86** |
| 1608 | 1.0357% | **$3,243,506.52** | $33,593.00 | **$2,799.42** |
| CU-1 | 5.9203% | **$3,243,506.52** | $192,025.32 | **$16,002.11** |
| CU-2 | 5.2198% | **$3,243,506.52** | $169,304.55 | **$14,108.71** |
| CU-3 | 2.3901% | **$3,243,506.52** | $77,523.05 | **$6,460.25** |
| CU-4 | 2.0824% | **$3,243,506.52** | $67,542.78 | **$5,628.56** |
| HU | 0.0000% | **$0.00** | $0.00 | **$0.00** |
| | | | | |
| | | | | |
| | | | | |
| Totals | **100%** | | **$3,243,548.69** | **$270,295.72** |
| | | | | **$3,243,548.69** |
| | | | **DIFF** | |
| | | | | |
| | | | | |

6

# EXHIBIT "F"

2018 Shared Component Budget Worksheet

| Budget Item | Prior Exp Factors | PCT ADJ | Proposed Budget | Notes | | |
|---|---|---|---|---|---|---|
| Total All Labor | $464,094.00 | 1.03 | $478,016.82 | Estimated 3% Increase | | |
| Total Utilities | $518,400.00 | 1.25 | $648,000.00 | Estimated 25% Increase due to increased occupancy | | |
| Professional Fees | $677,558.00 | 0.5 | $338,779.00 | Reduced due to end of litigation estimated to be no later than 2/1/2018 | | |
| Contract Services | $826,478.52 | 1.1 | $909,126.37 | Estimated 10% increase plus reinstitute old services including Security | | |
| Repairs & Maintenance | $94,548.00 | 1.12 | $105,893.76 | Estimated 12% increase as doing new work in-house to save the cost of outside contractors | | |
| Taxes | $18,500.00 | 1 | $18,500.00 | Same as last year | | |
| Building Reserves | $198,088.00 | 1 | $198,088.00 | Same as last year - Never funded by owners | | |
| APO Loan Payments | $398,399.57 | 1 | $398,399.57 | APO Operational Loan Payments from Year End 2017 final balance | | |
| | | | 0 | | | |
| Estimated Delinquent Owner Deficit | $3,196,066.00 | 0.2 | $639,213.20 | From Owners foreclosed upon or who refused to pay   Estimated deficit = 20% of the prior budget amount | | |
| | | | | | | |
| 2018 Total Annual Budget | | | $3,734,016.72 | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| Unit # | PCT of HU Shared Components | (1) NEW HU 2017 BUDGET AMOUNT | HU Annual Budget Amt | (2) HU Monthly Budget Amt |
|---|---|---|---|---|
| 501 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 502 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 503 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 504 | 0.8462% | $3,734,016.72 | $31,597.25 | $2,633.10 |
| 505 | 1.0275% | $3,734,016.72 | $38,367.02 | $3,197.25 |
| 506 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 507 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 508 | 1.0467% | $3,734,016.72 | $39,083.95 | $3,257.00 |
| 601 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 602 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 603 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 604 | 0.8462% | $3,734,016.72 | $31,597.25 | $2,633.10 |
| 605 | 1.0275% | $3,734,016.72 | $38,367.02 | $3,197.25 |
| 606 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 607 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 608 | 1.0467% | $3,734,016.72 | $39,083.95 | $3,257.00 |
| 701 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 702 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 703 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 704 | 0.8462% | $3,734,016.72 | $31,597.25 | $2,633.10 |
| 705 | 1.0275% | $3,734,016.72 | $38,367.02 | $3,197.25 |
| 706 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 707 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 708 | 1.0467% | $3,734,016.72 | $39,083.95 | $3,257.00 |
| 801 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 802 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 803 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 804 | 0.8462% | $3,734,016.72 | $31,597.25 | $2,633.10 |
| 805 | 1.0275% | $3,734,016.72 | $38,367.02 | $3,197.25 |
| 806 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 807 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 808 | 1.0467% | $3,734,016.72 | $39,083.95 | $3,257.00 |
| 901 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 902 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 903 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 904 | 0.8462% | $3,734,016.72 | $31,597.25 | $2,633.10 |
| 905 | 1.0275% | $3,734,016.72 | $38,367.02 | $3,197.25 |
| 906 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 907 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 908 | 1.0467% | $3,734,016.72 | $39,083.95 | $3,257.00 |
| 1001 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 1002 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 1003 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 1004 | 0.8462% | $3,734,016.72 | $31,597.25 | $2,633.10 |
| 1005 | 1.0275% | $3,734,016.72 | $38,367.02 | $3,197.25 |
| 1006 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 1007 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 1008 | 1.0467% | $3,734,016.72 | $39,083.95 | $3,257.00 |
| 1101 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 1102 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 1103 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 1104 | 0.8462% | $3,734,016.72 | $31,597.25 | $2,633.10 |
| 1105 | 1.0275% | $3,734,016.72 | $38,367.02 | $3,197.25 |
| 1106 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 1107 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 1108 | 1.0467% | $3,734,016.72 | $39,083.95 | $3,257.00 |
| 1201 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 1202 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 1203 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 1204 | 0.8462% | $3,734,016.72 | $31,597.25 | $2,633.10 |
| 1205 | 1.0275% | $3,734,016.72 | $38,367.02 | $3,197.25 |
| 1206 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 1207 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 1208 | 1.0467% | $3,734,016.72 | $39,083.95 | $3,257.00 |
| 1401 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 1402 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 1403 | 2.0192% | $3,734,016.72 | $75,397.27 | $6,283.11 |
| 1405 | 1.0275% | $3,734,016.72 | $38,367.02 | $3,197.25 |
| 1406 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 1407 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 1408 | 1.0467% | $3,734,016.72 | $39,083.95 | $3,257.00 |
| 1501 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 1502 | 1.0440% | $3,734,016.72 | $38,983.13 | $3,248.59 |
| 1503 | 2.0192% | $3,734,016.72 | $75,397.27 | $6,283.11 |
| 1505 | 1.0275% | $3,734,016.72 | $38,367.02 | $3,197.25 |
| 1506 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 1507 | 1.0000% | $3,734,016.72 | $37,340.17 | $3,111.68 |
| 1508 | 1.0467% | $3,734,016.72 | $39,083.95 | $3,257.00 |
| 1605 | 0.9560% | $3,734,016.72 | $35,697.20 | $2,974.77 |
| 1606 | 1.0055% | $3,734,016.72 | $37,545.54 | $3,128.79 |
| 1607 | 0.9615% | $3,734,016.72 | $35,902.57 | $2,991.88 |
| 1608 | 1.0357% | $3,734,016.72 | $38,673.21 | $3,222.77 |
| CU-1 | 5.9203% | $3,734,016.72 | $221,064.99 | $18,422.08 |
| CU-2 | 5.2198% | $3,734,016.72 | $194,908.20 | $16,242.35 |
| CU-3 | 2.3901% | $3,734,016.72 | $89,246.73 | $7,437.23 |
| CU-4 | 2.0824% | $3,734,016.72 | $77,757.16 | $6,479.76 |
| HU | 0.0000% | $0.00 | $0.00 | $0.00 |
| | | | | |
| | | | | |
| Totals | 100% | | $3,734,065.26 | $311,172.11 |
| | | | | $3,734,065.26 |
| | | | DIFF | |

# EXHIBIT "G"

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY,
FLORIDA

SIXTY SIXTY CONDOMINIUM
ASSOCIATION, INC., etc,

       Plaintiff,

v.

OPTIMA HOSPITALITY, LLC, etc.,

       Defendant.

_____/

CASE NO.: 11-21320 CA 13

OPTIMA HOSPITALITY, LLC, etc.,

       Counter-Plaintiff,

v.

SIXTY SIXTY CONDOMINIUM
ASSOCIATION, INC., etc.,

       Counter-Defendant.

_____/

OPTIMA HOSPITALITY, LLC, etc.,

       Third-Party Plaintiff,

v.

YENVY TRUONG, et al.,

       Third-Party Defendants.

_____/

## ORDER ON PLAINTIFF/COUNTER DEFENDANT, SIXTY SIXTY CONDOMINIUM ASSOCIATION'S, AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNTS I, II, & V OF ITS COMPLAINT AND ON DEFENDANT/COUNTER-PLAINTIFF, OPTIMA'S, CROSS-MOTION FOR SUMMARY JUDGMENT ON COUNTS I & II OF SIXTY SIXTY'S COMPLAINT

1

THIS CAUSE having come on to be heard on April 9, 2012, at 10:30 A.M., on Plaintiff/Counter-Defendant, SIXTY SIXTY CONDOMINIUM ASSOCIATION, INC.'s ("ASSOCIATION") Amended Motion for Partial Summary Judgment As To Counts I, II, & V of its Complaint ("ASSOCIATION's MSJ") and Defendant/Counter-Plaintiff, OPTIMA HOSPITALITY, LLC A/K/A OPTIMA HOSPITALITY ASSOCIATES, LLC ("OPTIMA"), Cross-Motion for Summary Judgment on Counts I & II of Sixty Sixty's Complaint ("OPTIMA's Cross-MSJ"), and the Court having heard arguments of counsel, and being otherwise advised in the premises, it is hereupon

**ORDERED AND ADJUDGED** as follows:

1.      The Court finds that the Sixty Sixty Condominium is a commercial condominium and not a mixed-use condominium pursuant to F.S. §718.103(23) and *Daytona Beach Club Condo Ass'n, Inc. v. Miller*, Arb. Case No. 2007-03-6407, Final Order of Dismissal (September 19, 2007). This finding is made with full knowledge of the pleadings by Optima.

2.      Plaintiff, ASSOCIATION's, MSJ on Counts I, II and V of Plaintiff's Complaint are Denied in their entirety.

3.      OPTIMA's Cross-MSJ on Count I of Plaintiff ASSOCIATION's Complaint is Denied.

4.      OPTIMA's Cross-MSJ on Count II of Plaintiff ASSOCIATION's Complaint is Granted in favor of OPTIMA as to the following issues:

> a) The ASSOCIATION's claim that the Condominium Declaration improperly shifts the obligation for payment of Common Expenses;
>
> b) The ASSOCIATION's claim that the Condominium Declaration improperly grants OPTIMA the right and authority to veto amendments to the ASSOCIATION's Declaration of Condominium; and

2

SCH02632

c) The ASSOCIATION's claim that the Condominium Declaration improperly grants OPTIMA the right and authority to charge "Shared Costs" as consideration for the easement provided under Section 3.4(e) of the Condominium Declaration.

5.    All of the parties' objections made at the hearing, and all other claims and defenses, are preserved.

**DONE AND ORDERED** in Chambers at Miami, Miami-Dade County, Florida, this _____ day of May, 2012.

CONFORMED COPY

MAY 30 2012

_____

HONORABLE GARY FARWICK
Circuit Court Judge

**Copies furnished to:**
All Counsel of Record

3

SCH02633

# EXHIBIT "H"

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT, IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 2015-019981 CA 01

SIXTY SIXTY CONDOMINIUM
ASSOCIATION, INC.,
A Florida corporation,

vs.

CONDOMINIUM HOTEL MANAGEMENT
CORPORATION, INC., a Florida corporation,
et al.,

     Defendants.

_____/

## MEDIATION SETTLEMENT AGREEMENT

     The undersigned parties, SIXTY SIXTY CONDOMINIUM ASSOCIATION, INC. ("Association"), CONDOMINIUM HOTEL MANAGEMENT CORPORATION, INC. ("CHMC"), and SCHECHER GROUP, INC. ("SGI"), having mediated on March 8, 2016 with ROBERT A. DULBERG, Certified Mediator, hereby agree to the following in full and final settlement of the above captioned matter:

1.    Association agrees to file a voluntary dismissal of the pending lawsuit, without prejudice, as to CHMC and SGI, with each side to bear its respective attorneys' fees and costs. Association further agrees to voluntarily dismiss its action against A1 FIRE & SECURITY, LLC ("A1") without prejudice, provided however, that the dismissal against A1 shall be conditioned upon A1's agreement that each party shall bear their respective fees and costs in this litigation.

2.    Association agrees to hold an annual meeting within ninety (90) days and to provide appropriate notice as required by the Declaration.

3.    Association agrees to provide written notice to unit owners advising of this Mediation Settlement Agreement, and more specifically, to urge all unit owners to become current in their monthly maintenance fees.

4.    SGI, CHMC and Association agree to cooperate with going after delinquent accounts of unit owners, and institute foreclosure proceedings if necessary.

SCH01518

5.  Upon dismissal of SGI and CHMC from the pending lawsuit, as set forth in Paragraph 1 above, and with regard to the Emergency Special Assessments in the amount of $375,000.00 from 2015 and $975,860.46 from 2016, as previously imposed, SGI agrees to provide an option for a payment plan with each unit owner who is current with their monthly maintenance fees and the 2014 special assessment. Such payment plan will be based upon the unit owner's prior payment history, ability to pay, and the amount in arrears. SGI and CHMC agree to utilize the funds that are obtained, and to utilize their best efforts to reopen the building which is the subject of this lawsuit as soon as possible, which will include the payment of City of Miami Beach fines and costs for obtaining an occupational license.

6.  SGI agrees to provide to the Board of Directors of the Association a monthly accounting of shared costs and common expenses and profit and loss statement no later than the 20th day of each month.

7.  SGI and CHMC agree to prosecute the claim against A1 within one (1) year from the date of notice of voluntary dismissal.


Dated: March 8, 2016

_____          _____
Plaintiff                                Defendant SGI
By: Maria Velez, President               By: Richard Schecher

_____          _____
Counsel for Plaintiff                    CHMC
                                         By: Mirko Morales

                                         _____
                                         Counsel for Defendants SGI and CHMC